## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROY COCKRUM, SCOTT COMER, and    )
ERIC SCHOENBERG, c/o United to Protect    )
Democracy, 2020 Pennsylvania Ave. NW,    )
#163, Washington, DC 20006,    )
   )
      Plaintiffs,    )
   )
      v.    )  Civil Action No. 1:17-cv-1370
   )
DONALD J. TRUMP FOR PRESIDENT,    )
INC., 725 Fifth Ave., New York, NY 10022;    )
and ROGER STONE, 2524 Bayview Dr.,    )
Fort Lauderdale, FL 33305,    )
   )
      Defendants.    )
   )

## COMPLAINT

## INTRODUCTION AND SUMMARY

1.      Plaintiffs bring this suit to recover for injuries that they suffered when their stolen private information was published to the entire world during the 2016 presidential campaign.

2.      Plaintiffs are all private American citizens.  Until last year, Plaintiffs were unknown to the general American public.  At the time that their private information was published, none was a public official or public figure.  None was a candidate for public office.  None was a high-ranking campaign official or close personal advisor of a presidential candidate.  None expected that his private information would be shared with the world.

3.      Roy Cockrum is a former Episcopal monk.  He left the brotherhood in 2007 to care for his ailing parents.  In 2014, he won the Tennessee Powerball lottery and decided to give away the bulk of his winnings.  In 2016, his belief in maintaining an open and inclusive

society led him to donate to multiple candidates for public office and state Democratic parties, as well as to the Democratic National Committee ("DNC").

4.     Eric Schoenberg is a successful businessman who served as a Foreign Service Officer during the Reagan Administration.  At different times, he has been registered to vote as a Republican and as a Democrat.  In the 2016 election cycle, he contributed to the DNC.

5.     Scott Comer is a former mid-level staffer for the DNC.  A childhood trip to Washington left him in awe of American democracy in action and led him to work for political candidates and causes he believed in.  In 2011, he came out as gay to his mother and close friends.  But he did not tell his grandparents, because he knew that they viewed homosexuality as inconsistent with their deeply held religious beliefs.  For the next five years, he kept his sexual orientation from his grandparents so as not to upset them or disrupt his relationship with them, which he cherished.

6.     Defendants are Donald J. Trump for President, Inc. (the "Trump Campaign") and Roger Stone, an individual who was at various times employed by the Trump Campaign, or otherwise acting as its agent, but who was at all relevant times engaged in supporting its objectives.

7.     On one or more occasions before the summer of 2016, computer hackers working on behalf of the Russian government hacked into the email systems of the DNC in the District of Columbia and obtained voluminous amounts of data, including emails and other documents sent to and from thousands of individuals.  Some of those individuals were staff members of the DNC; some were donors; and some were other supporters, members of the media, or other private citizens.

8.      Among the materials obtained by the hackers were Mr. Comer's emails; Mr. Schoenberg's and his wife's social security numbers, dates of birth, home address, phone number, and banking relationships; and Mr. Cockrum's social security number, date of birth, address, and phone number.

9.      As the United States government has reported, the Russian government sought to use the information it had stolen from the DNC as part of a deliberate campaign to interfere in the U.S. election and tilt its outcome in favor of Donald Trump.

10.     On information and belief, to increase the utility of its hacking activity, Russia typically consults domestic political actors who act as Russia's partners to decide which extracted information to publish, how to time the release of the stolen information, and how to disseminate it in a way to maximize the political impact.

11.     Multiple agents of the Trump Campaign have long-standing financial connections and relationships with Russian individuals and entities, including several close to the Russian President and government.  On information and belief, trading on those connections and seeking to maximize the impact of the hacked materials, those in control of the hacked materials consulted with Defendants to better understand how the hacked materials could be used to greatest political effect.

12.     Agents of the Trump Campaign met with Russian officials on numerous occasions during the spring and summer of 2016.  On at least one occasion, senior Trump Campaign officials met with a Kremlin-connected lawyer, after being informed in an email that the meeting concerned information gathered as part of a Russian government effort to aid the Trump Campaign.  According to email correspondence regarding the meeting made public on Donald Trump Jr.'s Twitter account, rather than avoiding coordination with a foreign

government that was attempting to interfere in a U.S. election, Trump Jr. responded over email: "If it's what you say I love it especially later in the summer."

13.     On information and belief, and consistent with Defendants' apparent willingness to coordinate with Russian operatives to benefit their campaign, Defendants entered into an agreement with other parties, including agents of Russia and WikiLeaks, to have information stolen from the DNC publicly disseminated in a strategic way that would benefit the campaign to elect Mr. Trump as President (the "conspiracy").

14.     On information and belief, Defendants, in turn, provided benefits to the Russian government by making certain concessions important to Russia's national interests, including intervening in the drafting of the Republican Party platform to protect Russian interests.

15.     Defendants have provided other benefits to Russia, including a shift in Republican Party and U.S. priorities regarding NATO, efforts to lift or weaken U.S. sanctions on Russia, and a generally positive communications posture toward Russia to improve its image among Americans.

16.     On information and belief, in furtherance of this conspiracy, Defendants and those they conspired with arranged for the hacked information to be provided to WikiLeaks, which published it on July 22, 2016 and thereafter.  In particular, the DNC finance team's emails were singled out for publication, which had the direct and foreseeable consequence of intimidating and deterring existing donors from further supporting the DNC's financial efforts.  This effort also had the direct and foreseeable consequence of intimidating and deterring existing or potential donors from communicating with Mr. Comer or others at the DNC to support the Democratic Party's candidate for President; and it had the direct and foreseeable consequence of intimidating and deterring Mr. Comer from using email to advocate the election of his preferred candidate for

the Presidency, for fear that his communications would be publicly disclosed.  As a result of the

conspiracy, all of the Plaintiffs suffered substantial harm—set forth in detail below—on account

of their support for a particular candidate for President.

17.     As a result of the publication of hacked information pursuant to the conspiracy,

Mr. Cockrum's social security number, address, and phone number were published to the world

and remain permanently available to anyone with access to the Internet.  As a result, Mr.

Cockrum has seen multiple strangers attempt to obtain credit in his name, and at least one of

these attempts was successful.  Each new attempt requires a new round of extensive

communications with creditors and credit agencies in an effort to prevent substantial financial

loss.  These circumstances have led to significant distress and anxiety and will require lifelong

vigilance and expense.  In addition, Mr. Cockrum has been chilled in the extent to which he

supports and contributes to political campaigns.

18.     Mr. Schoenberg's and his wife's social security numbers, address, phone number,

and banking relationships were published to the world and remain permanently available to

anyone with access to the Internet.  As a result, Mr. Schoenberg's identity was stolen and his

information used in fraudulent attempts to get credit cards.  In one instance, two new credit cards

arrived together at his home—one in his wife's name, and the other in the name of an unknown

woman.  To this day, Mr. Schoenberg remains concerned that his and his family's credit and

financial information are permanently in jeopardy.  These circumstances led to significant

distress and anxiety and will require lifelong vigilance and expense.

19.     Thousands of Mr. Comer's emails were published to the world and remain

available to anyone with access to the Internet.  These emails included information about

conflicts with coworkers and collaborators, health information, and details from which his

grandparents deduced his sexual orientation.  These revelations strained relationships with family and friends and ended some of Mr. Comer's relationships altogether.  Because his emails were disclosed, Mr. Comer received phone calls threatening violence, some calling him "faggot." These circumstances led to severe emotional distress, anxiety, depression, and associated costs for medical care.  In addition, Mr. Comer has felt intimidated regarding how he communicates with others in his advocacy for candidates for federal office out of a fear that his communications will be publicly disclosed.

20.     None of the private information about Plaintiffs described above that was disclosed was newsworthy or involved any public policy matter at issue in the campaign.

