# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROY COCKRUM, ET AL., | |
| *Plaintiffs*, | |
| v. | Case No. 1:17-cv-1370-ESH |
| DONALD J. TRUMP FOR PRESIDENT, INC., 725 Fifth Avenue, New York, NY 10022, ET AL., | |
| *Defendants*. | |

---

## DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS

---

Jeffrey Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin
   *Counsel of Record*
Vivek Suri
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

Defendant Donald J. Trump for President, Inc. (the Campaign) respectfully moves that the Court:

1. Dismiss the D.C.-law claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1);

2. Dismiss all claims for lack of personal jurisdiction under Rule 12(b)(2);

3. Dismiss all claims for improper venue under Rule 12(b)(3); and

4. Dismiss all claims for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

Dated:  September 5, 2017

Jeffrey Baltruzak (PA Bar No. 318156)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Respectfully submitted,

/s/ Michael A. Carvin
Michael A. Carvin (DC Bar No. 366784)
  *Counsel of Record*
Vivek Suri (DC Bar No. 1033613)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*
*(\* application for admission pending)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROY COCKRUM, ET AL.,

                                 *Plaintiffs,*

                    v.

DONALD J. TRUMP FOR PRESIDENT,
INC. ET AL.,

                                 *Defendants.*

Case No. 1:17-cv-1370-ESH

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS

---

Jeffrey Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin
   *Counsel of Record*
Vivek Suri
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. ii

Introduction ........................................................................................................... 1

Facts ...................................................................................................................... 3

Standard of Review................................................................................................. 5

Argument ............................................................................................................... 6

I.    The Court should dismiss the complaint on procedural grounds ...................... 8

    A.   The Court lacks subject-matter jurisdiction over the D.C.-law claims........ 8

    B.   The Court lacks personal jurisdiction over the Campaign........................... 9

    C.   Venue is improper in this district.............................................................. 14

II.   The Court should dismiss the complaint for failure to state a claim ............... 16

    A.   Plaintiffs fail to state claims for public disclosure of private facts ............ 16

    B.   Plaintiffs fail to state a claim for intentional infliction of emotional distress.................................................................................................... 26

    C.   Plaintiffs fail to state a viable theory of vicarious liability against the Campaign .......................................................................................... 29

    D.   The theories of tort liability on which Plaintiffs rely violate the First Amendment and vagueness doctrine ......................................................... 34

    E.   Plaintiffs fail to state a claim under 42 U.S.C. § 1985 .............................. 37

Conclusion ............................................................................................................. 39

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramoff v. Shake Consulting, LLC,*
    288 F. Supp. 2d 1 (D.D.C. 2003) ........................................................... 15

*Aiken v. Lustine Chevrolet, Inc.,*
    392 F. Supp. 883 (D.D.C. 1975)............................................................. 10

*Albright v. Morton,*
    321 F. Supp. 2d 130 (D. Mass. 2004) .................................................... 24

*Alvarado v. KOB-TV, LLC,*
    493 F.3d 1210 (10th Cir. 2007) ............................................................. 18

*Armstrong v. Thompson,*
    80 A.3d 177 (D.C. 2013)................................................................... 24, 25

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ............................................................................... 19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................... 5, 29, 31

\* *Bartnicki v. Vopper,*
    532 U.S. 514 (2001) .................................................... 17, 18, 19, 27

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................... 29, 31

*Bettis v. Islamic Republic of Iran,*
    315 F.3d 325 (D.C. Cir. 2003) ............................................................... 27

*Boehner v. McDermott,*
    484 F.3d 573 (D.C. Cir. 2007) (*en banc*)............................................... 17

*Bristol-Myers Squibb Co. v. Superior Court,*
    137 S. Ct. 1773 (2017) ..................................................................... 11, 13

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) .......................................................................... 11, 13

*Cabot Oil & Gas Corp. v. Water Cleaning Services LLC,*
2012 WL 2133589 (S.D. Tex. June 12, 2012)....................................................... 15

*CAIR Action Network, Inc. v. Gaubatz,*
82 F. Supp. 3d 344, 356 (D.D.C. 2015).................................................. 33

*Calder v. Jones,*
465 U.S. 783 (1984) .............................................................................. 10

*California Democratic Party v. Jones,*
530 U.S. 567 (2000) .............................................................................. 20

*Carpenters v. Scott,*
463 U.S. 825 (1983) .............................................................................. 37

*Cheney v. U.S. District Court,*
542 U.S. 367 (2004) .......................................................................... 1, 29

*Citizens United v. FEC,*
558 U.S. 310 (2010) ....................................................................... 20, 35

*Clinton v. Jones,*
520 U.S. 681 (1997) .......................................................................... 1, 29

*Coates v. Cincinnati,*
402 U.S. 611 (1971) .............................................................................. 36

*Crane v. Carr,*
814 F.2d 758 (D.C. Cir. 1987) ............................................................. 10

*Creditwatch, Inc. v. Jackson,*
157 S.W. 3d 814 (Tex. 2005)............................................................... 26

*Daimler AG v. Bauman,*
134 S. Ct. 746 (2014) ........................................................................... 11

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
472 U.S. 749 (1985) .............................................................................. 21

*Eu v. San Francisco County Democratic Central Committee,*
489 U.S. 214 (1989) .............................................................................. 35

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,*
749 A.2d 724 (D.C. 2000)..................................................................... 32

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ......................................................................... 35

*Federer v. Gephardt*,
    363 F.3d 754 (8th Cir. 2004) .............................................................. 37

*Flax v. Schertler*,
    935 A.2d 1091 (D.C. 2007).................................................................. 33

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989) ......................................................................... 35

*Futtrell v. Department of Labor Federal Credit Union*,
    816 A.2d 793 (D.C. 2003)........................................................ 26, 28, 34

*Gill v. Farm Bureau Life Insurance Co.*,
    906 F.2d 1265 (8th Cir. 1990) ............................................................ 37

*Godfrey v. Georgia*,
    446 U.S. 420 (1980) ......................................................................... 36

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ......................................................................... 36

*Greater American Federal Savings & Loan Association v. Novotny*,
    442 U.S. 366 (1979) ......................................................................... 37

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936) ......................................................................... 20

*GTE New Media Services Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000)................................................. 9, 11, 13

*Halberstram v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................ 33

*Hargraves v. District of Columbia*,
    134 F. Supp. 3d 68, 93 (D.D.C. 2015).................................................. 26

*Harrison v. Washington Post Co.*,
    391 A.2d 781 (D.C. 1978).................................................................. 25

*Helmer v. Doletskaya*,
    393 F.3d 201 (D.C. Cir. 2004) ............................................................ 10

*Herbert v. National Academy of Sciences,*
   974 F.2d 192 (D.C. Cir. 1992) ................................................................ 5

*Hess v. Indiana,*
   414 U.S. 105 (1973) ........................................................................... 22

*Hinton v. Corrections Corp.,*
   624 F. Supp. 2d 45 (D.D.C. 2009) .......................................................... 5

*Howell v. New York Post Co.,*
   612 N.E. 2d 699 (N.Y. 1993) ................................................................ 26

*Hustler Magazine, Inc. v. Falwell,*
   485 U.S. 46 (1988) ...................................................................... 34, 36

*In re Barnes & Noble Pin Pad Litigation,*
   2016 WL 5720370 (N.D. Ill. Oct. 3, 2016) ............................................. 25

*In re Carter,*
   411 B.R. 730 (Bankr. M.D. Fla. 2009) .................................................... 25

*In re Zappos.com, Inc.,*
   2013 WL 4830497 (D. Nev. Sep. 9, 2013) ............................................... 25

*Johnson v. Sawyer,*
   47 F.3d 716 (5th Cir. 1995) (*en banc*) ................................................. 25

*Klayman v. Zuckerberg,*
   753 F.3d 1354 (D.C. Cir. 2014) ............................................................ 32

*LIVNAT v. Palestinian Authority,*
   851 F.3d 45 (D.C. Cir. 2017) ............................................................... 11

*McNally v. Pulitzer Publishing Co.,*
   532 F.2d 69 (8th Cir. 1976) ............................................................ 7, 17

*Menard v. CSX Transportation, Inc.,*
   698 F.3d 40 (1st Cir. 2012) ................................................................ 30

*Miller v. California,*
   413 U.S. 15 (1973) ...................................................................... 19, 36

*Morgan v. District of Columbia,*
   550 F. Supp. 465 (D.D.C. 1982) ........................................................... 39

*Morrison v. National Australia Bank Ltd.,*
   561 U.S. 247 (2010) ................................................................ 38

*New York Times Co. v. United States,*
   403 U.S. 713 (1971) ................................................................ 17

*Novak v. Capital Management & Development Corp.,*
   452 F.3d 902 (D.C. Cir. 2006) .................................................. 8

*Obergefell v. Hodges,*
   135 S. Ct. 2584 (2015) ............................................................ 24

*Ortberg v. Goldman Sachs Group,*
   64 A.3d 158 (D.C. 2013)...................................................... 27, 28

*Owens v. Haas,*
   601 F.2d 1242 (2d Cir. 1979)................................................... 39

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ............................................................ 20

