# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ROY COCKRUM, ET AL.,

                    *Plaintiffs,*

      v.

DONALD J. TRUMP FOR PRESIDENT,
INC., ET AL.,

                  *Defendants.*

Case No. 1:17-cv-1370-ESH

---

## DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S SPECIAL MOTION TO DISMISS UNDER THE D.C. ANTI-SLAPP ACT

---

Jeffrey Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin
  *Counsel of Record*
Vivek Suri
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

Defendant Donald J. Trump for President, Inc. (the Campaign) respectfully moves that the Court dismiss Plaintiffs' claims for public disclosure of private facts and intentional infliction of emotional distress in accordance with the District of Columbia Anti-SLAPP Act (D.C. Code § 16-5502(a)). In accordance with the Anti-SLAPP Act (*id.* § 16-5504(a)) and Federal Rule of Civil Procedure 54(d)(2), the Campaign reserves the right to seek the costs of litigation, including a reasonable attorney's fee, if the Court grants the motion.

Dated:  September 5, 2017

Respectfully submitted,

/s/ Michael A. Carvin

Jeffrey Baltruzak (PA Bar No. 318156)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin (DC Bar No. 366784)
  *Counsel of Record*
Vivek Suri (DC Bar No. 1033613)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*
*(\* application for admission pending)*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROY COCKRUM, ET AL., <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP FOR PRESIDENT, INC., ET AL., <br><br> *Defendants.* | Case No. 1:17-cv-1370-ESH |

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S SPECIAL MOTION TO DISMISS UNDER THE D.C. ANTI-SLAPP ACT

---

Jeffrey Baltruzak
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin
  *Counsel of Record*
Vivek Suri
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

# TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................................ii

Introduction ............................................................................................................. 1

Facts ......................................................................................................................... 2

Legal Background .................................................................................................... 4

Argument ................................................................................................................. 5

I.   The District of Columbia Anti-SLAPP Act applies in federal court .................. 5

    A.   The Anti-SLAPP Act is consistent with the Federal Rules ......................... 6

    B.   Applying the Anti-SLAPP Act in federal court advances the twin
        aims of *Erie* .................................................................................................. 8

    C.   *Abbas* permits application of the Anti-SLAPP Act, as now authorita-
        tively interpreted by the D.C. Court of Appeals, in federal court .............. 10

II.  The Anti-SLAPP Act requires dismissal of Plaintiffs' D.C.-law claims ........... 12

    A.   Plaintiffs' claims arise from an act in furtherance of the right of
        advocacy on issues of public interest ......................................................... 12

    B.   Plaintiffs have yet to produce any evidence at all, let alone enough
        evidence to allow a jury to rule for them .................................................... 16

Conclusion ............................................................................................................. 16

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbas v. Foreign Policy Group, LLC,*
    783 F.3d 1328 (D.C. Cir. 2015)......................................................... 10, 11

*Burke v. Air Serv International, Inc.,*
    685 F.3d 1102 (D.C. Cir. 2012)............................................................... 5

*Burlington N. R.R. Co. v. Woods,*
    480 U.S. 1 (1987) .................................................................................... 6

*California Democratic Party v. Jones,*
    530 U.S. 567 (2000) .............................................................................. 13

*Citizens United v. FEC,*
    558 U.S. 310 (2010) .............................................................................. 13

*Cohen v. Beneficial Industries Loan Corp.,*
    337 U.S. 541 (1949) ................................................................................ 7

\*  *Competitive Enterprises Institute v. Mann,*
    150 A.3d 1213 (D.C. 2016)............................................................*passim*

*Dunning v. Quander,*
    508 F.3d 8 (D.C. Cir. 2007) (*per curiam*) .............................................. 6

*Easaw v. Newport,*
    — F. Supp. 3d —, 2017 WL 2062851 (D.D.C. 2017)............................. 11

*Erie Railroad Co. v. Tompkins,*
    304 U.S. 64 (1938) .......................................................................*passim*

*Gasperini v. Center for Humanities, Inc.,*
    518 U.S. 415 (1996) ............................................................................ 5, 8

*Grosjean v. American Press Co.,*
    297 U.S. 233 (1936) .............................................................................. 13

*Hanna v. Plumer,*
    380 U.S. 460 (1965) ........................................................................ 5, 6, 9