21.     The publication of Plaintiffs' private information caused each of them concrete and tangible injuries.

22.     On information and belief, ever since and in furtherance of the conspiracy, Defendants and their coconspirators have taken efforts to hide evidence of their coordination. Associates of the Defendants have repeatedly shifted their explanations of the reasons and process for revising a proposed amendment to the Republican Party platform in a Russia-friendly direction.  Agents of the Trump Campaign, including close advisor and then-Senator Jeff Sessions and Mr. Trump's son-in-law Jared Kushner, have failed to disclose on security clearance forms and in sworn testimony a series of meetings they held with top Russian officials during the campaign and the transition.  Trump Jr. has provided inconsistent accounts of his meeting with a Russian government-linked attorney, whom he agreed to meet on the understanding that she would cooperate with his efforts to damage the Clinton campaign, even though he was informed (according to emails released on his Twitter account) that the meeting

was "part of Russia and its government's support for Mr. Trump."  Campaign advisor Michael

Flynn failed to properly report contractual arrangements and interactions with Russian entities.

23.     On information and belief, in furtherance of the conspiracy, Defendants have

publicly denied or dismissed Russia's role in the hacking, seeking to absolve Russia of any

accountability for its actions to harm Plaintiffs and interfere in the U.S. election. Mr. Trump

himself, who benefitted the most from this conspiracy, has repeatedly denied personal

relationships with Russia that he had previously admitted, and has sought to discredit reporting

on the underlying events discussed in this Complaint and to block attempts to investigate those

events, including by firing the lead investigator looking into the affair, former FBI Director

James Comey.  On July 7, 2017, President Trump met with President Putin and reportedly

accepted Mr. Putin's assertion that Russia did not interfere in the U.S. election and agreed with

Mr. Putin that any remaining focus on allegations of Russian meddling in the 2016 U.S. election

was a hindrance and that the two countries should move on from the issue.

24.     Defendants' conduct violated Plaintiffs' privacy rights under D.C. law.

Defendants aided and assisted each other in violation of these rights and conspired with one

another and with others known and unknown to commit this violation.  While one of the objects

of the conspiracy was to harm the Democratic Party's candidate for President of the United

States and improve the Trump Campaign's likelihood of success, the direct victims included Mr.

Cockrum, Mr. Schoenberg, and Mr. Comer.

25.     In addition, Defendants' conspiratorial conduct intimidated Plaintiffs and others

in a manner that could prevent them "from giving [their] support or advocacy in a legal manner,

toward or in favor of the election of [a] lawfully qualified person as an elector for President," and

injured Plaintiffs' person and property "on account of such support or advocacy," all in violation of 42 U.S.C. § 1985(3).

26.     Plaintiffs bring this suit to seek accountability and redress for the harms that they suffered from the release of their personal information, and to help prevent such harms from ever befalling anyone else.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

28.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.

29.     This Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

30.     Venue in this case is proper under 28 U.S.C. § 1391.  The DNC is headquartered in the District.  Mr. Comer was employed by the DNC, and all of the published emails were sent to or from and resided on the DNC's servers, were maintained by the DNC, and were hacked from those servers.  Moreover, Plaintiffs' private information was published across the world, including in this District.  Plaintiffs suffered injury in this District.

## PARTIES

31.     Mr. Cockrum contributed to the DNC during the 2016 campaign.  Mr. Cockrum joined The Society of St. John the Evangelist, an Episcopal Monastery, after the terrorist attacks of September 11, 2001.  He left the Monastery several years later to care for his elderly parents in Tennessee, where he won the Tennessee Powerball lottery and began a new career as a philanthropist.  He is a resident of the State of Tennessee.

32.     Mr. Schoenberg contributed to the DNC during the 2016 campaign.  Mr. Schoenberg has served as a Foreign Service Officer, held executive positions with an investment-banking firm, and is now Chairman of a technology services firm.  He is a resident of the State of New Jersey.

33.     Mr. Comer is a former employee of the DNC, where he worked as the Finance Office's Chief of Staff between April 2015 and October 2016.  Mr. Comer grew up in Tennessee, attended college at George Washington University and the University of Maryland, and has been working for Democratic candidates and advocacy organizations ever since in fulfillment of career goals formulated when his father took him to visit the nation's capital as an 11-year-old boy.  He is a resident of the State of Maryland.

34.     Defendant Donald J. Trump for President, Inc. (the "Trump Campaign"), is a Virginia corporation with headquarters in New York, New York.  Its purpose during the times relevant to this complaint was to elect Donald J. Trump to the presidency.  During the times relevant to this complaint, the chairman of the Trump Campaign was Paul Manafort, previously a lobbyist for Russian-linked entities.  Michael Flynn and Carter Page served as foreign policy advisors to the campaign during the relevant period.  Jeff Sessions was the chair of the campaign's national security advisory committee.  Jared Kushner is Mr. Trump's son-in-law and was a close advisor to Mr. Trump during the campaign.  Donald Trump Jr. is Mr. Trump's son and was also an agent of the campaign.

35.     Defendant Roger Stone is a lobbyist and political strategist who has referred to himself proudly as "a brand name when it comes to dirty tricks."  In 1979, Stone met Trump through the lawyer Roy Cohn, who mentored both Stone and Trump.  Stone and Trump have been friends and business associates ever since.  Stone began urging Trump to run for President

in 1987 and helped lead Trump's presidential campaign on the Reform Party ticket in 1999.  He

again urged Trump to run for President in 2016 and was intimately involved as an advisor to

Trump and the Trump Campaign during that election campaign.  He ostensibly left official

employment with the Trump Campaign in August 2015.  Stone continued to play an important

role in the Trump Campaign as agent and advisor even after his alleged departure, and he

remained in regular contact with Trump throughout the campaign.  In early 2016, Stone helped

arrange for his longtime friend and former business partner Manafort to become chairman of the

Trump Campaign.  He has consulted on political strategy around the world, including in Ukraine.

*The New York Times* has reported that "His ties to Russia are now under scrutiny by the F.B.I."

Stone is a resident of the State of Florida.

## <u>FACTUAL ALLEGATIONS</u>

I.      **Plaintiffs' Private Information Was Shared With the World, Causing Plaintiffs
        Substantial Harms**

      A.      <u>Emails Containing Plaintiffs' Private Information Were Disseminated on the
        Internet</u>

      36.     On July 22, 2016, WikiLeaks posted thousands of private emails on the Internet.

These emails were made available to anybody in the world with access to a web browser.

According to the WikiLeaks website:

> Starting on Friday 22 July 2016 at 10:30am EDT, WikiLeaks released over 2
> publications 44,053 emails and 17,761 attachments from the top of the US
> Democratic National Committee -- part one of our new Hillary Leaks series. The
> leaks come from the accounts of seven key figures in the DNC: Communications
> Director Luis Miranda (10520 emails), National Finance Director Jordon [sic]
> Kaplan (3799 emails), Finance Chief of Staff Scott Comer (3095 emails), Finance
> Director of Data & Strategic Initiatives Daniel Parrish (1742 emails), Finance
> Director Allen Zachary (1611 emails), Senior Advisor Andrew Wright (938
> emails) and Northern California Finance Director Robert (Erik) Stowe (751
> emails). The emails cover the period from January last year until 25 May this
> year.

37.     Emails containing private information belonging to each of the Plaintiffs—and many others—were included in the information published by WikiLeaks beginning on July 22, 2016.  These private details revealed personally identifying information, such as social security numbers, dates of birth, home addresses, cell phone numbers, and bank account details; personal health information ranging from doctor's appointments to life-threatening illnesses; information about conflicts with co-workers, collaborators, friends, and family members; their sexual orientation and/or information about romantic relationships; and myriad private details about their day-to-day experiences that were never intended for publication to the Internet for the whole world to see.

38.     The emails containing Plaintiffs' private information remain on the Internet to this day.  They are publicly searchable through the WikiLeaks site, allowing anybody to type an individual's name in order to browse emails to, from, or about that person.  Plaintiffs' social security numbers, and those of dozens of other potential identity theft victims, are available to the world.

39.     Plaintiffs are illustrative of dozens of American citizens whose lives were directly affected when this information was hacked and published on the Internet.  Because so many of the published emails came from the DNC's finance team, countless donors and prospective donors to the DNC had their private information, financial information, and communications published.