*Paul v. Howard University,*
   754 A.2d 297 (D.C. 2000)........................................................ 32

\* *Pearson v. Dodd,*
   410 F.2d 701 (D.C. Cir. 1969) .......................................... 7, 13, 17

*Randolph v. ING Life Insurance & Annuity Co.,*
   973 A.2d 702 (D.C. 2009)..................................................... 22, 25

*Reno v. ACLU,*
   521 U.S. 844 (1997) ................................................................ 36

*Robertson v. Cartinhour,*
   867 F. Supp. 2d 37 (D.D.C. 2012) .......................................... 30

*Ross v. Midwest Communications, Inc.,*
   870 F.2d 271 (5th Cir. 1989) ................................................... 18

*Smith v. Daily Mail Publishing Co.,*
   443 U.S. 97 (1979) .................................................................. 34

\* *Snyder v. Phelps,*
   562 U.S. 443 (2011) ................................................... 18, 19, 20, 26

*Snyder v. Phelps,*
    580 F.3d 206 (4th Cir. 2009) ............................................................................ 19

*Star-Telegram, Inc. v. Doe,*
    915 S.W.2d 471 (Tex. 1995)............................................................................... 18

*Steigleder v. McQuesten,*
    198 U.S. 141 (1905) ............................................................................................ 8

*Suber v. Guinta,*
    902 F. Supp. 2d 591 (E.D. Pa. 2012) ................................................................ 39

*Sundberg v. TTR Realty, LLC,*
    109 A.3d 1123 (D.C. 2015).................................................................................. 33

*Texas v. Johnson,*
    491 U.S. 397 (1989) ........................................................................................... 34

*Virgil v. Time, Inc.,*
    527 F.2d 1122 (9th Cir. 1975) ............................................................................ 17

*Walden v. Fiore,*
    134 S. Ct. 1115 (2014) ...................................................................... 11, 12, 13

*Weiss v. Lehman,*
    713 F. Supp. 489 (D.D.C. 1989)......................................................................... 23

*Wolf v. Regardie,*
    553 A.2d 1213 (D.C. 1989).................................................................... 16, 17, 34

*Wood v. Neuman,*
    979 A.2d 64 (D.C. 2009)..................................................................................... 28

*Woodke v. Dahm,*
    70 F.3d 983 (8th Cir. 1995) ............................................................................... 15

*Yonaty v. Mincolla,*
    97 A.D. 3d 141 (N.Y. App. Div. 2012) .............................................................. 24

## STATUTES

28 U.S.C. § 1367............................................................................................................ 8

28 U.S.C. § 1392.......................................................................................................... 14

42 U.S.C. § 1985.................................................................................................*passim*

47 U.S.C. § 230......................................................................................... 32

D.C. Code § 2-1401.01............................................................................... 24

D.C. Code § 13-423..................................................................................... 9

D.C. Code § 28-3852................................................................................... 25

D.C. Code § 46-401..................................................................................... 24

OTHER AUTHORITIES

John Alexander, *Samuel Adams: The Life of an American
Revolutionary* (2011) ....................................................................... 27

Samantha Barbas, *The Death of the Public Disclosure Tort*,
22 Yale Journal of Law & the Humanities 171 (2013) .......................... 16

Dan B. Dobbs, *The Law of Torts* (2017) ..................................................... 22

Restatement (Second) of Torts (1977)..................................... 18, 23, 25, 27

United to Protect Democracy, *Cockrum, Comer, and Schoenberg v.
Donald J. Trump for President, Inc. and Roger Stone*,
http://unitedtoprotectdemocracy.org/privacylawsuit/ ............................. 8

United to Protect Democracy, *Legal Experts React to Cockrum v.
Trump Campaign*, http://unitedtoprotectdemocracy.org/wpcontent/
uploads/2017/07/legal_experts_cockrumvtrump_7187.pdf ...................... 1

U.S. Department of the Treasury, Office of Tax Policy, *Selected Tax
Policy Implications of Global Electronic Commerce* (1996),
https://www.treasury.gov/resource-center/tax-policyDocuments/
Report-Global-Electronic-Commerce-1996.pdf...................................... 12

## INTRODUCTION

This is a meritless case. Plaintiffs allege, without factual grounds, that Donald J. Trump's presidential campaign conspired with Russian agents to publish emails stolen from the computers of the Democratic National Committee. Plaintiffs do not assert the Campaign helped steal the emails in the first place—only that it conspired to publish them after they had been stolen.

The object of this lawsuit is to launch a private investigation into the President of the United States. Plaintiffs have not named the President as a defendant, but the complaint foreshadows a fishing expedition into his "tax returns" (Compl. ¶ 168), "business relationships and financial ties" (*id.*), "real estate projects" (*id.* ¶ 90), conversations "with FBI Director Comey" (*id.* ¶ 176), and on and on. Plaintiffs' lawyers admit as much. They have put out a press release that describes this case as "a vehicle for discovery of documents and evidence."[1]

This lawsuit threatens to interfere with the President's ability to discharge his duties. The President occupies a "unique position in the constitutional scheme." *Clinton v. Jones*, 520 U.S. 681, 698 (1997). His "responsibilities" are "so vast and important" that he must "devote his undivided time and attention to his public duties." *Id.* at 697. Courts therefore have an obligation to ensure that private plaintiffs do not use "civil discovery" on "meritless claims" to compromise his "ability to discharge" his "constitutional responsibilities." *Cheney v. U.S. District Court*, 542 U.S. 367, 382, 386 (2004). It is obvious that Plaintiffs plan to do just that here.

---

[1] United to Protect Democracy, *Legal Experts React to Cockrum v. Trump Campaign*, http://united toprotectdemocracy.org/wpcontent/uploads/2017/07/legal_experts_cockrumvtrump_7187.pdf

Worse, this lawsuit threatens to interfere with a pending criminal investigation. The Department of Justice has already appointed Robert Mueller as Special Counsel to investigate coordination with Russia during the 2016 presidential election campaign. The Special Counsel must already coordinate with congressional committees to ensure that they do not interfere with each other's investigations. A parallel civil case, with parallel discovery proceedings, handled by a group of self-appointed private investigators, will surely complicate those efforts.

Fortunately, under blackletter law, this disruptive, politically motivated lawsuit must be dismissed on jurisdictional and merits grounds. First, Plaintiffs have sued in the wrong court; they cannot establish personal jurisdiction or venue here. The Campaign is incorporated and headquartered outside this district. Plaintiffs all live outside the district. Their alleged injuries occurred outside the district. A court in the district has no authority to hear the case.

Plaintiffs also fail to state a claim. They allege that the Campaign conspired to publish the DNC emails after hackers stole them, not that the Campaign participated in the hack itself. The most serious problem here (though far from the only one) is that both tort law and the First Amendment prohibit liability for revealing documents about public issues, even if the documents also happen to include some private facts. The DNC emails unquestionably exposed information of public interest (most notably, the DNC's hostility to Senator Bernie Sanders). Even crediting Plaintiffs' far-fetched accusations (which Plaintiffs make on information and belief), Plaintiffs have no viable legal claim. The case should be dismissed.

## FACTS

On July 22, 2016, days before the Democratic Convention met to nominate Hillary Clinton for President of the United States, WikiLeaks published a collection of thousands of work emails sent and received by officials at the Democratic National Committee. (Compl. ¶ 36.) As a result, the public learned important information about the presidential campaign and about the Democratic Party. For example:

- The emails revealed DNC officials' hostility toward Senator Sanders during the Democratic primaries. DNC figures discussed portraying Senator Sanders as an atheist, speculating that "this could make several points difference" because "my Southern Baptist peeps would draw a big difference between a Jew and an atheist." (Ex. 1.) They suggested pushing a media narrative that Senator Sanders "never ever had his act together, that his campaign was a mess." (Ex. 2.) They opposed his push for additional debates. (Ex. 3.) They complained that he "has no understanding" of the Democratic Party. (Ex. 4.)

- According to *The New York Times*, "thousands of emails" between donors and fundraisers revealed "in rarely seen detail the elaborate, ingratiating and often bluntly transactional exchanges necessary to harvest hundreds of millions of dollars from the party's wealthy donor class." These emails "capture[d] a world where seating charts are arranged with dollar totals in mind, where a White House celebration of gay pride is a thinly disguised occasion for rewarding wealthy donors and where physical proximity to the president is the most precious of currencies." (Ex. 5.)

- The emails revealed the coziness of the relationship between the DNC and the media. For example, they showed that reporters would ask DNC to pre-approve articles before publication. (Ex. 6.) They also showed staffers talking about giving a CNN reporter "questions to ask us." (Ex. 7.)

- The emails revealed the DNC's attitudes toward Hispanic voters. One memo discussed ways to "acquire the Hispanic consumer," claiming that "Hispanics are the most brand loyal consumers in the World" and that "Hispanics are the most responsive to 'story telling.'" (Ex. 8.) Another email pitched "a new video we'd like to use to mop up some more taco bowl engagement." (Ex. 9.)