*Shady Grove Orthopedic Associates v. Allstate Ins. Co.*,
　559 U.S. 393 (2010) ................................................................... 5, 6

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
　190 F.3d 963 (9th Cir. 1999) ................................................... 9

*Walker v. Armco Steel Corp.*,
　446 U.S. 740 (1980) ................................................................ 6

STATUTES

42 U.S.C. § 1985 ........................................................................... 3

D.C. Code § 16-5501 ............................................................. 12, 14, 15

D.C. Code § 16-5502 ................................................................*passim*

D.C. Code § 16-5504 ................................................................... 4

OTHER AUTHORITIES

Fed. R. Civ. P. 56 ...................................................................*passim*

## INTRODUCTION

Plaintiffs claim that the Trump Campaign committed a tort by conspiring with others to speak about them. They allege that Russian hackers stole emails from the Democratic National Committee, and that the Campaign later conspired with others to publish those emails on WikiLeaks. Plaintiffs do not claim that the Campaign participated in the hack itself; rather, they claim that the mere dissemination of the information is tortious. Plaintiffs seek, in other words, to hold the Campaign liable for speech. Not for false speech, defamatory speech, or threatening speech, but for truthful speech uttered in the course of a presidential campaign.

The District of Columbia has enacted a statute—the Anti-SLAPP Act (D.C. Code § 16-5502)—to protect defendants from just such lawsuits. Under that statute, a court must dismiss any claim arising out of speech related to issues of public interest, unless the plaintiff, at the outset of the case, produces the same evidence that he would need to survive summary judgment.

The Anti-SLAPP Act governs the resolution of D.C.-law claims in federal court. Plaintiffs' claims for public disclosure of private facts and intentional infliction of emotional distress trigger the statute's protections, yet Plaintiffs have not even *attempted* to introduce affidavits or other evidence to satisfy the Act's evidentiary requirements. The Court should therefore dismiss these claims.[*]

---

[*] The issues presented in this motion overlap with the issues in No. 1:17-cv-913-ESH, *Deripaska v. Associated Press*, which is also pending before this Court. In that case, a Russian billionaire sued the Associated Press for defaming him in an article about Paul Manafort's alleged links with Russia. The Associated Press has sought dismissal of the lawsuit under the D.C. Anti-SLAPP Act.

# FACTS

On July 22, 2016, days before the Democratic Convention met to nominate Hillary Clinton for President, WikiLeaks published thousands of work emails sent and received by officials at the DNC. (Compl. ¶ 36.) As a result, the public learned important information about the presidential campaign and the Democratic Party. For example (as shown in exhibits attached to the Campaign's motion to dismiss):

- The emails revealed DNC officials' hostility toward Senator Bernie Sanders during the Democratic primaries. DNC figures discussed portraying Senator Sanders as an atheist, speculating that "this could make several points difference" because "my Southern Baptist peeps would draw a big difference between a Jew and an atheist." (Ex. 1.) They suggested pushing a media narrative that he "never ever had his act together, that his campaign was a mess." (Ex. 2.) They opposed his push for additional debates. (Ex. 3.) They complained that he "has no understanding" of the Democratic Party. (Ex. 4.)

- According to *The New York Times*, "thousands of emails" between donors and fundraisers revealed "in rarely seen detail the elaborate, ingratiating and often bluntly transactional exchanges necessary to harvest hundreds of millions of dollars from the party's wealthy donor class." These emails "capture[d] a world where seating charts are arranged with dollar totals in mind, where a White House celebration of gay pride is a thinly disguised occasion for rewarding wealthy donors and where physical proximity to the president is the most precious of currencies." (Ex. 5.)

- The emails revealed the coziness of the relationship between the DNC and the media. For example, they showed that reporters would ask DNC to preapprove articles before publication. (Ex. 6.) They also showed staffers talking about giving a CNN reporter "questions to ask us." (Ex. 7.)

- The emails revealed the DNC's attitudes toward Hispanic voters. One memo discussed ways to "acquire the Hispanic consumer," claiming that "Hispanics are the most brand loyal consumers in the World" and that "Hispanics are the most responsive to 'story telling.'" (Ex. 8.) Another email pitched "a new video we'd like to use to mop up some more taco bowl engagement." (Ex. 9.)