40.     Before their publication beginning on July 22, 2016, none of the Plaintiffs' private emails had been posted on the Internet or made available to the public.  Before the publication beginning on July 22, 2016, none of the Plaintiffs' social security numbers had been posted on the Internet.

41.     The published emails were not curated or redacted to remove private facts about Plaintiffs.

42.     The published emails contained detailed private factual information concerning each Plaintiff, including the following:

43.     Mr. Cockrum's social security number, date of birth, address, and other personally identifying information appeared in the leaked emails.  Mr. Cockrum was required to provide most of this information in order to obtain Secret Service clearance to attend an event with President Obama.  Mr. Cockrum's private information remains on the Internet to this day.

44.     Mr. Schoenberg's and his wife's social security number, dates of birth, address, banking relationships, and other personally identifying information appeared in the leaked emails.  Mr. Schoenberg was required to provide this information to obtain Secret Service clearance to attend an event with President Obama.  Mr. Schoenberg's private information remains on the Internet to this day.

45.     The publication of DNC emails in general received coverage in Mr. Comer's hometown newspaper, and his family members—including his grandparents—searched for and read emails to, from, and about him, including emails suggesting that Mr. Comer is gay.  Until publication of his emails on WikiLeaks, Mr. Comer was not openly gay with his grandparents and several other members of his close-knit family.  These emails revealed his sexuality to family members with whom he had decided not to share this facet of his life and in a manner he never would have chosen.  Realizing that his grandparents would learn that he was gay caused instantaneous and intense distress, and knowing that they learned in this way continues to cause great sadness.  This revelation and discussion of other private details about his life and work caused immediate and lasting strain on family relations.

46.     Mr. Comer also had private medical information disseminated.  A May 17, 2016 email from Mr. Comer to his boss graphically describes his work while suffering from a virus.

B.     <u>The Private Information Disseminated About Plaintiffs Was of No Legitimate Concern to the Public</u>

47.     Plaintiffs were private Americans who did not hold and have not sought political office.

48.     Some information dumped by WikiLeaks was the subject of news reporting and some political controversy.  But much of the information published, including sensitive private facts related to the Plaintiffs, was not the subject of news reporting or public interest but was nevertheless made available for the whole world to see.

49.     The published information about Plaintiffs on topics such as sexual orientation, medical conditions, private relationships, social security numbers, and personal financial information was not of any relevance to the political campaign or at all newsworthy.

50.     There is no legitimate public concern in these intimate details about private individuals' personal relationships with family and friends.

51.     There is no legitimate public concern in Plaintiffs' medical information.

52.     There is no legitimate public concern in Plaintiffs' personally identifying information such as banking information, social security numbers, and home addresses.

C.     <u>Plaintiffs Suffered Concrete and Tangible Harms From the Publication of Their Private Information, Including Injuries to Their Person and Property</u>

53.     The publication of the private facts caused the Plaintiffs to suffer greatly, as would any reasonable person who had such private details about their personal life published with fanfare on the Internet.

54.     Shortly after the DNC emails were published on WikiLeaks, Mr. Cockrum learned that his social security number and other personally identifying information were available online for the world to see.

55.     Immediately thereafter, and ever since, Mr. Cockrum has received notices of strangers attempting to obtain credit in his name, some successfully.

56.     After his personal information was published, Mr. Cockrum feared identity theft—and worse—so he directed his personal assistant to take extra precautions when admitting visitors to his office and speaking with strangers on the phone.

57.     He continues to experience anxiety over actual and potential future identity theft, and especially the ability of sophisticated hackers to gain access to his personal or business financial accounts.  He feels that protecting himself, his family, and his philanthropy will require extreme vigilance with no end in sight.

58.     Shortly after publication of DNC emails on WikiLeaks, Mr. Schoenberg learned that his and his wife's social security numbers, dates of birth, home address, phone numbers, banking relationships, and other personally identifying information had been broadcast to the world.

59.     As a result of the mass publication of this private information, Mr. Schoenberg began getting phone calls and letters about fraudulent applications for credit in his and his wife's name.  One such application resulted in issuance of a credit card on a new account shared between his wife and a stranger.

60.     He has been required to spend countless hours speaking with creditors and other financial and reporting institutions to rectify the problems caused by the disclosure of his social security number.

61.     He continues to experience anxiety and fear over potential future identity theft, and especially the ability of sophisticated hackers to gain access to his financial accounts using personally identifying information that is now readily available online.  Even if his social security number is removed from the WikiLeaks archive available online, he will forever be concerned that it has now been substantially disseminated among criminal enterprises.  He fears that these risks to his and his family's financial security will never go away.

62.     Mr. Comer's sexual orientation was disclosed to grandparents for whom he cares deeply, but who do not approve of homosexuality—and with whom he was not prepared to discuss this aspect of his life.  He had grown up visiting with them often and continued to have a close relationship with them into adulthood; but he feared that being open with them about his homosexuality would threaten whatever years he has left with them.  This relationship is now tested by a tension Mr. Comer had worked hard to prevent.

63.     The emotional toll caused by publication of his private emails also brought an end to a long-term romantic relationship that Mr. Comer believes would have remained strong today, but for the publication of his private information.

64.     Mr. Comer's working environment deteriorated rapidly after his emails' release. He perceived that his counterparts in the Hillary Clinton campaign viewed him as damaged goods.  He was marginalized and isolated by his colleagues and saw a major event that he eagerly anticipated leading taken away from him and given to other staff in the wake of the WikiLeaks posting.

65.     Not only did Mr. Comer see his working relationships and professional reputation suffer, but he suffered broader reputational harm as well.  Emails taken out of context in which he made colloquial references about other gay individuals to friends who understood that those

references were made without animus or disrespect generated press reports labeling Mr. Comer as homophobic and racist. Mr. Comer's deep commitment to civil rights made these allegations predictably and particularly painful, and they also risked damage to his reputation in the advocacy community.

66.     After being marginalized at work as a result of the publication of his hacked emails, Mr. Comer determined that he was required to leave his job, leading to lost wages.

67.     Mr. Comer received constant harassing phone calls—as many as 20 per day—for several weeks in the aftermath of the publication of his emails. While the quantity of hostile messages tapered over time, they did not stop for months, and this experience still impacts his comfort in communicating over the phone. Many of the callers threatened violence and used vile language, calling him "a faggot," wishing he would "fucking die," or saying "the world would be better off if [he] were dead." This barrage of insults and threats made him feel like a pariah.

68.     Mr. Comer also experienced significant emotional distress, including anxiety and depression. He has incurred and continues to incur substantial medical expenses for treatment for distress caused by the Defendants and their co-conspirators.

69.     The injuries suffered by all three Plaintiffs were the result of their having taken steps to advocate for and support a candidate for President—steps for which, as a result of this conspiracy, they were punished.

## II.     The Injuries Suffered by Plaintiffs Were Caused by a Conspiracy Involving the Defendants and Others

70.     On information and belief, the publication of Plaintiffs' private information and the injuries described above resulted from a conspiracy between Defendants, Russian government agents, and other parties to disseminate information hacked from the DNC.

71.     Public reporting from U.S. intelligence and law enforcement officials, and other sources, establishes all of the hallmarks of a conspiracy between Defendants and other co-conspirators, including Russian actors.  Each party had motive to act together, there was ample opportunity to reach agreement, each party took actions that would be illogical absent a conspiracy, each party benefited from these actions, and each party took steps to conceal what had occurred.

72.     U.S. government officials have opened a series of law enforcement and bipartisan congressional investigations into Russian interference in the election and links to the Trump Campaign.  In particular, on March 20, 2017, in public testimony to the House Intelligence Committee, then-FBI Director Comey stated that the FBI investigation into Russian interference with the election includes the "nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."  On May 3, 2017, in testimony before the Senate Judiciary Committee, Comey again confirmed the existence of an ongoing investigation into possible collusion between the Trump campaign and Russia to interfere with the 2016 election. According to news reports based on information from U.S. officials, "[t]he FBI has information that indicates associates of President Donald Trump communicated with suspected Russian operatives to possibly coordinate the release of information damaging to Hillary Clinton's campaign."