3

WikiLeaks, however, did not redact the emails, so the publication also included details that Plaintiffs describe as private. (Compl. ¶¶ 41–46.) Plaintiffs Roy Cockrum and Eric Schoenberg, both Democratic Party donors, allege that the emails revealed their social security numbers, dates of birth, addresses, and other identifying information—which they say they sent to the DNC to get security clearances for an event with President Barack Obama. (*Id.* ¶¶ 43–44.) Plaintiff Scott Comer, formerly the DNC's Finance Chief of Staff and LGBT Finance Director, alleges that the emails included information "suggesting" (and allowing his grandparents to "deduc[e]") that "he is gay." (*Id.* ¶¶ 19, 45; Ex. 10.)

Plaintiffs sued Donald J. Trump for President, Inc. (the Campaign) and Roger Stone over the publication of the emails. They allege that "elements of Russian intelligence" (on their own, without involvement of the Campaign) hacked into the DNC's email systems "in July 2015" and "maintained that access" over the course of the next year. (Compl. ¶ 76.) They say that, in "a series of secret meetings in the spring and summer of 2016," the Campaign and Stone conspired with "Russian actors" to publish those emails on WikiLeaks in order to harm Hillary Clinton. (*Id.* at 19.) They say that this conspiracy covered only the "release" of the emails, not their initial acquisition. (*Id.* ¶ 137.)

Plaintiffs raise claims under D.C. law for public disclosure of private facts and intentional infliction of emotional distress (which they seek to attribute to the Campaign under conspiracy and aiding-and-abetting liability). They also raise a third claim under 42 U.S.C. § 1985(3) for conspiracy to intimidate or injure voters.

## STANDARD OF REVIEW

Rules 12(b)(1), (2), and (3) provide for the dismissal of a complaint for lack of subject-matter jurisdiction, personal jurisdiction, and venue. The court may resolve a motion under these Rules "on the complaint standing alone" or, if the defendant disputes the complaint, on the basis of evidence outside the pleadings. *Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992). For purposes of this motion, the Campaign rests on the complaint standing alone, but it reserves its right to present evidence outside the pleadings if necessary.

Rule 12(b)(6) provides for the dismissal of a complaint for failure to state a claim. A court must decide a motion under Rule 12(b)(6) on the basis of the factual allegations in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). But the court may consider documents that are "integral" to the complaint—in other words, documents upon which the complaint "necessarily relies"—"even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corrections Corp.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009). The Court may also consider matters outside the complaint that are subject to "judicial notice." *Id.* at 47. Here, the Court may consider the contents of the WikiLeaks emails, even though Plaintiffs have not attached them to their complaint. The complaint "necessarily relies" on these emails. In addition, the emails are available on the internet, so the Court may take judicial notice of their contents.

## ARGUMENT

To decide jurisdiction, venue, and the merits, it is important to recognize at the threshold that this is a case about the *publication* rather than the *acquisition* of the DNC emails. That is clear from Plaintiffs' factual theory: "Defendants entered into an agreement with other parties, including agents of Russia and WikiLeaks, to have information stolen from the DNC *publicly disseminated in a strategic way.*" (Compl. ¶ 13) (emphasis added). The complaint reinforces that theory on every page: "the *publication* of hacked information pursuant to the conspiracy" (*id.* ¶ 17); "conspiracy … *to disseminate information*" (*id.* ¶ 70); "agreement … to trade *the dissemination of hacked emails* for changes in the Republican platform" (*id.* ¶ 99); "coordinating … *to disseminate* the hacked emails" (*id.* ¶ 103); "motive … to cause the *dissemination*" (*id.* ¶ 109); "an agreement regarding the *publication*" (*id.* ¶ 116); "agreed … to *publicly disclose*" (*id.* ¶ 184) (all emphases added).

That is no surprise. Plaintiffs *could not*, consistently with Rule 11, have alleged the Campaign's involvement in the initial hack. According to Plaintiffs' own account, Russian intelligence hacked the DNC's networks "in July 2015," and gained access to email accounts "by March 2016." (*id.* ¶ 76.) But the Campaign supposedly became motivated to work with Russia only in "the spring of 2016" (*id.* ¶ 107), and supposedly entered into the agreement in "secret meetings" in "April," "May," "June," and "July" 2016 (*id.* ¶¶ 78, 81–86). In other words, Plaintiffs themselves say that the alleged conspiracy came into being *after* the hack and *after* the acquisition of the emails.

Plaintiffs' principal liability theory, public disclosure of private facts, likewise has everything to do with the publication and nothing to do with the acquisition of the emails. The District of Columbia distinguishes between the tort of public disclosure of private facts and the separate tort of intrusion. The D.C. Circuit explained the difference in *Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969) (Wright, J.), a case where a newspaper published letters stolen from a United States senator. Intrusion consists of using "improperly intrusive means" to gather information, regardless of whether the information is later published. *Id.* at 704. Public disclosure, by contrast, consists of the "publication" of private information, regardless of the "manner in which it has been obtained." *Id.* at 704–05. Under D.C. law, "injuries from intrusion and injuries from publication should be kept clearly separate." *Id.* at 705. Other jurisdictions agree: while "the manner in which information is obtained may be relevant in assessing whether the privacy tort of intrusion has been committed," it "is not relevant in assessing whether the public disclosure of private facts constitutes an actionable invasion of privacy." *McNally v. Pulitzer Publishing Co.*, 532 F.2d 69, 79 & n.14 (8th Cir. 1976). Plaintiffs have sued for public disclosure, not intrusion.

Plaintiffs' remaining legal theories, intentional infliction of emotional distress and violation of § 1985(3), also necessarily rest on the release of the emails. Plaintiffs allege that the Campaign caused emotional distress through a conspiracy "to publicly disclose" the emails. (Compl. ¶ 192.) They likewise allege that it violated § 1985(3) through a conspiracy "to publicly disclose" the emails. (*Id.* ¶ 203.)

With this backdrop in mind, the Court should dismiss this complaint.

## I. The Court Should Dismiss The Complaint On Procedural Grounds

The Court should dismiss the complaint under Rules 12(b)(1), (2), and (3) for lack of subject-matter jurisdiction, lack of personal jurisdiction, and improper venue.

### A. The Court lacks subject-matter jurisdiction over the D.C.-law claims

Plaintiffs invoke diversity and supplemental jurisdiction over their D.C.-law tort claims. To invoke diversity jurisdiction, a plaintiff must plead "the citizenship of each and every party to the action." *Novak v. Capital Management & Development Corp.*, 452 F.3d 902, 906 (D.C. Cir. 2006). Citizenship (which turns on domicile) and residence are "wholly different things" for "purposes of jurisdiction." *Steigleder v. McQuesten*, 198 U.S. 141, 143 (1905). As a result, "an allegation of *residence* is insufficient to establish the *citizenship* necessary for diversity jurisdiction." *Novak*, 452 F.3d at 906. Here, the complaint alleges that Cockrum is a "resident" of Tennessee, Schoenberg is a "resident" of New Jersey, Comer is a "resident" of Maryland, and Stone is a "resident" of Florida. (Compl. ¶¶ 31–35.) But it never says where they are *citizens*. So there is no diversity jurisdiction.

Supplemental jurisdiction, too, is improper, because Plaintiffs' D.C.-law claims "substantially predominat[e] over" their federal claim. 28 U.S.C. § 1367(c)(2). This predominance is obvious from the weakness of the federal claim, which Plaintiffs understandably put last in their complaint, and from Plaintiffs' lawyers' press release describing public disclosure as "the principal claim" in this case.[2]

---

[2] United to Protect Democracy, *Cockrum, Comer, and Schoenberg v. Donald J. Trump for President, Inc. and Roger Stone*, http://unitedtoprotectdemocracy.org/privacylawsuit/

### B. The Court lacks personal jurisdiction over the Campaign

This Court may exercise personal jurisdiction over the Campaign only if Plaintiffs satisfy (1) the D.C. long-arm statute and (2) the Due Process Clause. *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). These are not coextensive; Plaintiffs must satisfy both. *Id*. Plaintiffs satisfy neither.

### 1. Exercising personal jurisdiction would violate the D.C. long-arm statute

The D.C. long-arm statute lists a number of grounds for jurisdiction (D.C. Code § 13-423(a)); only two are relevant here. Clause (a)(3) grants jurisdiction over a defendant who causes "tortious injury in the District" through an act *inside* the District. And clause (a)(4) grants jurisdiction over a defendant who causes "tortious injury in the District" through an act *outside* the District, but only if the defendant also engages in a persistent course of conduct in the District. Importantly, both clauses require "tortious injury in the District." There is no such injury here, because (1) this case involves a mental injury; (2) mental injury usually occurs where the plaintiff lives; and (3) Plaintiffs all live outside the District.

There is no question that the only "tortious injury" in this case is a mental injury. The injury in the claim for publication of private facts is the "shame" and "humiliation" caused by the disclosure (Compl. ¶ 187)—a mental harm. The injury in the claim for intentional infliction of emotional distress is "emotional distress" (*id*. ¶ 198)—again, a mental harm. And the injury in the claim under § 1985 is the "intimidation" and distress allegedly caused by the disclosure of "private emails" (*id*. ¶ 207)—once more, a mental harm.