WikiLeaks, however, did not redact the emails, so the publication also included details that Plaintiffs describe as private. (Compl. ¶¶ 41–46.) Plaintiffs Roy Cockrum and Eric Schoenberg, both Democratic Party donors, allege that the emails revealed their social security numbers, dates of birth, addresses, and other identifying information, which they say they sent to the DNC in order to get clearances to attend an event with President Barack Obama. (*Id.* ¶¶ 43–44.) Plaintiff Scott Comer, formerly the DNC's Finance Chief of Staff and LGBT Finance Director, alleges that the emails included information "suggesting" (and allowing his grandparents to "deduc[e]") that "he is gay." (*Id.* ¶¶ 19, 45.)

Plaintiffs sued Donald J. Trump for President, Inc. (the Campaign) and Roger Stone over the publication of the emails. They allege that "elements of Russian intelligence" (on their own, without involvement of the Campaign) hacked into the DNC's email systems "in July 2015" and "maintained that access" over the course of the next year. (*Id.* ¶ 76.) They say that, in "a series of secret meetings in the spring and summer of 2016," the Campaign and Stone conspired with "Russian actors" to publish those emails on WikiLeaks in order to harm Hillary Clinton. (*Id.* at 19.) They say that this conspiracy covered only the "release" of the emails, not their initial acquisition. (*Id.* ¶ 137.)

Plaintiffs raise claims under D.C. law for public disclosure of private facts and intentional infliction of emotional distress. They also raise a claim under 42 U.S.C. § 1985(3) for conspiracy to intimidate or injure voters.

## LEGAL BACKGROUND

A strategic lawsuit against public participation (or SLAPP) is a lawsuit "filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." *Competitive Enterprises Institute v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016). Under traditional court rules, SLAPPs deter speech even if they are ultimately dismissed, because they drag speakers through onerous discovery and trial proceedings.

The District of Columbia, like many states, has responded to this threat to public debate by enacting a statute under which the defendant may secure dismissal of a speech-related lawsuit before discovery. To claim the protection of the act, the defendant must first make a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." § 16-5502(b). If the defendant does so, the court must dismiss the case with prejudice unless the plaintiff "demonstrates that the claim is likely to succeed on the merits." *Id.*

The D.C. Court of Appeals has held that this likely-to-succeed standard "is substantively the same" as Federal Rule 56's standard for summary judgment. *Mann*, 150 A.3d at 1238 n.32. The plaintiff must come forward with "evidence" that "suffices to permit a jury" to find for him on each element of his claim. *Id.* The main difference between an anti-SLAPP motion and a summary judgment motion is that the former requires the plaintiff to produce the requisite evidence *before* discovery. *Id.*; *see* § 16-5502(c). In addition, a defendant who prevails on the anti-SLAPP motion may recover "the costs of litigation, including reasonable attorney fees." § 16-5504(a).

## ARGUMENT

The D.C. Anti-SLAPP Act applies in federal court. The Act requires dismissal of Plaintiffs' D.C.-law claims.

## I. The District of Columbia Anti-SLAPP Act Applies in Federal Court

Ever since *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts hearing state-law claims have applied state substantive law and federal procedural law. The District of Columbia is not a state, but the same framework governs federal courts hearing claims under D.C. local law. *Burke v. Air Serv International, Inc.*, 685 F.3d 1102, 1107 n.4 (D.C. Cir. 2012).

Federal courts apply a two-step test to determine whether a state or federal provision governs a given issue. *Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see Burke*, 685 F.3d at 1107. First, regardless of whether the state provision is substantive or procedural, it is preempted if it comes into "direct collision" with a valid Federal Rule. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). If there is no direct collision, the court proceeds to the second step to determine whether the state law is substantive or procedural. This issue turns on whether application of the state provision would advance the "twin aims" of *Erie*—namely, avoiding unfair discrimination in the administration of state law and discouraging forum-shopping. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428 (1996). If it would, the federal court must apply the state provision. *Id.*

As we explain below, these principles require application of the D.C. Anti-SLAPP Act in federal court.