73.     Plaintiffs seek accountability and redress for the harms they suffered from their fellow Americans who were participants in this conspiracy.

A.   The Russian Government Engaged in a Campaign to Interfere in the U.S. Election and Tilt the Outcome to Donald J. Trump

74.   According to an unclassified public report released by the U.S. Intelligence

Community (hereinafter "the U.S. Intelligence Community Report"):

> Russian efforts to influence the 2016 US presidential election represent the most recent expression of Moscow's longstanding desire to undermine the US-led liberal democratic order, but these activities demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations.
> We assess Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election. Russia's goals were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. We have high confidence in these judgments.

75.   According to former Director of National Intelligence James Clapper, the U.S.

intelligence community has "concluded first that President Putin directed an influence campaign

to erode the faith and confidence of the American people in our presidential election process.

Second, that he did so to demean Secretary Clinton, and third, that he sought to advantage Mr.

Trump."

B.   As Part of That Campaign, Russian Operatives Hacked the Servers of U.S. Political Entities, Including the DNC

76.   In order to defeat Hillary Clinton and help elect Donald Trump, hackers working

on behalf of the Russian government broke into computer networks of U.S. political actors

involved in the 2016 election, including the DNC and the Clinton campaign.  Elements of

Russian intelligence gained unauthorized access to DNC networks in July 2015, and maintained

that access until at least June 2016.  By March 2016, the Russian General Staff Main Intelligence

Directorate ("GRU") gained unauthorized access to DNC networks, Democratic Congressional

Campaign Committee ("DCCC") networks, and the personal email accounts of Democratic party officials and political figures.

77.     By May 2016, the GRU had extracted large volumes of data from DNC networks, including email accounts of DNC staffers.

C.     <u>On Information and Belief, Through a Series of Secret Meetings in the Spring and Summer of 2016, Defendants and Their Co-conspirators Agreed to Disseminate Certain Hacked DNC Emails, and Russia Sought to Obtain Policy Concessions</u>

*a.     Defendants engaged in a series of meetings with Russian operatives throughout 2016*

78.     On information and belief, Russian actors and agents of the Trump Campaign held multiple secret meetings throughout the campaign, including around the time that Russian operatives were stealing material from the DNC servers and in the days and weeks leading up to the publication of Plaintiffs' private information.

79.     The Government Communications Headquarters (GCHQ), a British intelligence agency, first became aware of suspicious interactions between members of the Trump Campaign and Russian intelligence operatives in late 2015.  German, Estonian, and Polish agencies— among others—also detected such interactions between late 2015 and early 2016.

80.     In the summer of 2016, U.S. intelligence officials collected information that senior Russian intelligence operatives and political figures were discussing exerting influence over the Trump Campaign.  They considered this intelligence to be sufficiently credible that they passed it on to the FBI, which opened a counterintelligence investigation that continues to this day into whether the Trump Campaign aided Russian interference in the 2016 election.

81.     On information and belief, Trump Campaign associates exchanged at least 18 undisclosed calls and emails with Russian officials and agents between April and November 2016, including at least six with Russian Ambassador to the United States Sergey Kislyak.

82.     On information and belief, Russian Deputy Foreign Minister Ryabkov has acknowledged contacts between Russian officials and Trump's "immediate entourage" during the campaign.

83.     On information and belief, around the time Manafort took over as campaign chairman in May of 2016, he met with Konstantin Kilimnik, a Russian-Ukrainian operative with suspected ties to Russian intelligence.  Manafort met with Kilimnik again in August of 2016. Manafort discussed the hacking of DNC emails with Kilimnik, and Kilimnik has claimed that he played a role in preventing adoption of a version of an amendment to the Republican Party platform regarding military aid to Ukraine.

84.     On June 9, 2016, Mr. Trump's son Donald Trump Jr., Paul Manafort, and Jared Kushner attended a meeting at Trump Tower with Natalia Veselnitskaya, a Kremlin-connected Russian lawyer.  The meeting was reportedly arranged at the request of Emin Agalarov, the son of Aras Agalarov, an oligarch connected with Putin.

85.     On information and belief, on or about July 7, 2016, Page visited Moscow and met with Putin confidants Igor Sechin and Igor Diveykin.

86.     On information and belief, on or about July 18, 2016, during the Republican National Convention and four days before Plaintiffs' private data was dumped to the world, representatives of the Trump Campaign, including Jeff Sessions, Page, and Trump advisor J.D. Gordon, met with Kislyak.

> b.     *Long-standing relationships between agents of the Trump Campaign and Russia provided a critical foundation for these meetings, which otherwise would have been anathema to a U.S. presidential campaign*

87.     The Trump Campaign employed a series of top advisors with longstanding and extensive financial and personal ties to Russia.

88.     Trump and the Trump businesses themselves have deep financial ties to Russia that date back to at least the mid-1990s.  As early as 1987, Trump traveled to Russia to explore building properties there.

89.     Throughout the 2000s, Trump tried, ultimately unsuccessfully, to develop real estate ventures in Russia.  In 2007, he declared with respect to his building plans, "we will be in Moscow at some point."

90.     Although Trump's long-standing hopes to develop properties in Russia have not yet come to fruition, Russian investors have played a key role in financing many of his real estate projects.  Members of the Russian elite have invested more than $100 million in Trump properties in the United States, including in Florida and New York.

91.     In September 2008, at a real estate conference in New York, Donald Trump Jr., an official and agent of the Trump businesses, stated, "[I]n terms of high-end product influx into the United States, Russians make up a pretty disproportionate cross-section of a lot of our assets; say in Dubai, and certainly with our project in SoHo and anywhere in New York.  We see a lot of money pouring in from Russia."

92.     In 2013, Trump concluded an agreement to hold the Miss Universe pageant in Russia.  The deal was financed in part by Aras Agalarov, an Azerbaijani oligarch who is an ally of Russian President Putin.  (Agalarov subsequently signed a preliminary deal with Trump to build a tower with Trump's name on it in Moscow.)  During an interview in Moscow at the time of the pageant, Trump stated, "I do have a relationship [with Putin] and I can tell you that he's very interested in what we're doing here today. . . .  I do have a relationship with him. . . .  He's done a very brilliant job in terms of what he represents and who he's represented."  While in Moscow, Trump also met with several other oligarchs with close ties to Putin.  After that

meeting, Trump stated, "I have a great relationship with many Russians, and almost all of the oligarchs were in the room."

93.     On September 21, 2015, Trump told the radio host Hugh Hewitt on his program, "The oligarchs are under [Putin's] control, to a large extent.  I mean, he can destroy them, and he has destroyed some of them. . . .  Two years ago, I was in Moscow . . . with the top-level people, both oligarchs and generals, and top-of-the-government people.  I can't go further than that, but I will tell you that I met the top people, and the relationship was extraordinary."

94.     On November 10, 2015, during a Republican primary debate, Trump stated "I got to know [Putin] very well because we were both on *60 Minutes*.  We were stablemates, and we did very well that night."

95.     Trump's business relationships in Russia continued through the 2016 presidential campaign.  Between April and December of 2016, the Russian patent office granted 10-year extensions to six Trump trademarks that were set to expire in 2016.

96.     Beyond Trump himself, Manafort, Page, Flynn, and Kushner all also had long-standing interests in and ties to Russia that, on information and belief, made them similarly receptive to Russian entreaties.

97.     On information and belief, in 2005, Manafort proposed to a Russian billionaire ally of President Putin's a plan for Manafort to influence politics inside the United States to benefit Putin's government.  Manafort eventually signed a $10 million annual contract with the billionaire beginning in 2006.  Manafort later advised Ukrainian President Viktor Yanukovych and his pro-Russian political party and helped him win several elections until Yanukovych was ousted from power in 2014.  After Yanukovych was forced to flee, a discovered ledger indicated

millions in undisclosed cash payments from Yanukovych and his pro-Russian political party to Manafort between 2007 and 2012.