Mental suffering happens where the mind is located. Thus, the D.C. Circuit has held that the injury in an invasion-of-privacy case usually occurs "in the place where the plaintiff lives." *Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987). This Court, too, has ruled that injuries to one's "mental and emotional well-being" can "only have been sustained" where one lives. *Aiken v. Lustine Chevrolet, Inc.*, 392 F. Supp. 883, 886 (D.D.C. 1975).

Plaintiffs, however, all live outside the District. Cockrum lives in Tennessee, Schoenberg in New Jersey, and Comer in Maryland. (Compl. ¶¶ 31–33.) None of them experienced their injuries in the District, as the long-arm statute requires.

It is not enough that Comer worked in the District. (*Id.* ¶ 30.) True, "emotional or reputational injury" can sometimes occur not just "where the plaintiff lives" but also where he "works." *Helmer v. Doletskaya*, 393 F.3d 201, 208 (D.C. Cir. 2004). It does so, however, only when the injury in question concerns the plaintiff's "career"—for example, where a "libelous story" impugns the plaintiff's "professional reputation." *Calder v. Jones*, 465 U.S. 783, 788–89 (1984). But Comer's alleged injuries arise from disclosure of his sexual orientation—a feature of his personal life, not his work life. Moreover, that disclosure allegedly disrupted Comer's relationship with his "grandparents" (Compl. ¶ 45), not his relationship with work colleagues. In fact, Comer's colleagues already knew his sexual orientation, which Comer discussed in his work emails. (*Id.*) Thus, although emotional injury *can* occur in one's workplace, Comer's alleged injury occurred where he lived, in Maryland. In short, none of the Plaintiffs can satisfy the D.C. long-arm statute.

## 2. Exercising personal jurisdiction would violate the Due Process Clause

"Even when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of jurisdiction is within the permissible bounds of the Due Process Clause." *GTE*, 199 F.3d at 1347. The Due Process Clause authorizes two forms of personal jurisdiction: general and specific. A court with general jurisdiction may hear *any* claim against a defendant, regardless of where the claim arose; a court with specific jurisdiction may only hear claims that arose in the forum. *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017). This Court has neither general nor specific jurisdiction.

General jurisdiction is easy. A corporation is subject to general jurisdiction only where it is "at home"—typically, its place of incorporation and its principal place of business. *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014); *see LIVNAT v. Palestinian Authority*, 851 F.3d 45, 56 (D.C. Cir. 2017). The Campaign is not at home in the District; it is incorporated in Virginia and its principal place of business is Trump Tower in New York. (Compl. ¶ 34.) So there is no general jurisdiction.

That leaves specific jurisdiction. Specific jurisdiction requires a "relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1126 (2014). A court has specific jurisdiction only if (1) the defendant has "purposefully established minimum contacts" with the forum by "purposefully direct[ing]" his activities there and (2) the plaintiff's claims "arise out of or relate to" those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

This case does not arise out of the Campaign's activities in the District of Columbia. Plaintiffs do not allege that the Campaign, WikiLeaks, or anyone else published the emails from within the District. Nor do they allege that the Campaign conspired with anyone else within the District. So there is no specific jurisdiction.

None of Plaintiffs' allegations suggests otherwise. *First*, the presence of the DNC's headquarters in the District (Compl. ¶ 30) does not create jurisdiction. Specific jurisdiction can rest only on "contacts that the defendant *himself* creates with the forum." *Walden*, 134 S. Ct. at 1122. The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum." *Id.* For example, a court does not acquire personal jurisdiction "merely because the plaintiff … was residing" in the forum at the time of the defendant's actions. *Id.* at 1123. Likewise, this Court does not acquire personal jurisdiction merely because the DNC (which is not even a plaintiff, but a third party) is headquartered in the District.

*Second*, the claim that hack targeted "the email systems of the DNC in the District" (Compl. ¶ 7) does not create personal jurisdiction. To begin, Plaintiffs have not even pleaded that the hacked servers were located in the District. Rather, the complaint alleges only that the DNC's "headquarter[s]" were located there. (*Id.* ¶ 30.) That tells us nothing about the servers, which could "be located anywhere in the world," since "their users are indifferent to their location."[3]

---

[3] U.S. Department of the Treasury, Office of Tax Policy, *Selected Tax Policy Implications of Global Electronic Commerce* (1996), https://www.treasury.gov/resource-center/tax-policyDocuments/Report-Global-Electronic-Commerce-1996.pdf

More fundamentally, even if the servers were located in the District, personal jurisdiction must (as just noted) rest on the defendant's own contacts with the forum. *Walden*, 134 S. Ct. at 1122. Jurisdiction thus cannot rest on an allegation that third parties (Russian computer hackers) hacked computers within the District. That is particularly so because Plaintiffs never allege that the Campaign in any way participated in, conspired to conduct, or aided and abetted the initial hack.

In all events, specific jurisdiction extends only to claims that "arise out of or relate to" the defendant's activities in the forum. *Bristol-Myers*, 137 S. Ct. at 1780. Plaintiffs' claims arise out of and relate to the *publication*, not the *acquisition*, of the emails. In fact, as a matter of tort law, liability for publication does "not turn on the manner in which [the information] has been obtained." *Pearson*, 410 F.2d at 705. Since the claims do not arise from the alleged hack, allegations that the hack targeted computers in the District could not establish personal jurisdiction.

*Third*, the accessibility of WikiLeaks in the District (Compl. ¶ 30) does not create specific jurisdiction. The D.C. Circuit has ruled jurisdiction cannot rest on the "mere accessibility" of a website in the forum. *GTE*, 199 F.3d at 1350. Personal jurisdiction requires action "purposefully directed" at the forum (*Burger King*, 471 U.S. at 472), but posting something on the internet, where the entire world can read it, is not action "purposefully directed" at the District. In addition, if mere accessibility were enough, a defendant who posts material on the internet would be subject to jurisdiction "in any forum in the country," "shred[ding]" the "constitutional assurances" provided by the Due Process Clause "out of practical existence." *GTE*, 199 F.3d at 1350.

13

### C. Venue is improper in this district

Plaintiffs' only possible basis for asserting venue is 28 U.S.C. § 1392(b)(2), which allows a case to be brought in a district "in which a substantial part of the events or omissions giving rise to the claim occurred." But a substantial part of the events or omissions giving rise to Plaintiffs' claim did not occur in the District of Columbia.

The events giving rise to Plaintiffs' claim are: (1) the posting of the emails on the internet and (2) the alleged conspiracy to publish those emails. But Plaintiffs do not claim that WikiLeaks published the emails from a location within the District. Nor do Plaintiffs claim that the Campaign (headquartered in Manhattan's Trump Tower), Roger Stone (residing in Florida), and actors in "Russia" conducted *any* (much less a "substantial part") of their alleged "series of secret meetings" in the District. (Compl. ¶¶ 78–86.)

Plaintiffs suggest that venue is nonetheless proper because the alleged computer hack targeted the District. (*Id.* ¶ 30.) That is incorrect. In the first place, Plaintiffs have not pleaded that the hacked email servers were located in the District. As we have noted, the complaint alleges that the DNC's "headquarter[s]" were located in the District, not that its email servers were located there. (*Id.*) The location of the headquarters tells us nothing about the location of the servers because, again, computer servers can be located anywhere in the world. Plaintiffs cannot satisfy their burden of establishing venue by alleging that the hacked servers may or may not have been in the District.

More importantly, even if Plaintiffs did plead that the hacked servers were located in the District, they still could not establish venue, because the hack is not an event "giving rise to" Plaintiffs' claims. An event counts for venue purposes only if the event "itself" "directly gives rise" to the claim. *Abramoff v. Shake Consulting, LLC*, 288 F. Supp. 2d 1, 5 (D.D.C. 2003). A mere "but-for relationship" between the event and the case is not enough. *Id.* Here, the alleged hack does not "itself" "directly give rise" to the claims. Quite the contrary, the manner of acquisition of the emails has no bearing at all on Plaintiffs' claims challenging the emails' publication.

Separately, Plaintiffs say that venue is proper in the District because "Plaintiffs' private information was published across the world, including in the District." (Compl. ¶ 30.) This theory is plainly incorrect, because it would render the venue rules meaningless in internet cases. It would allow plaintiffs in such cases to sue in every district where the internet may be read—*i.e.*, in every district. That is an untenable result. *See Cabot Oil & Gas Corp. v. Water Cleaning Services LLC*, 2012 WL 2133589, at *2 (S.D. Tex. June 12, 2012).

Finally, Plaintiffs say that venue is proper here because Comer worked in the District and "Plaintiffs suffered injury in this District." (Compl. ¶ 30.) That argument is doubly wrong. One, as shown above, Plaintiffs did *not* "suffer injury in this District." *Supra* 9–10. Two, in any event, venue is *defendant*-centered; courts must "focus on relevant activities of the defendant, not of the plaintiff." *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995). Whether Plaintiffs worked or were injured in this district is thus beside the point.

## II. The Court Should Dismiss the Complaint for Failure to State a Claim

The Court should also dismiss the complaint under Rule 12(b)(6) because the complaint fails to state a claim upon which relief can be granted.