### A. The Anti-SLAPP Act is consistent with the Federal Rules

A Federal Rule blocks application of a state law only if the two come into "direct collision." *Hanna*, 380 U.S. at 472. The Anti-SLAPP Act, as interpreted by the D.C. Court of Appeals, does not come into direct collision with any Federal Rule.

A state provision and Federal Rule "directly collide" only where they "unavoidabl[y]" "clash" (*Walker v. Armco Steel Corp.*, 446 U.S. 740, 749 (1980)), "unmistakably conflic[t]" (*Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 7 (1987)), or "flatly contradict each other" (*Shady Grove*, 559 U.S. at 405). Far from "flatly contradicting" the Federal Rules, the Anti-SLAPP Act *replicates* the standard for summary judgment established by Federal Rule of Civil Procedure 56. As the D.C. Court of Appeals put it, the anti-SLAPP and summary-judgment standards are "substantively the same." *Mann*, 150 A.3d at 1238 n.32. Two provisions cannot "unmistakably conflict" if they require application of the *same* substantive standard.

To be sure, the Anti-SLAPP Act protects defendants more than Rule 56 does. The Act requires courts to decide motions before discovery; the Rule does not. The Act allows courts to award attorney fees; the Rule, again, does not. But the *substantive standard* under the Act and the Rule are the same, and the Act's different means of enforcing that standard do not conflict with any Federal Rule. Nothing in the Rules *prohibits* disposing of a case before discovery; to the contrary, courts may grant dismissal, judgment on the pleadings, and (in some cases) even summary judgment before discovery (*see Dunning v. Quander*, 508 F.3d 8, 10 (D.C. Cir. 2007) (*per curiam*)). And nothing in the Rules *prohibits* courts from awarding fees; to the contrary, Rule

54(d)(2) states that entitlement to fees depends on "substantive law" rather than on the Rules of Procedure. The Act complements the Rules; it does not contradict them.

The Supreme Court's decision in *Cohen v. Beneficial Industries Loan Corp.*, 337 U.S. 541 (1949), reinforces this analysis, because it confirms that the Federal Rules usually do not preempt state provisions that grant defendants extra protection against meritless litigation. The Federal Rule in *Cohen* (then Rule 23, now Rule 23.1) established prerequisites for bringing shareholder derivative lawsuits; for example, the shareholder had to verify the complaint and identify previous attempts to use internal corporate procedures to resolve the problem. The state law in *Cohen* imposed an *additional* requirement intended to deter frivolous derivative lawsuits: Shareholders also had to post bond covering the corporation's costs and attorney fees. In an opinion by Justice Jackson, the Supreme Court held that the state law applied in federal court, because there was "n[o] conflict" between federal law and the supplemental safeguards provided by state law. *Id.* at 556.

The same reasoning applies here. As in *Cohen*, the Federal Rules establish certain minimum requirements for bringing lawsuits. As in *Cohen*, the state law creates a further safeguard in order to deter a category of abusive lawsuits (there abusive lawsuits against corporations, here abusive lawsuits against speakers). As in *Cohen*, federal courts may apply the state law, since the state safeguard *reinforces* the federal provisions and does not *contradict* them.

There is, thus, no "direct collision" between the Anti-SLAPP Act and any Federal Rule. The Act satisfies the first step of the *Erie* test.

## B. Applying the Anti-SLAPP Act in federal court advances the twin aims of *Erie*

The second step of the inquiry asks whether applying state law would advance the "twin aims of the *Erie* rule"—avoiding inequitable administration of state law and discouraging forum-shopping. *Gasperini*, 518 U.S. at 428. Applying the Anti-SLAPP Act in federal court would promote both of these objectives.

*Erie*'s first aim is avoiding "discrimination" between litigants in state court and litigants in federal court. *Erie*, 304 U.S. at 74. Any such discrimination contradicts elementary principles of "equal protection," which call for "uniformity in the administration" of state law regardless of "whether enforcement [is] sought in the state or in the federal court." *Id.* at 74–75.

Applying the Anti-SLAPP Act in the District's local courts but not in its federal courts would produce precisely the kind of discrimination and disuniformity that *Erie* aims to avoid. If a speaker gets sued in the District's local courts, he could move to dismiss his case at once. But if a speaker gets sued in the District's federal courts—say, because he happens to be from a different state than the plaintiff, triggering diversity jurisdiction—he would have to endure months of pleading, discovery, and trial. The result is a two-tier marketplace of ideas, in which speakers receive more or less protection depending on whether they end up in federal or local court (which, in light of the requirements for federal diversity jurisdiction, may depend on the states in which the speakers and their adversaries happen to live). *Erie* directs courts to avoid this kind of disparity.