98.     In March 2016, Trump identified Carter Page as one of his campaign's foreign policy advisors.  Page was an investment banker with Merrill Lynch in Moscow from 2004 to 2007.  In that capacity he was an adviser to Gazprom, a Russian state-owned energy company.

99.     On information and belief, in the summer of 2016, the FBI obtained a FISA warrant for Page, on the basis that there was probable cause to believe that he was acting as an agent of a foreign power.  The application for that warrant cited Page meeting with Russian intelligence operatives as early as 2013 (although the FBI concluded that Page did not know he was in contact with a spy).  The application also cited reports alleging that an agreement had been made between the Trump Campaign and Russian operatives to trade the dissemination of hacked emails for changes in the Republican platform regarding Ukraine.

100.     Michael Flynn also served as an adviser to the Trump Campaign and was considered as a possible running mate for Trump.  Following the election, he briefly served as Trump's National Security Advisor.  In 2015, Flynn was paid $11,250 by the U.S. subsidiary of a Russian cybersecurity firm and the same amount by a U.S. air cargo company affiliated with the Russian-owned Volga-Dnepr Group.  On December 10, 2015, Flynn was paid $45,000 to speak at an RT (formerly *Russia Today*) anniversary gala in Moscow, where he sat at the same table as President Putin and his chief of staff, Sergei Ivanov.  The U.S. Intelligence Community Report describes RT as "[t]he Kremlin's principal international propaganda outlet" and also notes that RT "has actively collaborated with WikiLeaks."

101.     Jared Kushner is Trump's son-in-law and was one of the most senior advisors within the Trump Campaign.  On information and belief, Kushner and his family have financial

and personal ties with Russian investors, including Lev Leviev and Roman Abramovich, two Russian oligarchs who are close Putin confidants.

         c.     *Defendants and their co-conspirators each had interests in coordinating on the dissemination of the hacked DNC emails*

102.    On information and belief, Russia's practice when it engages in cyber-attacks related to an election in another country is to partner with aligned parties who are on the ground in that country.  While Russia has extensive experience entering into and extracting information from computer networks, its modus operandi for interfering in elections like the 2016 U.S. election is to seek out domestic political operatives who can provide political expertise.

103.    On information and belief, Russia had an interest in coordinating with Defendants and their agents to disseminate the hacked emails in a way that would maximize their political impact.

104.    On information and belief, Russia also had an interest in extracting concessions from and obtaining leverage over Defendants and their agents in exchange for the dissemination of the information it had hacked from the DNC servers.

105.    As former CIA Director John Brennan has put it, "I know what the Russians try to do.  They try to suborn individuals and try to get individuals, including U.S. individuals, to act on their behalf, wittingly or unwittingly."

106.    On information and belief, Defendants also had an interest in coordinating with their co-conspirators to disseminate the information that Russian operatives had stolen from the DNC.

107.    In the spring of 2016, as it became apparent that Mr. Trump would face Secretary Clinton in the general election, polls showed his campaign trailing by a wide margin.

108.     The Trump Campaign faced difficulty in bringing together Republican supporters.
It trailed far behind its opponent in resources.  To have a chance of winning, the Trump
Campaign needed to discredit its opponent, depress her support, and create tensions and internal
battles within the Democratic Party.

109.     On information and belief, this need provided the Trump Campaign with a
powerful motive to work with Russian operatives to cause the dissemination of the hacked
materials.

        *d.*     *Defendants' conduct further demonstrates that they were receptive to
coordinating with Russia during the campaign*

110.     Not only did Defendants have a motive to coordinate with their co-conspirators to
disseminate the hacked DNC emails, but recently revealed information makes clear that they
were aware of Russia's effort to interfere in the election to benefit Trump and had no hesitation
about coordinating with Russia to benefit the Trump Campaign and harm Trump's opponent.

111.     As set forth above, Donald Trump Jr., Kushner, and Manafort met with a
Kremlin-connected Russian lawyer on June 9, 2016.  According to reports, Trump Jr. agreed to
attend this meeting after being promised damaging material about his father's opponent.  The
Trump Campaign participants in the meeting expected that the lawyer, Natalia Veselnitskaya,
would produce such material.  Trump Jr. attended the meeting after receiving an email indicating
that the material was part of a Russian government effort to aid the Trump Campaign.  That
email (released on July 11, 2017 on Trump Jr.'s Twitter account) stated, "This is obviously very
high level and sensitive information but is part of Russia and its government's support for Mr.
Trump."  Rather than refuse to be part of an effort by Russia to interfere in the election through
the release of Russian-obtained information, Trump Jr. expressed enthusiasm for the idea in a
responsive email, in which he stated: "If it's what you say I love it especially later in the

summer."  According to reports, the formatting of the email chain suggests that it was forwarded

to Manafort and Kushner before the meeting, meaning that they attended the meeting even

though they too were aware that it was part of Russian efforts to interfere with the election.

Trump Jr. acknowledged in a tweet issued on July 10, 2017 that he took the "meeting to hear info

about" Trump's opponent.

112.    This was not the only meeting that Trump Campaign officials are known to have

had with Russian-linked officials seeking information that could undermine Trump's opponent.

Around the time that WikiLeaks published the information hacked from the DNC, a British

security consultant named Matt Tait was approached by a Republican political operative named

Peter Smith with links to the Trump Campaign about an operation to obtain emails allegedly

taken from Clinton's private server.

113.    According to an essay that Tait published on *Lawfare*, Tait warned Smith that if

such emails existed, they had likely been obtained by Russian agents as part of wider efforts to

interfere with the U.S. election.  According to Tait:

> Smith . . . didn't seem to care.  From his perspective it didn't matter who had
> taken the emails, or their motives for doing so.  He never expressed to me any
> discomfort with the possibility that the emails he was seeking were potentially
> from a Russian front, a likelihood he was happy to acknowledge.  If they were
> genuine, they would hurt Clinton's chances, and therefore help Trump. . . .  Given
> the amount of media attention given at the time to the likely involvement of the
> Russian government in the DNC hack, it seemed mind-boggling for the Trump
> campaign—or for this offshoot of it—to be actively seeking those emails.

114.    According to Tait, Smith appeared to be closely connected to the Trump

Campaign and its agents:

> [I]t was immediately apparent that Smith was both well connected within the top
> echelons of the campaign and he seemed to know both Lt. Gen. Flynn and his
> son well.  Smith routinely talked about the goings on at the top of the Trump

team, offering deep insights into the bizarre world at the top of the Trump campaign.

In September 2016, Smith sent Tait a document entitled "A Demonstrative Pedagogical Summary to be Developed and Released Prior to November 8, 2016."  The document "detailed a company Smith and his colleagues had set up as a vehicle to conduct the research: 'KLS Research', set up as a Delaware LLC 'to avoid campaign reporting,' and listing four groups who were involved in one way or another.  The first group, entitled 'Trump Campaign (in coordination to the extent permitted as an independent expenditure)' listed a number of senior campaign officials: Steve Bannon, Kellyanne Conway, Sam Clovis, Lt. Gen. Flynn and Lisa Nelson."  According to Tait, "this document was about establishing a company to conduct opposition research on behalf of the campaign, but operating at a distance so as to avoid campaign reporting. Indeed, the document says as much in black and white."  On information and belief, this entity was established and Smith's activities were conducted in coordination with the Trump Campaign.  On information and belief, the willingness Smith showed to coordinate with potential Russian agents to obtain and disclose hacked data reflects Defendants' general approach to such coordination.

       *e.*     *On information and belief, Defendants and their co-conspirators reached an agreement to disseminate the hacked DNC emails*

115.    As described above, Defendants and their co-conspirators had a long history of financial and personal entanglements, extensive contact during the time period relevant to the dissemination of the hacked DNC emails, ample motive to coordinate regarding such dissemination, and a demonstrated inclination to coordinate to benefit Mr. Trump's campaign and undermine support for his opponent.

116.    On information and belief, during contacts between Russian officials and agents for Defendants, the parties did in fact reach an agreement regarding the publication of hacked DNC material (which included Plaintiffs' private information).  On information and belief, this agreement included policy concessions to Russian interests by Defendants.  U.S. intelligence officials deemed reports describing the contours of the agreement between Defendants and Russian officials to be important enough to brief both the outgoing and incoming Presidents about it.