### A. Plaintiffs fail to state claims for public disclosure of private facts

Public disclosure of private facts consists of "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person." *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989). This theory of liability, which punishes *truthful* disclosures, clashes with elementary free-speech principles. Liability is so rare that scholars have described the tort as an "anachronism," "moribund," and "dead," waiting only for its "remains" to be "formally interred." Samantha Barbas, *The Death of the Public Disclosure Tort*, 22 Yale Journal of Law & the Humanities 171, 172–73 (2013) (collecting sources). Plaintiffs fail to state a claim for this tort.

#### 1. Plaintiffs' public disclosure claims fail because the publication concerned newsworthy and public issues

Tort law protects a publisher from liability for a disclosure that deals with newsworthy issues (regardless of how the publisher obtained the disclosed material). The First Amendment, too, protects a publisher from liability for a disclosure that deals with public issues (at least if the publisher was not involved in the initial illegal acquisition). Here, the DNC emails, taken as a whole, plainly deal with public issues. And Plaintiffs do not allege that the Campaign in any way participated in their acquisition. Tort law and the First Amendment thus both prohibit liability.

**a.** Under tort law, one element of public disclosure is that "the public has no legitimate concern" in the disclosure. *Wolf*, 553 A.2d at 1220. A publisher thus faces no liability "when its publication is 'newsworthy'; that is, when it concerns facts of legitimate public interest." *Id.* at 1220 n.12. That is so even if the publisher or its source stole the information. Thus, in *Pearson*, a case about publication of stolen letters, the D.C. Circuit held that newsworthiness does "not turn on the manner in which" the information "has been obtained." 410 F.2d at 706. Other jurisdictions agree that the manner of acquisition "is not relevant." *McNally*, 532 F.2d at 79; *see Virgil v. Time, Inc.*, 527 F.2d 1122, 1126 (9th Cir. 1975).

Independently, the First Amendment prohibits punishing a speaker for a disclosure of stolen information if (1) the disclosure deals with "a matter of public concern" and (2) the speaker was not "involved" in the acquisition. *Bartnicki v. Vopper*, 532 U.S. 514, 529, 535 (2001). For example, in *Bartnicki*, a radio commentator had the right to play an illegally intercepted telephone call because the call (a conversation between school-union representatives about labor negotiations) addressed public issues and the commentator did not "participate in the interception." *Id.* at 518. A contrary rule "would be fraught with danger"; it would allow the government to punish newspapers because of a "defect in the chain of title" in the information they print. *Boehner v. McDermott*, 484 F.3d 573, 586 (D.C. Cir. 2007) (*en banc*) (opinion of Sentelle, J., joined by a majority of the court). *See also New York Times Co. v. United States*, 403 U.S. 713 (1971), (First Amendment protects the right of newspapers to print the stolen *Pentagon Papers*.)

17

**b.** The DNC emails deal with newsworthy and public issues. That defeats tort liability and fulfills the first part of the test for First Amendment protection.

The law broadly construes "newsworthiness" and "public concern." Speech is "newsworthy" under tort law if it deals with anything that the media "customarily" covers. Restatement (Second) of Torts § 652D, comment g (1977). This vast field includes "suicides," "divorces," "the escape of a wild animal," "the birth of a child to a twelve-year old girl," and other "matters of genuine, even if more or less deplorable, popular appeal." *Id.* Similarly, any "subject of general interest" qualifies as a "matter of public concern" under the First Amendment. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). This sweeping category includes, for example, a call between school-union representatives about labor negotiations. *Bartnicki*, 532 U.S. at 518.

Tort law analyzes newsworthiness "on an aggregate basis"; publishers do not have to "parse out concededly public interest information" "from allegedly private facts." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1221 (10th Cir. 2007). That is because publishers have the right to conclude that redactions would undermine the "credibility" of a disclosure, causing the public to doubt its accuracy. *Ross v. Midwest Communications, Inc.*, 870 F.2d 271, 275 (5th Cir. 1989). Courts may not question this exercise of "editorial discretion" by "blue-penciling" disclosures. *Id.* Moreover, requiring publishers to redact private details—"to sort through an inventory of facts, to deliberate, and to catalogue"—"could cause critical information of legitimate public interest to be withheld until it becomes untimely and worthless to an informed public." *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 475 (Tex. 1995).

The First Amendment requires the same approach. Speech deals with a "matter of public concern" if its "overall thrust" and "dominant theme" deal with public issues. *Snyder*, 562 U.S. at 454. In *Snyder*, protestors held up hateful signs at a soldier's funeral, some specifically condemning the fallen soldier ("You're Going to Hell" and "God Hates You"). *Id.* Yet the First Amendment protected the whole funeral protest, including these private taunts, since public matters were the protest's "dominant theme." *Id.* at 454. Or, as the Fourth Circuit put it, the protestors' "general message" "primarily concerned" public matters. *Snyder v. Phelps*, 580 F.3d 206, 225 (4th Cir. 2009). This holistic approach accords with the broader "First Amendment rule" that courts must always judge speech "as a whole." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248 (2002); *see Miller v. California*, 413 U.S. 15, 24 (1973) (speech is obscene only if "the work, *taken as a whole*, appeals to the prurient interest" and "the work, *taken as a whole*, lacks serious … value" (emphasis added)).

In the aggregate, the disclosure here was newsworthy and addressed public issues. Six separate features of the disclosure make that obvious.

*First*, the nature of the disclosure. Every disclosed email was (1) a work email (2) sent or received by a political operative (3) during a presidential campaign. That means the emails *inherently* addressed politics, elections, and campaigns—all paradigmatic public issues. If a private phone call between local union operatives about school negotiations is a matter of public concern (*Bartnicki*, 532 U.S. at 516), so are emails between national political operatives about a campaign for the Presidency of the United States.

*Second*, the "content" of the disclosure. *Snyder*, 562 U.S. at 453. The disclosed emails dealt pervasively with public issues (and important public issues at that). They revealed the Democratic Party's conduct during its presidential primaries, which are "public affair[s]," "structur[ed] and monitor[ed]" by the state. *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They revealed the nature of the Democratic Party's interactions with wealthy donors, educating citizens who want to find out "whether elected officials are in the pocket of … moneyed interests." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010). They revealed the closeness of the party's ties to the media, "the great interpreters between the government and the people." *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). If "the escape of a wild animal" is newsworthy, the contents of the DNC's emails must be too.

*Third*, the "context" of the disclosure. *Snyder*, 562 U.S. at 453. WikiLeaks published the emails on July 22, 2016, "right before the Democratic National Convention." (Compl. ¶ 141.) That timing shows that the "overall thrust" of the disclosure was the revelation of publicly important facts, not the exposure of private details. Plaintiffs agree that "one of the objects" of the disclosure was "to harm the Democratic Party's candidate for President." (*Id.* ¶ 24).

*Fourth*, the "place" of the disclosure. *Snyder*, 562 U.S. at 456. In *Snyder*, the Supreme Court ruled that a funeral protest was public because it took place on a street. *Id.* WikiLeaks published the emails on the modern equivalent of a street—"the vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). Again, a sign of the disclosure's public rather than private focus.

*Fifth*, the "motiv[e]" of the disclosure. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985). The complaint says that the purpose of the disclosure was "to benefit the Trump Campaign and harm Trump's opponent" (Compl. ¶ 110), not to tell Comer's grandparents that he is gay or to release a few social security numbers buried in the midst of thousands of emails.

*Sixth*, the effect of the disclosure. The disclosure made "headlines." (*Id.* ¶ 141.) As Plaintiffs recognize, it got coverage in everything from "*The New York Times*" to "Mr. Comer's hometown newspaper." (*Id.* ¶¶ 45, 141.) It is oxymoronic to say that a disclosure that got so much coverage was *not* newsworthy.

In the final analysis, there is no doubt whatever that the disclosure, taken as a whole, spoke to newsworthy and public issues (even if individual emails also revealed private matters). That by itself defeats tort liability, and it also establishes the first part of *Bartnicki*'s test for First Amendment protection.

**c.** As for the second part of the First Amendment test: Plaintiffs do not allege that the Campaign was involved in the acquisition of the emails. In fact, they *cannot* allege that the Campaign was involved in the acquisition of the emails; they say that the hack occurred in June *2015*, but that the Campaign entered into the supposed conspiracy in "secret meetings" in the summer of *2016*. *Supra* 6.

Tort law precludes liability because the disclosure was newsworthy. And the First Amendment precludes liability because the emails dealt with public issues and the Campaign did not participate in their acquisition.

## 2. Plaintiffs' public disclosure claims also fail because the complaint fails to plead intent to expose private facts

Public disclosure, like other privacy torts, is "an intentional tort." *Randolph v. ING Life Insurance & Annuity Co.*, 973 A.2d 702, 711 (D.C. 2009). "The defendant must intend to reveal the [private] information." Dan B. Dobbs, *The Law of Torts* § 581 (2017). Intent is essential under the First Amendment, which generally allows the punishment of truthful speech only if the speaker "intends to produce" the harm that the state seeks to prevent. *Hess v. Indiana*, 414 U.S. 105, 109 (1973).