8

*Erie*'s second aim is to prevent forum-shopping. *Hanna*, 380 U.S. at 467. To pro-

mote this aim, courts must avoid any divergence between federal and state practice

that makes an "important … difference to the character or result of the litigation,"

or has an "important … effect upon the fortunes of one or both of the litigants." *Id.*

at 468 n.9. Courts may, however, tolerate "trivial" discrepancies between federal and

state practice—say, variations in time limits for filing pleadings—because they are

unlikely to prompt forum-shopping. *Id.* at 468.

Applying the Anti-SLAPP Act in local but not federal court would generate the

very forum-shopping that *Erie* seeks to avoid. Far from having merely "trivial" con-

sequences, the Anti-SLAPP Act makes an "important … difference" to the "character"

of the litigation and the "fortunes" of the litigants—to the character of the litigation

because it allows the court to cut it off sooner, and to the fortunes of the litigants

because it spares defendants from wasting their resources on pleading, discovery,

and trial. Indeed, the Anti-SLAPP Act's fee-shifting provision will often deter the

plaintiff from filing a fishing-expedition lawsuit in the first place. There is no doubt,

therefore, that if the Anti-SLAPP Act were enforced in state court but not federal

court, a "litigant interested in bringing meritless SLAP claims would have a signifi-

cant incentive to shop for a federal forum." *United States ex rel. Newsham v. Lock-

heed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999). *Erie* instructs federal

courts to avoid such an outcome.

In sum, applying the Anti-SLAPP Act in federal court would advance the twin

aims of *Erie*. This Court must therefore apply the Act to Plaintiffs' D.C.-law claims.

**C.** ***Abbas* permits application of the Anti-SLAPP Act, as now authoritatively interpreted by the D.C. Court of Appeals, in federal court**

Plaintiffs may argue that the D.C. Circuit's decision in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015), forecloses application of the Anti-SLAPP Act in federal court. It does not, because it rests on an interpretation of the Anti-SLAPP Act that the D.C. Court of Appeals has since repudiated.

In *Abbas*, a party invoked the D.C. Anti-SLAPP Act in federal court. In the absence of authoritative guidance from the D.C. Court of Appeals, the D.C. Circuit interpreted the Act's "likelihood of success" standard to be "different from and more difficult for plaintiffs to meet" than the dismissal and summary-judgment standards established by Rules 12 and 56. *Id.* at 1335. The D.C. Circuit stressed, in reaching this conclusion, that the "D.C. Court of Appeals" had "never interpreted the … likelihood of success standard to simply mirror" the summary-judgment standard. *Id.*

As interpreted in *Abbas*, the Act conflicted with the Federal Rules, since it imposed a more stringent substantive standard than Rules 12 and 56 for reviewing the sufficiency of a claim. Because the Rules "establish the exclusive criteria for testing the … sufficiency of a claim in federal court," a state provision could not replace those criteria with a "different … and more difficult" standard. *Id.* at 1334–35.

The D.C. Circuit continued, however, that "an interesting issue could arise if a State anti-SLAPP act did in fact exactly mirror" Rule 56. *Id.* at 1335 n.3. Would the Act still be preempted? The court said that it "need not address" that "hypothetical" question, because, as it had explained, "the D.C. Anti-SLAPP Act's dismissal standard [did] not exactly mirror" Rule 56. *Id.*

A year later, however, in *Mann*, the D.C. Court of Appeals adopted the very reading of the Anti-SLAPP Act that the D.C. Circuit had rejected. Expressly disagreeing with *Abbas*, the court ruled that the anti-SLAPP and summary-judgment standards are "the same"—that the Act's standard *does* "simply mirror the standards imposed by Federal Rule 56." 150 A.3d at 1238 n.32. The court continued that its new interpretation "will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti-SLAPP Act … in federal courts." *Id.*

In light of the D.C. Court of Appeals' decision in *Mann*, the D.C. Circuit's decision in *Abbas* no longer remains good law. When a decision of the D.C. Court of Appeals "clearly and unmistakably renders inaccurate a prior decision by the D.C. Circuit interpreting D.C. law," this Court is bound by the D.C. Court of Appeals' "more recent expression of the law." *Easaw v. Newport*, — F. Supp. 3d —, 2017 WL 2062851, at *10 (D.D.C. 2017). Here, the D.C. Court of Appeals' "more recent expression" of D.C. law establishes that the anti-SLAPP standard mirrors the summary-judgment standard. The D.C. Circuit's earlier interpretation is no longer controlling, and its application of *Erie* to that interpretation is no longer relevant.