D.    The Trump Campaign Provided a Series of Beneficial Concessions to Russia

117.    In the midst of the extensive contacts between Russian officials and Defendants during the relevant time period, not only was Plaintiffs' hacked information disclosed, but the Republican Party, now under the control of the Trump Campaign, at the Campaign's direction reversed its long-standing position vis-à-vis Russia to adopt a more pro-Russia approach.

118.    For many years, the Republican party has taken strong positions opposed to Russia and the government of Vladimir Putin.

119.    During the 2008 presidential campaign, for example, the Republican nominee John McCain made opposition to Russian aggression a centerpiece of his platform.  In particular, the Republican Party firmly opposed Russian actions against neighboring states.

120.    In his speech at the 2008 Republican National Convention, McCain criticized Russian aggression, "Russia's leaders, rich with oil wealth and corrupt with power, have rejected democratic ideals and the obligations of a responsible power.  They invaded a small, democratic neighbor to gain more control over the world's oil supply, intimidate other neighbors, and further their ambitions of re-assembling the Russian empire."  McCain added, "[W]e can't turn a blind

eye to aggression and international lawlessness that threatens the peace and stability of the world and the security of the American people."

121.    During the 2012 presidential campaign, Republican nominee Mitt Romney called Russia "our number one geopolitical foe."  During a presidential debate, Romney stated, "I have clear eyes on this. I'm not going to wear rose-colored glasses when it comes to Russia, or Mr. Putin."

122.    During his acceptance speech at the 2012 Republican National Convention, Romney again challenged Mr. Putin.  Romney promised: "Under my administration, our friends will see more loyalty, and Mr. Putin will see a little less flexibility and more backbone."

123.    The Trump Campaign took a dramatically different approach to Russia, marking a stark departure from its party's traditional platform.

124.    On information and belief, on or about July 18, 2016—four days before DNC emails containing Plaintiff's private information were dumped publicly, and the same day that Sessions, Page, and Gordon met with Kislyak—the Trump Campaign worked to remove strong language about Russia's action in Ukraine from the Republican platform.

125.    Specifically, at a Republican platform meeting, one member proposed an amendment stating: "Today, the post-Cold War ideal of a 'Europe whole and free' is being severely tested by Russia's ongoing military aggression in Ukraine."  The proposed amendment continued: "The Ukrainian people deserve our admiration and support in their struggle." Accordingly, the amendment called for maintaining or increasing sanctions against Russia, increasing aid for Ukraine, and "providing lethal defensive weapons" to Ukraine.  But, according to reporting, Trump Campaign staffers in the room "intervened" and "were able to get the issue

tabled while they devised a method to roll back the language." The Campaign staffers wrote an alternate amendment "with softer language," which was ultimately adopted.

126.    Mr. Gordon later would admit that he was personally involved in softening the language on Ukraine.

127.    Despite Russia's recent aggression in Ukraine, and in contrast to the convention speeches of Senator McCain and Governor Romney in 2008 and 2012, Trump did not mention Russia at all during his convention speech.

128.    The Trump Campaign took other steps to benefit Russia. The Trump Campaign advanced a significant Russian foreign policy interest by casting doubt on the U.S.'s commitment to its NATO allies. Candidate Trump repeatedly declined to support NATO's historical commitment to defend members who are under attack, refused to offer support to Baltic countries if they were attacked by Russia, and instead criticized NATO members. In response to Trump's comments regarding NATO, Republican Senator Lindsey Graham stated that "The Republican nominee for President is essentially telling the Russians and other bad actors that the United States is not fully committed to supporting the NATO alliance."

129.    Trump and his associates also have undertaken efforts to lift sanctions imposed on Russia in response to its interference with the 2016 election. On December 29, 2016, the Obama administration imposed economic sanctions on Russian actors in response to such interference. The United States also expelled certain Russian diplomats and seized Russian-owned facilities in New York and Maryland.

130.    On information and belief, on that same day, in a phone conversation with Russian ambassador Kislyak, Flynn urged Russia not to respond to the recent U.S.-imposed sanctions. Flynn subsequently lied about the substance of the conversation.

131.    Immediately upon taking office, the Trump administration undertook efforts to lift economic sanctions imposed on Russia.

132.    Another of Russia's foreign policy goals has been to improve Russia's and Putin's image within the United States.  Candidate Trump made a series of comments supportive of Putin, all consistent with this Russian policy desire.  For example, in December 2015, Mr. Trump said of Putin: "It is always a great honor to be so nicely complimented by a man so highly respected within his own country and beyond."  Mr. Trump elsewhere during the campaign described Putin as "very much of a leader" with "very strong control over his country," adding that "he's been a leader, far more than our president has been a leader."

133.    This public relations campaign has been effective.  According to a recent Gallup poll, "Americans see Russian President Vladimir Putin in a better light than two years ago."

134.    Mr. Trump also sought to minimize Putin's negative human rights record.  In response to questions about Putin arranging the deaths of opponents, Trump responded, "I haven't seen any evidence that he killed anybody."

135.    These actions and other statements from the Trump Campaign helped to further Russia's foreign policy objectives.

E.    Pursuant to the Conspiracy, Certain Hacked DNC Emails, Containing Plaintiffs' Private Information, Were Published to the World on WikiLeaks

136.    On July 22, 2016, four days after the change to the Republican Party platform and in furtherance of the conspiracy, actors in control of the stolen materials obtained by Russia caused WikiLeaks to post thousands of private emails hacked from the DNC on the Internet.  As set forth above, the emails published on WikiLeaks included private information about each of the Plaintiffs—and about dozens of other private Americans.  The information about Plaintiffs was not newsworthy and its release caused them substantial injuries.

137.    On information and belief, Defendants conspired with their co-conspirators to select the materials to be released and time the release of the hacked DNC emails to obtain maximum political benefit for the Trump Campaign.  Although Russian agents had possessed large volumes of DNC data for some time, the DNC emails were not published on WikiLeaks until the timing was politically optimal to benefit the Trump Campaign.  As Trump Jr. indicated in an email (later published on his Twitter account), the release of information would be helpful to the Trump Campaign "especially later in the summer."

138.    Shortly after the DNC emails were published, Stone, who was still in close contact with Trump and Manafort, admitted in an interview that he had communicated with WikiLeaks founder Julian Assange but that he was "not at liberty" to discuss aspects of those communications.  On October 12, 2016, Stone admitted that he had "backchannel communications" with Assange "through an intermediary—somebody who is a mutual friend." He added that "[t]hat friend travels back and forth from the United States to London and we talk."

139.    At around the time the DNC emails were published, Stone engaged in public and private Twitter conversations with the hacker Guccifer 2.0, who several weeks earlier had claimed credit for the DNC hack.

140.    According to the U.S. Intelligence Community Report, Guccifer 2.0 was working as an agent of Russian military intelligence.  The report states that GRU (Russian intelligence) "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."  The "GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks. Moscow most likely chose WikiLeaks because of its self-proclaimed reputation for authenticity."

141.    The strategic timing and content of the publication of DNC emails right before the Democratic National Convention aggravated tensions and internal disagreements within the Democratic party, as intended.  Headlines from around the time of the Convention demonstrated the effect of the publication.  *The New York Times* reported that "the publication of 20,000 Democratic National Committee emails by WikiLeaks this weekend provided a disastrous prelude to the convention."  A *National Review* article entitled "WikiLeaks blows up the party's hopes for a smooth convention week" explained, "This week, the Democrats begin their convention with the resignation of their national committee chairwoman, Debbie Wasserman Schultz, after nearly 20,000 of the committee's e-mails were published by WikiLeaks."