Plaintiffs never plead, much less plausibly, that the alleged conspirators acted with intent to expose private facts about them. To the contrary, they say that the object of the supposed conspiracy was "to benefit the Trump Campaign and harm Trump's opponent." (Compl. ¶ 110.) That is why the disclosure happened "right before the Democratic National Convention" (*Id.* ¶ 141), not right before Cockrum applied for a credit card or right before Comer took a trip to see his grandparents.

In fact, Plaintiffs do not even plead that the Campaign (or the other conspirators) even *knew* that the emails included the personal details that are the subject of this lawsuit. They do not allege that the Campaign ever possessed or reviewed the emails. They do not allege that the Campaign knew that the emails contained any social security numbers (let alone Cockrum's and Schoenberg's numbers). And they certainly do not make the absurd claim that the Campaign knew that the emails would allow Comer's grandparents to "deduc[e]" that Comer is gay (*Id.* ¶ 19). The Campaign could not have intended to disclose Plaintiffs' private information if it did not even know that the emails contained Plaintiffs' private information.

### 3. Comer's public-disclosure claim fails for additional reasons

**a.** Comer's claim rests mainly on emails "suggesting" and allowing his grandparents to "deduc[e]" that he is gay. (Compl. ¶¶ 19, 45.) But Comer fails to plead an essential element of the tort: that he kept the disclosed fact "private." A fact is "private" only if the plaintiff keeps it "entirely to himself" or reveals it "at most" to "family" and "close friends." Restatement (Second) of Torts § 652D, comment b. For example, if a plaintiff reveals "intimate facts about her childhood" to work colleagues, those facts are no longer private. *Weiss v. Lehman*, 713 F. Supp. 489, 504 (D.D.C. 1989).

The complaint never pleads that Comer kept his sexual orientation private. Far from it, it says only that he "was not openly gay *with his grandparents and several other members of his close-knit family*." (Compl. ¶ 45 (emphasis added)). Thus, he *was* "openly gay" with everyone else.

Further, Comer's claim rests on the disclosure of emails "suggesting" his sexual orientation (not on the disclosure of his sexual orientation itself). But the complaint does not say that Comer kept this "suggestive" information private. In fact, it does not even say what the "suggestive" information was. It could be Comer's job title, "LGBT Finance Director"—which the complaint does not mention (Compl. ¶ 33), but which appears in Comer's signature block in hundreds of emails to recipients both inside and outside the DNC. (*E.g.*, Exs. 11–12.) If so, his signature block and his job title are not private facts. Regardless, whatever "suggestive" information allowed Comer's grandparents to "deduce" his sexual orientation, Comer shared it with colleagues in work emails. So it was not private.

More fundamentally, the public-disclosure tort simply does not cover the truthful disclosure of another's sexual orientation. Public-disclosure liability lies for disclosures that cause "shame" and "humiliation." *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013). The District of Columbia does not consider homosexuality shameful or humiliating—certainly not after *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). In fact, the District legalized same-sex marriage eight years ago (D.C. Code § 46-401), and bans "discrimination by reason of … sexual orientation" (D.C. Code § 2-1401.01).

By way of analogy, modern cases hold that is not defamatory to call someone gay. That is because punishing such statements would "legitimize relegating homosexuals to second-class status" (*Albright v. Morton*, 321 F. Supp. 2d 130, 138 (D. Mass. 2004) (Gertner, J.)) and validate "the flawed premise" that homosexuality "is shameful and disgraceful" (*Yonaty v. Mincolla*, 97 A.D. 3d 141, 144 (N.Y. App. Div. 2012)). That logic is equally applicable here. What is more, tort law and the First Amendment have always protected true speech more than false speech. If *falsely* calling someone gay is not a tort, *truthfully* calling someone gay cannot be a tort either.

**b.** The complaint alleges in passing that the WikiLeaks disclosure included an email that Comer sent "to his boss" in which he "graphically describes his work" while suffering from the stomach flu. (Compl. ¶ 46; Ex. 13.) But the disclosure of this email was not tortious. It is not "shameful" or "humiliating" to have the stomach flu. In addition, Comer failed to keep information about his medical illness private; he instead revealed his illness to his boss, and even drew a connection between the illness and his job duties. Comer's public-disclosure claim must fail.

### 4. Cockrum and Schoenberg's public-disclosure claims fail for additional reasons

Cockrum's and Schoenberg's claims rest on emails containing their social security numbers, phone numbers, addresses, and dates of birth. (Compl. ¶¶ 43–44.) But these kinds of disclosures lie outside the scope of the public-disclosure tort.

Public-disclosure liability covers disclosures of "*embarrassing* private facts." *Harrison v. Washington Post Co.*, 391 A.2d 781, 784 (D.C. 1978) (emphasis added). "Embarrassing," in the sense that disclosure would cause "shame" and "humiliation." *Armstrong*, 80 A.3d at 189. "Private," in the sense that the plaintiff has revealed it "at most" to "family" and "close friends." Restatement (Second) of Torts § 652D, comment b. Social security numbers, addresses, and so on are not "embarrassing," "shameful," or "humiliating." Nor do people reveal them only to family and friends. So the public-disclosure tort does not cover them. *See In re Barnes & Noble Pin Pad Litigation*, 2016 WL 5720370, at *7 (N.D. Ill. Oct. 3, 2016) (social security number); *In re Zappos.com, Inc.*, 2013 WL 4830497, at *3 (D. Nev. Sep. 9, 2013) (social security number); *In re Carter*, 411 B.R. 730, 741 (Bankr. M.D. Fla. 2009) (social security number); *Johnson v. Sawyer*, 47 F.3d 716, 732 (5th Cir. 1995) (*en banc*) (address).

Other laws deal with the problems caused by exposure of social security numbers. For example, using improper means to gain access to a social security number can amount to the separate tort of intrusion. *Randolph*, 973 A.2d at 710. A D.C. statute also requires businesses to safeguard consumer financial data against security breaches. D.C. Code § 28-3852. But the exposure of a social security number simply does not constitute a public disclosure of private facts, the tort asserted here.

## B. Plaintiffs fail to state a claim for intentional infliction of emotional distress

On to the next claim. Intentional infliction of emotional distress consists of "(1) extreme and outrageous conduct" that "(2) intentionally or recklessly" "(3) causes the plaintiff severe emotional distress." *Futtrell v. Department of Labor Federal Credit Union*, 816 A.2d 793, 808 (D.C. 2003). This is a "narrow tort" with "rigorous" requirements. *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2015). Plaintiffs cannot satisfy those requirements here.

### 1. The claims fail because the speech was newsworthy and public

The intentional-infliction claims fail for the same basic reason as the public-disclosure claims: The speech was newsworthy and public. As a matter of tort law, a plaintiff may not use a claim for intentional infliction "to circumvent the limitations" on other torts. *Creditwatch, Inc. v. Jackson*, 157 S.W. 3d 814, 818 (Tex. 2005). In particular, if a disclosure is "newsworthy," a plaintiff may not get around the newsworthiness of the public-disclosure tort by raising an intentional infliction claim instead. *Howell v. New York Post Co.*, 612 N.E. 2d 699, 705 (N.Y. 1993). For all the reasons already discussed, the disclosure here was newsworthy.

Separately, the First Amendment prohibits intentional-infliction liability for public speech. For example, in *Snyder*, the First Amendment prohibited intentional-infliction liability for picketers who held up hateful signs at a soldier's funeral ("God Hates Fags," "Thank God for Dead Soldiers," "Thank God for IEDs") because the protest as a whole addressed public issues. 562 U.S. at 448. The same result must follow here, since the disclosure, as a whole, addressed public issues.

26

### 2. The claims fail because the disclosure was not directed at Plaintiffs

As a general matter, a defendant commits intentional infliction of emotional distress only if he engages in conduct "directed at" the plaintiff, not if he engages in conduct "directed at a third person." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335 (D.C. Cir. 2003) (quoting Restatement (Second) of Torts § 46(2)). In other words, the plaintiff must be the target of the conduct, not just a collateral victim. But all agree that Plaintiffs were not the targets of the disclosure. Rather, the complaint says that the point of the disclosure, which occurred right before the Democratic convention, was "to harm the Democratic Party's candidate." (Compl. ¶ 24.) Plaintiffs thus have no claims for intentional infliction of emotional distress.

### 3. The claims fail because the disclosure was not outrageous

A defendant is liable for intentional infliction only if his conduct was so "outrageous," "atrocious," and "utterly intolerable" that it went "beyond all possible bounds of decency" "in a civilized community." *Ortberg v. Goldman Sachs Group*, 64 A.3d 158, 163 (D.C. 2013). As a matter of law, it does not exceed all possible bounds of decency to print a collection of newsworthy documents in whose acquisition the publisher did not participate. *Bartnicki*, 532 U.S. at 518. Indeed, the practice goes back at least as far as 1773, when Benjamin Franklin and Samuel Adams published the stolen letters of the Governor of Massachusetts Bay. *See* John Alexander, *Samuel Adams: The Life of an American Revolutionary* 150–52 (2011). Nor (in Comer's case) is it outrageous to "suggest" someone's sexual orientation, particularly when the person has not kept his sexual orientation private in the first place. *Supra* 23.