Indeed, *Abbas* has nothing at all to say about the present case. The D.C. Circuit expressly stated that it "need not address" the "interesting" but "hypothetical" question of how *Erie* applies to a state law that "in fact exactly mirror[s]" Rule 56. 783 F.3d at 1335 n.3. This Court must therefore decide afresh—under *Erie*, not *Abbas*—whether the Anti-SLAPP Act, as the D.C. Court of Appeals has now interpreted it, applies in federal court. For the reasons discussed earlier, it does.

## II. The Anti-SLAPP Act Requires Dismissal of Plaintiffs' D.C.-Law Claims

To invoke the protections of the Anti-SLAPP Act, a defendant must make, in the special motion to dismiss, "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." § 16-5502(b). Once the defendant makes this showing, the court must dismiss the case unless the plaintiff comes forward with evidence that would suffice to survive summary-judgment. *Id.* This special motion to dismiss clearly makes the necessary prima facie showing. Plaintiffs, however, have yet to come forward with any evidence at all, let alone evidence that would suffice to survive summary judgment.

### A. Plaintiffs' claims arise from an act in furtherance of the right of advocacy on issues of public interest

The D.C. Anti-SLAPP Act applies to any claim that "arises from an act in furtherance of the right of advocacy on issues of public interest." § 16-5502(b). As relevant here, "act in furtherance …" includes (1) "any written or oral statement made … in a place open to the public or a public forum in connection with an issue of public interest" as well as (2) "any other expression or expressive conduct that involves … communicating views to members of the public in connection with an issue of public interest." § 16-5501(1).

Plaintiffs' D.C.-law tort claims "arise from" the "publication of DNC emails on WikiLeaks" "right before the Democratic National Convention." (Compl. ¶¶ 58, 141.) Defendants must therefore show that the publication satisfies one of the two parts of the definition set out above. It satisfies both.

To begin, the publication both (1) occurred "in a place open to the public or a public forum" and (2) involved "communicating views to members of the public." It occurred in a place open to the public or a public forum, because "websites" qualify as "places open to the public" and as "public forums." *Mann*, 150 A.3d at 1227. And it involved "communicating views to members of the public," since (in Plaintiffs' own words) the emails were "published to the entire world." (Compl. ¶ 1.)

The publication of the emails also has an obvious "connection" with issues "of public interest." That is apparent from the content of the emails. For example, they revealed the DNC's conduct toward Senator Sanders during the Democratic presidential primaries—which are "public affair[s]," "structur[ed] and monitor[ed]" by the state (*California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000)). The emails also revealed the nature of the Democratic Party's interactions with wealthy donors, information that should interest any citizen who wants to find out "whether elected officials are in the pocket of … moneyed interests." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010). The emails likewise showed the closeness of the party's ties to the media, "the great interpreters between the government and the people" (*Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)). That is more than enough to show a "connection" with an "issue of public interest."

The complaint confirms all of these points. It states that the emails received coverage in papers ranging from "*The New York Times*" to "Comer's hometown newspaper." (Compl. ¶¶ 45, 141.) The emails would not have received such widespread coverage if they had no connection with public affairs.

13

Plaintiffs may respond that even if the emails as a whole have a connection with the public interest, the specific disclosures at issue in this case do not. For several reasons, however, such a response would be mistaken.

*First*, the Act turns on the character of the defendant's speech as a whole, not on the character of each individual statement that the defendant utters. It applies if the "act" from which the claim arises furthers the right of public advocacy. § 16-5502(a). Here, the "act" from which Plaintiffs' claims arise is the publication of a large collection of emails. The critical question, then, is whether that single act of publication has the requisite connection with an issue of public interest (not whether each individual email does). It does, and the Act thus applies to Plaintiffs' claims. *See* Campaign's Memorandum in Support of Motion to Dismiss 19–21.