F.    <u>Throughout the Remainder of the Campaign, Defendants Amplified and Drew Attention to Hacked Emails that Had Been Published</u>

142.    The Trump Campaign sought to maximize its advantage from the release of the hacked emails by further publicizing and amplifying the released information.  In the last months of the campaign, Mr. Trump mentioned WikiLeaks over 160 times during his campaign appearances, drawing increased attention to the released Russian-hacked emails.  On July 23, the day after the release of the DNC emails, candidate Trump sought to amplify and gain further political benefit from the timing of the release of the emails.  "The Wikileaks e-mail release today was so bad to Sanders that it will make it impossible for him to support [Hillary Clinton], unless he is a fraud," Trump tweeted to his followers.

143.    Defendants also continued to communicate with Russia and others regarding the hacking and release of emails that could harm Secretary Clinton.  On July 27, 2016, during the Democratic National Convention, candidate Trump held a press conference in Florida.  During his remarks, Trump called on Russia to continue its cyberattacks, stating, "Russia, if you're listening, I hope you're able to find the 30,000 [Hillary Clinton] emails that are missing."

144.    Following that statement, Defendant Stone engaged in a series of exchanges with one of the Russian hackers culminating in the release of a second tranche of emails, this time from the DCCC and Clinton Campaign Chairman John Podesta's account.

145.    In August and September 2016, Defendant Stone and Guccifer 2.0 engaged in an exchange of direct messages over Twitter.

146.    On August 12, 2016, Guccifer 2.0 released documents obtained from the DCCC and tweeted: "@RogerJStoneJr thanks that u believe in the real #Guccifer2."  Guccifer 2.0 subsequently tweeted "paying u back," in reply to a tweet from Defendant Stone.

147.    On August 18, 2016, Defendant Stone stated in a C-SPAN interview that he was in touch with Assange "through an intermediary."

148.    On August 21, 2016, Defendant Stone tweeted: "Trust me, it will soon the [sic] Podesta's time in the barrel.  #CrookedHillary."

149.    In mid-September, Stone said on a radio interview that he expected "Julian Assange and the Wikileaks people to drop a payload of new documents on a weekly basis fairly soon."

150.    On October 1, 2016, Defendant Stone tweeted: "Wednesday @HillaryClinton is done."

151.    Two days later, on October 3, 2016, Defendant Stone tweeted: "I have total confidence that @wikileaks and my hero Julian Assange will educate the American people soon # LockHerUp."

152.    Then, on October 4, 2016, Defendant Stone tweeted: "Payload coming. #Lockthemup."

153.    Just two days later, on October 7, 2016, WikiLeaks published the first batch of emails hacked from Clinton campaign chairman John Podesta, one hour after an Access Hollywood video surfaced on which Trump made lewd remarks about sexually assaulting women.

154.    Later on, Trump himself previewed disclosures that would be coming, in order to elevate attention to them.  For example, on November 2, he declared: "So today, I guess WikiLeaks, it sounds like, is going to be dropping some more."

155.    As set forth above, the release of Plaintiffs' private information, as well as the subsequent amplification by Defendants, caused them real and substantial harm as a result of their participation in the political process and their support and advocacy for a particular presidential candidate.  This harm to Plaintiffs was a direct and foreseeable consequence of the dissemination of the hacked emails.  The publication of the emails also served to intimidate Plaintiffs and potential donors and supporters of Mr. Trump's opponent, as it put them on notice that their support and advocacy could expose them to the release of their private information.

G.      All of the Parties Then Sought to Deny and Conceal and Evidence of Their Interactions

156.    Defendants and their co-conspirators have said and done nothing to hold Russia accountable for this attack on the election and the privacy of Plaintiffs and others like them. Quite the opposite—Defendants have denied that Russia was involved; they have continued to take actions favorable to Russia, including efforts to roll back sanctions imposed by the Obama administration in response to Russian interference in the election; they have attempted to conceal their contacts with Russian actors and in some cases have overtly lied about such contacts.

157.    On information and belief, Defendants and their co-conspirators have attempted to conceal their involvement in the change in the Republican Party's platform language about

Ukraine.  Mr. Trump and Mr. Manafort initially denied any campaign involvement in the platform language.  In January 2017, J.D. Gordon, the Trump Campaign's national security policy representative at the Republican National Convention, also denied involvement.  But in March 2017, Mr. Gordon admitted that he was personally involved in softening the language on Ukraine.

158.    While letting Russia off the hook for its role in disseminating private information and interfering with the U.S. election, Defendants and other Trump associates have repeatedly attempted to conceal and have failed to disclose their own contacts with Russian actors.

159.    On information and belief, in December 2016, Jared Kushner and Michael Flynn discussed with Russian Ambassador Kislyak the establishment of a communication back channel with Russia, which would use Russian diplomatic facilities in an apparent attempt to avoid detection by American intelligence agencies.

160.    Also in December 2016, on information and belief, Mr. Kushner met with Sergey Gorkov, the chairman of Vnesheconombank, a Russian state-owned bank that is subject to U.S. sanctions.

161.    Mr. Kushner failed to disclose these meetings, and others with foreign government officials, in security clearance forms, as required by law.

162.    Trump Campaign advisor and now-Attorney General Jeff Sessions also failed to disclose during his Senate confirmation hearing and in security clearance forms at least two meetings during the campaign with Russian ambassador Kislyak.

163.    Mr. Flynn failed to disclose payments from foreign sources, including Russian sources, as required by law.

164.    Mr. Manafort failed to register with the Department of Justice as a foreign agent while working for Yanukovych.  In June 2017, Manafort retroactively filed foreign agent registration forms showing that his firm had been paid over $17 million from Yanukovych's pro-Russian Ukrainian political party over a two-year period.

165.    Defendants also concealed the June 9, 2016 meeting between Donald Trump Jr., Manafort, Kushner, and a Russian lawyer.  When news of the meeting came to light, Trump Jr. offered differing and incomplete explanations of the origins and purpose of the meeting.  He first said the meeting was focused on questions of child adoption.  Only later did he acknowledge that the purpose of the meeting was to discuss information about Trump's opponent to benefit his campaign.

166.    On the same day that he called on Russia to hack Hillary Clinton's emails, Trump walked back his repeated boasts about his Russia connections, insisting that "I never met Putin. I've never spoken to him."  In a television interview, he reiterated: "But I have nothing to do with Russia, nothing to do, I never met Putin, I have nothing to do with Russia whatsoever."

167.    On October 26, 2016, at a rally in Kinston, North Carolina, Trump falsely declared, "First of all, I . . . have no business whatsoever with Russia, have nothing to do with Russia."

168.    To date, despite questions about his business relationships and financial ties to Russia, Trump has refused to disclose the past ten years of his tax returns.  He has refused to disclose them in a stark break from precedent and in the face of extreme political pressure to disclose them.  He has done this notwithstanding the obvious opportunity to put to rest some of the damaging speculation about Russian dealings that may or may not be indicated on these

returns.  On information and belief, these tax returns could reveal the nature and extent of his business entanglements with Russian interests.

169.    Mr. Trump and his associates have repeatedly questioned or denied Russia's involvement in the hacking of the DNC emails and interference with the 2016 election, despite the overwhelming consensus of the U.S. Intelligence Community and others that Russia was responsible.

170.    For example, on June 15, 2016, shortly after the hacking of the DNC became public, Trump suggested that the DNC hacked itself to get attention.

171.    On July 26, 2016, Trump tweeted that Democrats were blaming Russia to "deflect the horror and stupidity of the WikiLeaks disaster."

172.    On September 8, 2016, in an interview on the Russian-controlled media outlet RT, Trump stated that it is "probably unlikely" that Russia interfered with the election.  He further stated: "I think maybe the Democrats are putting that out.  Who knows?  But I think that it's pretty unlikely."

173.    On September 26, 2016, during the first presidential debate, Trump dismissed accusations that Russia was behind the DNC hacks and stated: "It also could be somebody sitting on their bed that weighs 400 pounds, okay?"

174.    On October 9, 2016, during the second presidential debate, Trump claimed that "[Clinton] doesn't know if it's the Russians doing the hacking.  Maybe there is no hacking."

175.    On November 28, 2016, in an interview with *Time* magazine after the election, Trump stated: "I don't believe [Russia] interfered.  That became a laughing point, not a talking point, a laughing point."