### 4. The claims fail because the disclosure did not cause severe distress

Finally, a plaintiff claiming intentional infliction of emotional distress must show distress "so acute" that it causes or threatens to cause "physical illness." *Ortberg*, 64 A.3d at 164. That is a high bar. In one case, the D.C. Court of Appeals held that a plaintiff's distress was insufficiently severe even though the defendant's acts left her "horrified," "shaken," "embarrassed," "constantly crying," and "almost sleepless." *Wood v. Neuman*, 979 A.2d 64, 78 (D.C. 2009). Accordingly, "worry," "difficulty," and "mental distress" also do not suffice. *Ortberg*, 64 A.3d at 164.

Plaintiffs never allege that the disclosure caused them emotional distress so acute that they became physically ill. Instead, Cockrum and Schoenberg say that the disclosure caused "significant distress," "anxiety," and "concer[n]." (Compl. ¶¶ 17–18.) Comer says that it caused "instantaneous and intense distress." (*Id.* ¶ 45.) That is nowhere near enough. Plaintiffs' claims must fail.

That is so even though Comer says that he sank into "depression" and needed "medical care" at some unspecified point after the disclosure. (*Id.* ¶ 19.) A plaintiff has a claim only if the defendant's acts "proximately cause" the distress. *Futrell*, 816 A.2d at 808. Comer does not satisfy that requirement. He says that after the release of the emails (1) his grandparents "deduced his sexual orientation," his colleagues "marginalized" him, and strangers made "harassing phone calls"; (2) the resulting "emotional toll" "brought an end to a long-term romantic relationship"; and (3) these "circumstances," in turn, "led to" depression. (Compl. ¶¶ 19, 63–67.) This chain of causation is far too attenuated to support tort liability.

## C. Plaintiffs fail to state a viable theory of vicarious liability against the Campaign

Establishing that *someone* committed a tort obviously is not enough. Plaintiffs must show that *the Campaign* is responsible for that tort, even though the Campaign did not itself obtain the emails or give them to WikiLeaks to publish. Plaintiffs strain to make this showing by relying on four theories of vicarious liability: the Campaign (1) conspired with "Russian actors," (2) conspired with WikiLeaks, (3) conspired with Roger Stone, and (4) aided and abetted the publication. None of these theories is viable.

### 1. Plaintiffs fail to plead a conspiracy with "Russian actors"

Rule 8 requires a complaint to state a "plausible" claim for relief. *Iqbal*, 556 U.S. at 678. The Court must first excise allegations that are not "well-pleaded" and thus "not entitled to the assumption of truth." *Id.* at 679. It must then ask whether the allegations that remain support a "reasonable inference" of misconduct. *Id.* at 678.

The plausibility standard protects defendants against "costly and protracted discovery" on a "largely groundless claim." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558–59 (2007). This protection is essential here, where discovery would burden the President. As discussed, the President's "unique position in the constitutional scheme" requires him to "devote his undivided time and attention to his public duties." *Jones*, 520 U.S. at 697–98. Courts must therefore ensure that plaintiffs do not use "civil discovery" on "meritless claims" to interfere with his "ability to discharge" his responsibilities. *Cheney*, 542 U.S. at 382, 386. (Compare *Iqbal*, which warns courts to avoid imposing discovery burdens on "high-level officials." 556 U.S. at 686.)

The complaint rests largely on allegations made on "information and belief." But these allegations are not well-pleaded, and the Court must disregard them.

To plead on information and belief, a plaintiff must state "the facts upon which" the belief is "based." *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 n.57 (D.D.C. 2012) (quoting *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1279 (D.C. Cir. 1994)). If Plaintiffs "had any facts to support" their beliefs, "they should have been set forth"; "'information and belief' does not mean pure speculation." *Menard v. CSX Transportation, Inc.*, 698 F.3d 40, 44 (1st Cir. 2012).

Most of the complaint's 40 or so information-and-belief allegations fail to state the basis of the belief. For example, Plaintiffs believe that "Campaign associates exchanged at least 18 undisclosed calls and emails with Russian officials and agents between April and November 2016." (Compl. ¶ 81.) But the complaint provides nothing identifying the *basis* of this belief. Plaintiffs also believe that, in 2005, Paul Manafort proposed a plan "to influence politics inside the United States" to "a Russian billionaire." (*Id.* ¶ 97.) Again, nothing about the basis of the belief. Plaintiffs likewise believe that Jared Kushner has "financial and personal ties with Russian investors." (*Id.* ¶ 101.) Yet again, nothing about the basis of the belief. Plaintiffs further believe that "Russia's practice when it engages in cyber-attacks related to an election in another country is to partner with aligned parties who are on the ground in that country." (*Id.* ¶ 102.) Same problem. These allegations are not well-pleaded and thus are not entitled to the presumption of truth at the motion-to-dismiss stage.

The remnants of the complaint do not come close to satisfying Rule 8. A conspiracy complaint must, at a minimum, allege the "time," the "place," and the "person[s] involved" in the alleged conspiracy. *Twombly*, 550 U.S. at 565 n.10. But once the complaint is shorn of speculation about secret meetings, it does not identify which employees of the Campaign supposedly conspired, which "Russian actors" they conspired with, or when or where they conspired.

In addition, the "factual content" that remains in the complaint does not raise a "reasonable inference" of misconduct. *Iqbal*, 556 U.S. at 678. Plaintiffs allege that the goal of the conspiracy was to release the emails (Compl. ¶ 184), which occurred in July 2016 (*Id.* ¶ 36). But nearly every "meeting" and event shaping the conspiracy occurred *after* the WikiLeaks dump in July 2016. The only meeting Plaintiffs identify that occurred before the release was one involving Donald Trump Jr. and Russian lawyer Natalia Veselnitskaya in June 2016. (*Id.* ¶¶ 111). But Plaintiffs *do not* allege that meeting concerned the DNC emails. In all events, a single meeting cannot support Plaintiffs' conclusion that there was a complex global conspiracy to release the emails one month after that meeting. *Cf. Twombly*, 550 U.S. at 567 n.12 (even regular meetings do not suggest conspiracy).

Nor can a court infer conspiracy from the complaint's allegations that then-candidate Trump talked about, "amplified," and "drew attention to" the emails after their release. (Compl. at 33.) *Of course* he did so. That is what political candidates do—draw attention to information that hurts their opponents. That does not prove that they participated in a scheme to release the information in the first place.

31

### 2.  Plaintiffs cannot rely on claims of a conspiracy with WikiLeaks

Plaintiffs likewise cannot establish vicarious liability by alleging that the Campaign conspired with WikiLeaks. Under section 230 of the Communications Decency Act (47 U.S.C. § 230), a website that provides a forum where "third parties can post information" is not liable for the third party's posted information. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014). That is so even when even when the website performs "editorial functions" "such as deciding whether to publish." *Id.* at 1359. Since WikiLeaks provided a forum for a third party (the unnamed "Russian actors") to publish content developed by that third party (the hacked emails), it cannot be held liable for the publication.

That defeats the conspiracy claim. A conspiracy is an agreement to commit "an unlawful act." *Paul v. Howard University*, 754 A.2d 297, 310 (D.C. 2000). Since WikiLeaks' posting of emails was not an unlawful act, an alleged agreement that it should publish those emails could not have been a conspiracy.

### 3.  Plaintiffs cannot rely on claims of a conspiracy with Stone

Plaintiffs also cannot rely on allegations of a conspiracy with Roger Stone. Plaintiffs do not claim that Stone himself handed over the emails to WikiLeaks; thus, Stone is not himself a tortfeasor for whose acts the Campaign can be vicariously liable. In addition, the complaint alleges that Stone was "agent" of the Campaign (Compl. ¶ 35). A corporation, however, "cannot conspire" with its agents. *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.C. 2000).

### 4.  Plaintiffs cannot establish aiding-and-abetting liability

Plaintiffs finally contend that the Campaign is vicariously liable for the publication of the leaked emails because it "aided and abetted" the disclosure. (Compl. ¶¶ 185, 193.) This theory fails for the simple reason that the District of Columbia "ha[s] not recognized" liability for aiding and abetting tortious conduct. *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015); *see, e.g.*, *Flax v. Schertler*, 935 A.2d 1091, 1107 n.15 (D.C. 2007) ("we have not" "recognize[d] a tort of aiding and abetting tortious conduct"); *CAIR Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 356 (D.D.C. 2015) ("Because the D.C. Court of Appeals has not recognized a claim for aiding and abetting a tort, this claim fails"). The D.C. Circuit predicted nearly 35 years ago that the District would recognize such liability (*Halberstram v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)), but the D.C. Court of Appeals' more recent decisions in 2007 and 2015 rejecting such liability supersede that case (*see, e.g.*, *Gaubatz*, 82 F. Supp. 3d at 356).