*Second*, the Act turns on the primary purpose of the defendant's speech, not on its ancillary effects. To distinguish "issues of public interest" from issues of private interest, courts must consider whether the defendant's statements are "*directed primarily toward*" "commenting on or sharing information about a matter of public significance," or instead toward "protecting the speaker's commercial interests." § 16-5501(3) (emphasis added). WikiLeaks' publication of the DNC emails was plainly "directed primarily toward" "sharing information about a matter of public significance"—namely, information about the misdeeds of officials at the Democratic National Committee. (*See* Compl. ¶ 13.) Nobody thinks it was "directed primarily toward" exposing Comer's sexual orientation or Cockrum and Schoenberg's financial information. Again, the Act applies to Plaintiffs' claims.

14

*Third*, the Act's language is in all events so sweeping that it encompasses all of the emails published by WikiLeaks. The Act applies where the defendant engages in speech "*in connection with*" an issue of public interest. § 16-5501(1) (emphasis added). "Issue of public interest," in turn, includes any issue "*related to*" public affairs. § 16-5501(3). "In connection with" and "related to" are broad phrases. Work emails sent by officials of a political party necessarily have a "connection" with issues that are "related to" public affairs, even if not every single email specifically discusses public affairs. That, once more, means that the Act applies to Plaintiffs' claims.

Any other interpretation would make a parody of the Act's protections. Many notable exercises of the right of free speech have involved the publication of massive collections of leaked documents—the *New York Times*' publication of the *Pentagon Papers* in 1971, the International Committee of Investigative Journalists' publication of the *Panama Papers* in 2015, and so on. In each such case, the collections as a whole plainly concerned issues of profound public importance, even though some individual documents within the collection may well have discussed only private matters. Yet the publishers of these documents would lose the Anti-SLAPP Act's protection if courts were to scrutinize the document line by line to separate out the parts that relate to public affairs from the parts that do not. The D.C. Council could not have intended such a result when it enacted the Anti-SLAPP Act "to protect a particular value of a high order—the right to free speech guaranteed by the First Amendment." *Mann*, 150 A.3d at 1231. The Anti-SLAPP Act applies to Plaintiffs' claims.

### B. Plaintiffs have yet to produce any evidence at all, let alone enough evidence to allow a jury to rule for them

To overcome the Campaign's anti-SLAPP motion, Plaintiffs must produce evidence that would suffice to survive summary judgment. *Mann*, 150 A.3d at 1238 n.32. In other words, they must "present evidence—not simply allegations—and that the evidence must be legally sufficient to permit a jury … to reasonably find in the plaintiff's favor." *Id.* at 1221. Compare Federal Rule of Civil Procedure 56(c)(1), which requires a party to rely on "affidavits" and other evidence—not just on allegations in the complaint—to survive summary judgment.

So far, Plaintiffs have produced no evidence at all—no affidavits, no documents, nothing. They certainly have not produced evidence that is "legally sufficient to permit a jury … to reasonably find" in their favor on each of the elements of their claims. All Plaintiffs have at the moment are allegations (indeed, allegations resting on "information and belief"). Plaintiffs, therefore, cannot fulfill their burden under the Anti-SLAPP Act. The Court should dismiss their D.C.-law claims for public disclosure of private facts and intentional infliction of emotional distress.

## CONCLUSION

In accordance with the District of Columbia Anti-SLAPP Act, the Court should dismiss Plaintiffs' claims for public disclosure of private facts and intentional infliction of emotional distress.

Dated:  September 5, 2017

Respectfully submitted,

/s/ Michael A. Carvin

Jeffrey Baltruzak (PA Bar No. 318156)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
jbaltruzak@jonesday.com

Michael A. Carvin (DC Bar No. 366784)
   *Counsel of Record*
Vivek Suri (DC Bar No. 1033613)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
vsuri@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*
*(* application for admission pending)*

## CERTIFICATE OF SERVICE

I certify that on September 5, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:  September 5, 2017

/s/ Michael A. Carvin
_____
Michael A. Carvin
*Counsel for Donald J. Trump for President, Inc.*