176. After assuming the Presidency, Trump made repeated efforts to ingratiate himself with FBI Director Comey, who was overseeing an investigation into Russian interference in the 2016 election and possible Trump Campaign involvement. On information and belief, Trump asked for Comey's personal loyalty and also requested that Comey let go of his investigation into wrongdoing by Flynn. Trump and his staff also made several efforts to have members of the U.S. law enforcement and intelligence communities publicly rebut claims of such coordination.

177. On May 9, 2017, Trump fired Comey. On information and belief, the next day, he told Russian Foreign Minister Sergey Lavrov and Ambassador Kislyak that he "faced great pressure because of Russia," and that as a result of firing Comey, "That's taken off."

178. On July 6, 2017, in remarks to reporters while traveling in Poland, Trump stated, "I think it very well could be Russia but I think it could very well have been other countries," continuing, "no one really knows for sure." In fact, U.S. intelligence agencies are unanimous in the view that it was indeed Russia.

179. On July 7, 2017, Trump met personally with President Putin and reportedly accepted Putin's denial of involvement in trying to disrupt the U.S. election. Secretary of State Tillerson indicated that the two agreed that continued focus on this issue would be a hindrance and thus agreed to move on.

180. In sum, as set forth above, Russia adopted at its highest levels of government a strategy to interfere with the 2016 U.S. election and successfully executed that strategy by, among other things, stealing and conspiring with others to disseminate DNC emails. On November 8, 2016, Donald Trump won the election to become President of the United States. Russia achieved a major foreign policy goal with the election of Trump and defeat of Hillary Clinton.

181.    In the process, Plaintiffs paid a personal price merely for seeking to participate in the democratic process.  And the threat that actors like the Defendants and their co-conspirators might seek to disseminate hacked employee and supporter information again in the future hangs over our democratic process, imposing a chilling effect on the rights of Americans to support and advocate for candidates for office.

182.    Defendants and their co-conspirators have engaged in extensive efforts to deny Russia's involvement in the hacked information, to undermine efforts to hold Russia accountable for its cyberattack on the DNC and release of Plaintiffs' personal information, and to conceal their contacts with Russian actors in order to conceal their own involvement in the conspiracy.

## COUNT I
### Public Disclosure of Private Facts in Violation of D.C. Law (Co-Conspirator and Aiding and Abetting Liability)

183.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

184.    Defendants agreed with each other and with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

185.    Defendants also aided and abetted the above-described public disclosure.

186.    Defendants and their co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

187.    Defendants and their co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts, in which the public has no legitimate concern, about Plaintiffs and other individuals similarly

situated, and that publication of such information would cause suffering, shame, or humiliation to a person of ordinary sensibilities.

188.     In furtherance of the conspiracy, one or more conspirators published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding sexual orientation, personal health matters, social security numbers, credit cards, personal relationships, banking relationships, home addresses, and telephone numbers.

189.     As a direct and proximate result of the conduct of Defendants and their co-conspirators, Plaintiffs have sustained significant harm, entitling them to damages in an amount to be proven at trial.

190.     The outrageous, malicious, and willful misconduct of the Defendants—conspiring with a hostile foreign government to publish Plaintiffs' stolen and private information to the world as part of a conspiracy to influence a Presidential election—also entitles the Plaintiffs to punitive damages so that the Defendants themselves and others in their position are deterred from repeating their outrageous actions in the future.

## COUNT II
### Intentional Infliction of Emotional Distress in Violation of D.C. Law (Co-Conspirator and Aiding and Abetting Liability)

191.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

192.     Defendants agreed with each other and with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

193.     Defendants also aided and abetted the above-described public disclosure.

194.    Defendants and their co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

195.    Defendants and their co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts about Plaintiffs and other individuals similarly situated, and that publication of the emails would cause Plaintiffs and others severe or extreme emotional distress.

196.    In furtherance of the conspiracy, one or more conspirators published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding sexual orientation, personal health matters, social security numbers, credit cards, personal relationships, banking relationships, home addresses, and telephone numbers.

197.    The conduct of Defendants and their co-conspirators was extreme, outrageous, and beyond the bounds of decency.

198.    As a direct and proximate result of the conduct of Defendants and their co-conspirators, Plaintiffs have suffered severe or extreme emotional distress, entitling them to damages in an amount to be proven at trial.

199.    The outrageous, malicious, and willful misconduct of the Defendants—conspiring with a hostile foreign government to publish Plaintiffs' stolen and private information to the world as part of a conspiracy to influence a Presidential election—also entitles the Plaintiffs to receive punitive damages so that the Defendants themselves and others in their position are deterred from repeating their outrageous actions in the future.

## COUNT III
**(Conspiracy to Intimidate Lawful Voters from Giving Support or Advocacy to Electors for President and to Injure Citizens in Person or Property on Account of Such Support or Advocacy in Violation of 42 U.S.C. 1985(3))**

200.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

201.     Plaintiffs are U.S. citizens who are lawfully entitled to vote.

202.     Plaintiffs communicated with each other and with others at the DNC, and made and solicited contributions to the DNC, for the purpose of giving support and advocacy in a legal manner in favor of the election of a candidate for President of the United States.

203.     Defendants agreed with each other and with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

204.     Defendants and their co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

205.     Defendants and their co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts about Plaintiffs and other individuals similarly situated.

206.     In furtherance of the scheme, one or more conspirators published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding sexual orientation, personal health matters, social security numbers, credit cards, personal relationships, banking relationships, home addresses, and telephone numbers, as well as information about Plaintiffs' lawful support and advocacy for a candidate for President.

Defendants further conspired with other parties to draw attention to the disseminated DNC emails containing Plaintiffs' private information.

207.    In so doing, and by exposing Plaintiffs to significant harm as a result of their prior activities in support of a candidate for President, Defendants conspired to prevent by intimidation Plaintiffs and others like them from giving their support or advocacy in a legal manner for a candidate for President of the United States.

208.    In so doing, Defendants conspired to injure Plaintiffs and others like them in their persons and property on account of their support or advocacy in a legal manner for a candidate for President of the United States.

209.    As a natural and foreseeable result of the conspiracy, Plaintiffs were injured in their persons and property.

210.    As a natural and foreseeable result of the conspiracy, Plaintiffs have been deprived of the ability to exercise rights and privileges of citizens of the United States.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully pray that this Court:

a)  Issue judgment in favor of Plaintiffs.

b)  Award compensatory and consequential damages as proven at trial, and in an amount over $75,000, to compensate Plaintiffs for the injuries they suffered.

c)  Award punitive damages as just and proper in light of Defendants' outrageous and malicious conduct and to deter such egregious conduct from being committed in the future.

d) Require Defendants to disgorge any profits they obtained through their involvement in the conspiracy, including gains from their financial relationships with Russian actors and financial benefits accruing to them from Russia's intervention in the election.

e) Award Plaintiffs costs and reasonable attorneys' fees.

f) Provide such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial of all issues so triable.

Date: July 12, 2017

/s/ *Benjamin L. Berwick*
BENJAMIN L. BERWICK (D.D.C. Bar No. MA0004)
Ben.Berwick@protectdemocracy.org
IAN BASSIN (NY Attorney Registration No. 4683439)
Ian.Bassin@protectdemocracy.org
JUSTIN FLORENCE (D.C. Bar No. 988953)
Justin.Florence@protectdemocracy.org
ANNE TINDALL (D.C. Bar. No. 494607)
Anne.Tindall@protectdemocracy.org
United to Protect Democracy
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
(202) 856-9191

NANCY GERTNER (MA Bar No. 190140)
Fick & Marx
100 Franklin Street, 7th floor
Boston, MA 02110
(857) 321-8360
ngertner@fickmarx.com

RICHARD PRIMUS (D.C. Bar No. 472223)
The University of Michigan Law School*
625 S. State Street
Ann Arbor, MI 48109
(734) 647-5543
PrimusLaw1859@gmail.com

STEVEN A. HIRSCH (CA Bar No. 171825)
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400
shirsch@keker.com

* For identification purposes.


*Counsel for Plaintiffs*