Plaintiffs in any event fail to plead a plausible case of aiding and abetting. Plaintiffs' theory of aiding and abetting is that "Russian individuals" allegedly "consulted" with the Campaign "to better understand how the hacked materials could be used to greatest political effect" (Compl. ¶ 11), and the Campaign allegedly helped "select the materials to be released" (*id.* ¶ 137). As we have just explained, however, Plaintiffs have not plausibly pleaded that the Campaign coordinated with "Russian individuals." As a result, Plaintiffs can no more rely on aiding-and-abetting liability than they can rely on conspiracy liability.

### D. The theories of tort liability on which Plaintiffs rely violate the First Amendment and vagueness doctrine

Plaintiffs' tort claims fail for one final set of reasons: the underlying theories of tort liability violate the First Amendment and the vagueness doctrine.

#### 1. Plaintiffs' theories of tort liability violate the First Amendment

Public-disclosure liability (even when properly construed) violates the First Amendment on its face. Intentional-infliction liability violates the First Amendment as applied to truthful speech. At a minimum, both violate the First Amendment as applied to truthful speech in a political campaign (the kind of speech at issue here).

Under the First Amendment, the government has no power to restrict expression "because of the content of the message." *Texas v. Johnson*, 491 U.S. 397, 412 (1989). In particular, it may not prohibit speech simply because society finds the speech "offensive or disagreeable." *Id.* at 414. Plaintiffs' tort theories flatly contradict this elementary principle: public-disclosure liability arises if the disclosure is "highly offensive" (*Wolf*, 553 A.2d at 1220), and intentional-infliction liability if the speech is "outrageous" (*Futtrell*, 816 A.2d at 808).

In addition, the First Amendment generally denies the government power to punish truthful speech. "State action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 102 (1979). After all, the First Amendment protects speech precisely in order to promote "the common quest for truth." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988). Plaintiffs' tort theories contradict this rudimentary principle as well; they would punish publication of *truthful* information about Plaintiffs' lives.

34

Privacy cannot justify these violations of core First Amendment norms. "Punishing truthful publication in the name of privacy" is an "extraordinary measure." *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989). The state may resort to this measure, "if at all," only if it satisfies strict scrutiny—only where liability is "narrowly tailored to a state interest of the highest order." *Id.* at 541. There is no narrow tailoring here. The state has available a "far more limited means" of protecting privacy "than the extreme step of punishing truthful speech" (*id.* at 538): It could just punish the people who acquire the information unlawfully in the first place.

At a minimum, privacy cannot justify suppressing true speech during a political campaign. The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 223 (1989). It leaves voters "free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United*, 558 U.S. at 341. It would eviscerate that guarantee to punish true disclosures made in a political campaign.

## 2.  Plaintiffs' theories of tort liability are void for vagueness

The Due Process Clause prohibits laws that are "impermissibly vague." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Free Speech Clause requires "rigorous adherence" to this principle "when speech is involved." *Id.* The public-disclosure tort is impermissibly vague because it turns on whether the disclosure is "highly offensive"; the intentional-infliction tort is impermissibly vague as applied to speech because it turns on whether the speech is "outrageous."

The terms "highly offensive" and "outrageous" bear all the hallmarks of vague laws. They deny speakers "fair warning" (*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)); a speaker cannot accurately predict in advance what disclosures a jury will deem "highly offensive." They invite "arbitrary and discriminatory" enforcement (*id.*); "outrageous" is an "inherent[ly] subjectiv[e]" standard, inviting liability "on the basis of the jurors' tastes or views" (*Hustler*, 485 U.S. at 55). They also "inhibit the exercise" of "First Amendment freedoms" (*Grayned*, 408 U.S. at 109); uncertainty about the scope of the torts will deter speakers from speaking in the first place. In-validating these terms would break no new ground; the law reports are replete with cases invalidating indefinite terms such as "annoying" (*Coates v. Cincinnati*, 402 U.S. 611, 616 (1971)), "vile" (*Godfrey v. Georgia*, 446 U.S. 420, 428–29 (1980)), and "offensive" (*Reno v. ACLU*, 521 U.S. 844, 873 (1997)).

*Miller v. California* is dispositive. It held that an obscenity statute that simply bans "patently offensive" portrayal of sex violates the First Amendment. 413 U.S. at 24. An obscenity statute must instead "specifically defin[e]" the acts whose portrayal is prohibited (for instance: "masturbation, excretory functions, and lewd exhibition of the genitals"). *Id.* at 25. This specific listing is necessary to "reduc[e] the vague-ness inherent in the open-ended term 'patently offensive.'" *Reno*, 521 U.S. at 873. Here, however, the District of Columbia has neither specifically listed nor defined the kinds of disclosures that would be tortious; it has instead rested on the phrases "highly offensive" and "outrageous" standing alone. Unless obscene speech is to be given greater protection than political speech, the torts are void for vagueness.

### E. Plaintiffs fail to state a claim under 42 U.S.C. § 1985

That leaves Plaintiffs' claim under § 1985(3), which creates liability for conspiracies to interfere with certain civil rights, including the right to give "support or advocacy" in a federal election. The claim fails for a variety of independent reasons.

*First*, Plaintiffs fail to allege the state action that § 1985(3) requires. "Section 1985(3) provides no substantive rights itself; it merely provides a remedy" for conspiracies to violate rights defined by other laws. *Greater American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 372 (1979). Section 1985(3) thus provides a remedy for "purely private conspiracies" only where the conspiracy targets a right that is protected "against private, as well as official, encroachment." *Carpenters v. Scott*, 463 U.S. 825, 832–33 (1983). Put another way, if the predicate constitutional guarantee requires state action, so does a § 1985(3) claim.

Plaintiffs' claims rest on the right to give "support or advocacy"—a First Amendment right. But the First Amendment "restrains only official conduct," so § 1985(3) does not cover "wholly private conspiracies" to violate it. *Carpenters*, 463 U.S. at 833. For example, in *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004), the Eighth Circuit ruled that "the support or advocacy clause" did not cover a private conspiracy to break in to a candidate's campaign headquarters because "a First Amendment claim cannot be actionable … without showing state or government action." The Eighth Circuit reached the same conclusion in *Gill v. Farm Bureau Life Insurance Co.*, 906 F.2d 1265, 1270 (8th Cir. 1990). Here, Plaintiffs do not allege any state involvement in the alleged wrongdoing. That dooms their claim under § 1985(3).

37

*Second*, Plaintiffs fail to plead the requisite kind of conspiracy. Section 1985(3) prohibits only conspiracies that "prevent by force, intimidation, or threat" voters from giving support or advocacy or "to injure" citizens because of support or advocacy. As a matter of ordinary English, two people have conspired "to prevent" or "to injure" only if prevention or injury is the *purpose* (not merely the *effect*) of their agreement.

Plaintiffs, however, do not adequately plead *any kind* of conspiracy. *Supra* 29–31. They certainly do not plead a conspiracy whose purpose is to intimidate or injure voters. They thus state that "one of the objects of the conspiracy was to harm the Democratic Party's candidate for President," but not that another object of the conspiracy was to intimidate Roy Cockrum or to threaten Eric Schoenberg or to injure Scott Comer. (Compl. ¶ 24.) At most, Plaintiffs have alleged that the purpose of the conspiracy was to *convince* voters to choose Mr. Trump over Secretary Clinton by revealing information that would embarrass the Democratic Party. (*Id.* ¶¶ 24, 110.) If trying to convince voters to pick one candidate over another violates § 1985(3), political parties are conspiring to break the law every day.

*Third*, Plaintiffs improperly seek to apply § 1985(3) extraterritorially. Federal laws "apply only within the territorial jurisdiction of the United States" unless Congress "clearly" says otherwise. *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Far from clearly saying otherwise, § 1985(3) begins: "If two or more persons *in any State or Territory* conspire …" (emphasis added). But "Russian actors" are not "persons in any State or Territory." Neither is WikiLeaks.

*Finally*, Plaintiffs improperly seek *respondeat superior* liability. *Respondeat superior* liability does "[n]ot extend" to § 1985(3); a defendant is liable for its own acts or policies, but not for the acts of its employees or agents. *Morgan v. District of Columbia*, 550 F. Supp. 465, 470 (D.D.C. 1982); *see Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979); *Suber v. Guinta*, 902 F. Supp. 2d 591, 609 (E.D. Pa. 2012). The complaint does not allege that Donald J. Trump for President, Inc. itself entered into a conspiracy; rather, it alleges that "agents of the Trump Campaign" did so. (Compl. ¶ 12.) Plaintiffs are thus seeking vicarious rather than personal liability. The unavailability of such liability is yet another reason to dismiss this § 1985(3) claim.

## CONCLUSION

The Court should dismiss the complaint for lack of subject-matter jurisdiction, lack of personal jurisdiction, and improper venue. Alternatively, it should dismiss the complaint for failure to state a claim.

Dated:  September 5, 2017

Respectfully submitted,

/s/ Michael A. Carvin

Jeffrey Baltruzak (PA Bar No. 318156)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin (DC Bar No. 366784)
  *Counsel of Record*
Vivek Suri (DC Bar No. 1033613)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*
*(\* application for admission pending)*

## CERTIFICATE OF SERVICE

I certify that on September 5, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:  September 5, 2017

/s/ Michael A. Carvin
_____
Michael A. Carvin
*Counsel for Donald J. Trump for President, Inc.*