**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ROY COCKRUM; SCOTT COMER; and ERIC SCHOENBERG, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP FOR PRESIDENT, INC.; and ROGER STONE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 1:17-cv-1370-ESH |

## FIRST AMENDED COMPLAINT

## INTRODUCTION AND SUMMARY

1.     Plaintiffs bring this suit to recover for injuries that they suffered when their stolen private information was published to the entire world during the 2016 presidential campaign.

2.     Plaintiffs are all private American citizens.  Until last year, Plaintiffs were unknown to the general American public.  At the time that their private information was published, none was a public official or public figure.  None was a candidate for public office.  None was a high-ranking campaign official or close personal advisor of a presidential candidate.  None expected that his private information would be shared with the world.

3.     Roy Cockrum is a former Episcopal monk.  He left the brotherhood in 2007 to care for his ailing parents.  In 2014, he won the Tennessee Powerball lottery and decided to give away the bulk of his winnings.  In 2016, his belief in maintaining an open and inclusive society led him to donate to multiple candidates for public office and state Democratic parties, as well as to the Democratic National Committee ("DNC").

4.      Eric Schoenberg is a successful businessman who served as a Foreign Service Officer during the Reagan Administration.  At different times, he has been registered to vote as a Republican and as a Democrat.  In the 2016 election cycle, he contributed to the DNC.

5.      Scott Comer is a former mid-level staffer on the finance team of the DNC.  A childhood trip to Washington, D.C. left him in awe of American democracy in action and led him to attend college in D.C. and, eventually, to work for political candidates and causes he believed in.  In 2011, Mr. Comer came out as gay to his mother and close friends.  He came out to his father a couple years later.  But he did not tell most of his family, including his siblings and his grandparents.  He knew that his grandparents viewed homosexuality as inconsistent with their deeply held religious beliefs.  For the next five years, Mr. Comer kept his sexual orientation from his grandparents (as well as certain other close friends and relatives) so as not to upset them or disrupt his relationship with them, which he cherished.

6.      Defendants are Donald J. Trump for President, Inc. (the "Trump Campaign") and Roger Stone, an individual who was at various times employed by the Trump Campaign, or otherwise acting as its agent, but who was at all relevant times engaged in supporting its objectives.

7.      On one or more occasions before the summer of 2016, computer hackers working on behalf of the Russian government hacked into the email systems of the DNC in the District of Columbia and obtained voluminous amounts of data, including emails and other documents sent to and from thousands of individuals.  Some of those individuals were staff members of the DNC; some were donors; and some were other supporters, members of the media, or other private citizens.

8.      Among the materials obtained by the hackers were Mr. Comer's emails; Mr. Schoenberg's and his wife's social security numbers, dates of birth, home address, phone number, and banking relationships; and Mr. Cockrum's social security number, date of birth, address, and phone number.

9.      As the United States government has reported, the Russian government sought to use the information it had stolen from the DNC as part of a deliberate campaign to interfere in the U.S. election and tilt its outcome in favor of Donald Trump.

10.     On information and belief, to increase the utility of its hacking activity, Russia typically consults domestic political actors who act as Russia's partners to decide which extracted information to publish, how to time the release of the stolen information, and how to disseminate it in a way that would maximize the political impact.

11.     Multiple agents and associates of the Trump Campaign have long-standing financial connections and relationships with Russian individuals and entities, including several close to the Russian President and government.  On information and belief, trading on those connections and seeking to maximize the impact of the hacked materials, those in control of the hacked materials consulted with Defendants to better understand how the hacked materials could be used to greatest political effect.

12.     Agents of the Trump Campaign, acting on behalf of the Campaign, met with— and were otherwise in contact with—Russian officials or their agents on numerous occasions during the spring and summer of 2016.  On at least one occasion, senior Trump Campaign officials met with a Kremlin-connected lawyer after being informed in an email that the meeting concerned information gathered as part of a Russian government effort to aid the Trump Campaign.  According to email correspondence regarding the meeting made public on Donald

Trump Jr.'s Twitter account, rather than avoiding coordination with a foreign government that was attempting to interfere in a U.S. election, Mr. Trump Jr. responded over email: "If it's what you say I love it especially later in the summer."

13.     On information and belief, and consistent with Defendants' apparent willingness to coordinate with Russian operatives to benefit their campaign, an agreement arose out of those meetings and contacts.  Defendants entered into an agreement with other parties, including agents of Russia and WikiLeaks, to have information stolen from the DNC publicly disseminated in a strategic way that would benefit the campaign to elect Mr. Trump as President (the "conspiracy").

14.     On information and belief, Defendants, in turn, provided benefits to the Russian government by making certain concessions important to Russia's national interests, including intervening in the drafting of the Republican Party platform to protect Russian interests.

15.     Defendants have provided other benefits to Russia, including a shift in Republican Party and U.S. priorities regarding NATO, efforts to lift or weaken U.S. sanctions on Russia, and a generally positive communications posture toward Russia to improve its image among Americans.

16.     On information and belief, in furtherance of this conspiracy, Defendants and those they conspired with arranged for the hacked information to be provided to WikiLeaks, which published it on July 22, 2016 and thereafter.  In particular, the DNC finance team's emails, which contained correspondence with donors as well as donors' personal information, were singled out for publication—of the seven email accounts whose contents were released, six were finance team members.  Defendants' targeting of the finance team and release of the finance team's emails had several intended, direct, and foreseeable effects: First, it intimidated and

deterred existing donors from further supporting the DNC's financial efforts.  Second, it

intimidated and deterred existing or potential donors from communicating with Mr. Comer or

others at the DNC to support the Democratic Party's candidate for President.  Third, it

intimidated and deterred individuals, including Mr. Comer, from using email to advocate the

election of their preferred candidate for the Presidency, for fear that their communications would

be publicly disclosed.  As a result of the conspiracy, all of the Plaintiffs suffered substantial

harm—set forth in detail below—on account of their support for a particular candidate for

President.

    17.    As a result of the publication of hacked information pursuant to the conspiracy,

Mr. Cockrum's social security number, address, and phone number were published to the world

and remain permanently available to anyone with access to the Internet.  As a result, Mr.

Cockrum has seen multiple strangers attempt to obtain credit in his name, and at least one of

these attempts was successful.  Each new attempt requires a new round of extensive

communications with creditors and credit agencies in an effort to prevent substantial financial

loss.  These circumstances have led to significant distress and anxiety and will require lifelong

vigilance and expense.  In addition, Mr. Cockrum has been chilled in the extent to which he

supports and contributes to the DNC and political campaigns.

    18.    Mr. Schoenberg's and his wife's social security numbers, address, phone number,

and banking relationships were published to the world and remain permanently available to

anyone with access to the Internet.  As a result, Mr. Schoenberg's identity was stolen and his

information used in fraudulent attempts to get credit cards.  In one instance, two new credit cards

arrived together at his home—one in his wife's name, and the other in the name of an unknown

woman.  To this day, Mr. Schoenberg remains concerned that his and his family's credit and

financial information are permanently in jeopardy. These circumstances led to significant distress and anxiety and will require lifelong vigilance and expense.

19.     Thousands of Mr. Comer's emails were published to the world and remain available to anyone with access to the Internet. These emails included information about conflicts with coworkers and collaborators, frank statements about certain individuals, health information, and details from which his grandparents deduced his sexual orientation. These revelations strained relationships with coworkers, family, and friends, and ended some of Mr. Comer's relationships altogether. Publication of private statements about other individuals caused damage to his personal and professional reputation. Because his emails were disclosed, Mr. Comer received phone calls threatening violence, some calling him "faggot." These circumstances led to severe emotional distress, anxiety, and depression. He found himself unable to sleep, haunted by nightmares, and unable to focus. He recognized the severity of the injury to his mental health and sought treatment, generating significant costs for medication and frequent visits with physicians and therapists.

20.     In addition, Mr. Comer has felt intimidated regarding how he communicates with others in his advocacy for candidates for federal office out of a fear that his communications will be publicly disclosed.

21.     None of the private information about Plaintiffs described above that was disclosed was newsworthy or involved any public policy matter at issue in the campaign. While a handful of the released emails unrelated to Plaintiffs received a significant amount of news coverage, the vast majority of the tens of thousands of emails and attachments indiscriminately dumped on the Internet in furtherance of the conspiracy were not of public interest.

22.     The publication of Plaintiffs' private information caused each of them concrete and tangible injuries.

23.     On information and belief, ever since and in furtherance of the conspiracy, Defendants and their coconspirators have taken efforts to hide evidence of their coordination. Associates of the Defendants have repeatedly shifted their explanations of the reasons and process for revising a proposed amendment to the Republican Party platform in a Russia-friendly direction.  Agents of the Trump Campaign, including close advisor and then-Senator Jeff Sessions and Mr. Trump's son-in-law Jared Kushner, have failed to disclose on security clearance forms and in sworn testimony a series of meetings one or both held with top Russian officials during the campaign and the transition.  Mr. Trump Jr. has provided inconsistent accounts of his meeting with a Russian government-linked attorney, whom he agreed to meet on the understanding that she would cooperate with his efforts to damage the Clinton campaign; he participated in the meeting knowing (according to emails released on his Twitter account) that the meeting was "part of Russia and its government's support for Mr. Trump."  Campaign advisor Michael Flynn failed to properly report contractual arrangements and interactions with Russian entities in both the U.S. and Russia.

24.     In furtherance of the conspiracy, Defendants have publicly denied or dismissed Russia's role in the hacking, seeking to absolve Russia of any accountability for its actions to harm Plaintiffs and interfere in the U.S. election. Mr. Trump himself, who benefitted the most from this conspiracy, has repeatedly denied personal relationships with Russia that he had previously admitted, and has sought to discredit reporting on the underlying events discussed in this Complaint and to block attempts to investigate those events, including by firing the lead investigator looking into the affair, former FBI Director James Comey.  On July 7, 2017, Mr.

Trump met with Russian President Vladimir Putin and reportedly accepted Mr. Putin's assertion that Russia did not interfere in the U.S. election and agreed with Mr. Putin that any remaining focus on allegations of Russian meddling in the 2016 U.S. election was a hindrance and that the two countries should move on from the issue.

25.     Defendants' conduct violated Plaintiffs' privacy rights under D.C. law. Defendants aided and assisted each other in violation of these rights and conspired with one another and with others known and unknown to commit this violation.  While one of the objects of the conspiracy was to harm the Democratic Party's candidate for President of the United States and improve the Trump Campaign's likelihood of success, the direct victims included Mr. Cockrum, Mr. Schoenberg, and Mr. Comer.

26.     In addition, Defendants' conspiratorial conduct intimidated eligible voters, including Plaintiffs, in a manner designed to prevent them "from giving [their] support or advocacy in a legal manner, toward or in favor of the election of [a] lawfully qualified person as an elector for President," and injured Plaintiffs' person and property "on account of such support or advocacy," all in violation of 42 U.S.C. § 1985(3).

27.     Plaintiffs bring this suit to seek accountability and redress for the harms that they suffered from the release of their personal information, and to help prevent such harms from ever befalling anyone else.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

29.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.

30.     This Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

31.     Venue in this case is proper under 28 U.S.C. § 1391.  This forum is a proper venue because, among other reasons described in this Complaint, conduct in furtherance of the conspiracy was planned, directed, and/or carried out in the District; Defendants met with their co-conspirators in the District; Mr. Comer was employed by the DNC in the District, which is also where the DNC is headquartered; all of the published emails were sent to or from and resided on the DNC's servers, and were hacked from those servers, and those servers were physically in the District both when the published emails were sent and received, and when the Defendants agreed to participate in the conspiracy alleged in this Complaint; the hacked and published emails included those containing the social security number and other private information Mr. Cockrum sent to those servers in the District in order to attend an event in the District; Plaintiffs' private information was published across the world, including in this District; Plaintiffs suffered injury in this District as a result of their activities in and directed towards this District; and one of the goals of the conspiracy was to convince voters, including the more than 400,000 registered voters in the District, to cast their ballot for Mr. Trump, whose campaign had successfully petitioned for him to appear on the ballot in the District in order for him to stand for election in the District.

## PARTIES

32.     Mr. Cockrum contributed to the DNC during the 2016 campaign.  Mr. Cockrum joined The Society of St. John the Evangelist, an Episcopal monastery, after the terrorist attacks of September 11, 2001.  He left the monastery several years later to care for his elderly parents in Tennessee, where he won the Tennessee Powerball lottery and began a new career as a

philanthropist.  Mr. Cockrum has lived in Tennessee since 2009; he has a driver's license issued by the State of Tennessee; he owns his home, through a revocable living trust, in Tennessee; his family is in Tennessee; he intends to remain in Tennessee indefinitely; and he has no other home. He is a domiciliary and citizen of the State of Tennessee.

33.     Mr. Schoenberg contributed to the DNC during the 2016 campaign.  Mr. Schoenberg has served as a Foreign Service Officer, held executive positions with an investment banking firm, and is now Chairman of a technology services firm.  Mr. Schoenberg has lived in New Jersey for the last 24 consecutive years and for a total of 42 years; he has a driver's license issued by the State of New Jersey; he owns his home in New Jersey; his family is in New Jersey; he intends to remain in New Jersey indefinitely; and he has no other home.  He is a domiciliary and citizen of the State of New Jersey.

34.     Mr. Comer is a former employee of the DNC, where he worked in the District of Columbia as the Finance Office's Chief of Staff between April 2015 and October 2016.  In June of 2016, he was given the additional title of LGBT Finance Chair, which he kept until he left in October 2016.  Mr. Comer grew up in Tennessee, attended college at George Washington University and the University of Maryland, and has been working for Democratic candidates and advocacy organizations ever since in fulfillment of career goals formulated when his father took him to visit the nation's capital as an 11-year-old boy.  Mr. Comer has lived in Maryland since 2011; he has a driver's license issued by the State of Maryland; he rents his home in Maryland; he intends to remain in Maryland indefinitely; and he has no other home.  He is a domiciliary and citizen of the State of Maryland.

35.     Defendant Donald J. Trump for President, Inc. (the "Trump Campaign"), is a Virginia corporation with its permanent headquarters in New York, New York.  Its purpose

during the times relevant to this complaint was to elect Donald J. Trump to the presidency.  Paul

Manafort, previously a lobbyist for Russian-linked entities, joined the Campaign on March 29,

2016; he became campaign Chairman on April 20, 2016 and served in that capacity until his

resignation on August 19, 2016.  Michael Flynn and Carter Page served as foreign policy

advisors to the Campaign during the relevant period.  Mr. Flynn has lived and worked in the

Washington, D.C. area for many years, and spent a substantial amount of time in the District

during and after the campaign.  Jeff Sessions was a U.S. Senator and the chair of the Campaign's

national security advisory committee.  He worked in D.C. and maintained a residence in the

District.  Jared Kushner is Mr. Trump's son-in-law and was a close advisor to Mr. Trump during

the Campaign.  Donald Trump Jr. is Mr. Trump's son and was also an agent of the Campaign.

36.     Much of the work of the Campaign and its agents and associates took place in the

District.  Although the Campaign opened its official D.C.-area office in Alexandria, Virginia,

near where Mr. Manafort has a home, the Campaign referred to this as its "Washington, DC

based office."  The work of this office, by the Campaign's own admission, was focused on D.C.

and involved extensive work in the District, including recruiting delegates for the Republican

National Convention, coordinating with the Republican National Committee in D.C., and

working with lawmakers in Congress.  Barry Bennett, a Trump Campaign senior advisor, stated

that having an office in D.C. would help Campaign staff develop relationships with lawmakers

on Capitol Hill: "Having an office here in Washington and working with them every day will

make it a lot easier to do that."  Furthermore, several members of the Campaign's national

security and foreign policy team, which was central to the conspiracy, were based in the District.

The Campaign's national security advisory committee, which included Mr. Page, was organized

by the D.C.-area office.  J.D. Gordon, a national security advisor to the Trump Campaign who

was the Campaign's national security policy representative at the Republican National

Convention, worked out of the D.C.-area office.  And, as noted, Mr. Sessions, who worked in the

District of Columbia and maintained a residence in the District, chaired the Trump Campaign's

national security advisory committee and handled foreign policy and national security matters for

the Campaign.

37.     On information and belief, prior to and after the opening of the Campaign's D.C.-

area office, agents and associates of the Campaign frequently conducted Campaign-related

business in D.C., including at the Trump International Hotel in the District (even before it

opened for business in September 2016) and on Capitol Hill.  Many of the Campaign's agents

and associates were based in or near D.C. and spent a substantial amount of time in D.C.

working on behalf of the Campaign.  Meetings and other conduct relevant to the conspiracy

occurred in D.C.

38.     The Campaign took steps to ensure that Mr. Trump appeared on the ballot in D.C.

for both the Republican primary and the general election, and to try to convince the residents of

the District to vote for him and to not support the Democratic presidential campaign.

39.     Mr. Trump himself made repeated trips to D.C. during the campaign and

immediately after the election, including on March 21, 2016; March 31, 2016; April 27, 2016;

May 12, 2016; June 10, 2016; July 7, 2016; September 9, 2016; October 26, 2016; and

November 10, 2016.

40.     The day after the election, Mr. Trump's transition team office opened in

Washington, D.C.  On January 20, 2017, Mr. Trump took up residency in the White House.

Since January 20, 2017, when Mr. Trump was inaugurated as President of the United States, the

Trump Campaign's operations have been directed from Washington, D.C., where Mr. Trump, the

person who directs the Campaign and the person whose reelection it exists to forward, resides. Since January 20, 2017, the Trump Campaign has organized at least eight full-scale events across the country, with substantial planning for these events being directed out of Washington, D.C. On June 28, 2017, the Trump Campaign held its first 2020 reelection fundraiser at the Trump International Hotel in Washington, D.C.  The Campaign raised approximately $10 million at this fundraiser.

41.     Defendant Roger Stone is a lobbyist and political strategist who has referred to himself proudly as "a brand name when it comes to dirty tricks."  In 1979, Mr. Stone met Mr. Trump through the lawyer Roy Cohn, who mentored both men.  Mr. Stone and Mr. Trump have been friends and business associates ever since.  Mr. Stone began urging Mr. Trump to run for President in 1987 and helped lead Mr. Trump's presidential campaign on the Reform Party ticket in 1999.  He again urged Mr. Trump to run for President in 2016 and was intimately involved as an advisor to Mr. Trump and the Trump Campaign during that election campaign.  He left official employment with the Trump Campaign in August 2015.  Mr. Stone continued to play an important role in the Trump Campaign as an advisor even after his departure, and he remained in regular contact with Mr. Trump throughout the campaign.  In early 2016, Mr. Stone helped arrange for his longtime friend and former business partner Mr. Manafort to become Chairman of the Trump Campaign.  He has consulted on political strategy around the world, including in Ukraine. *The New York Times* has reported that "[h]is ties to Russia are now under scrutiny by the F.B.I."  Mr. Stone lived and worked in D.C. for approximately 20 years, until 2000.  He made at least two trips to D.C. during the campaign—on or about November 9, 2015 and on or about October 30, 2016—during which, on information and belief, he interacted with other agents and associates of the Campaign.  Although he rents an apartment in New York, Mr.

13

Stone's primary residence is in Fort Lauderdale, Florida; in 2013, Mr. Stone publicly considered running for Governor of Florida in the 2014 election; Mr. Stone's family is in Florida; Mr. Stone directs his professional activities from an office in Florida. Mr. Stone is a domiciliary and citizen of the State of Florida.

## FACTUAL ALLEGATIONS

I.      **Plaintiffs' Private Information Was Shared With the World, Causing Plaintiffs Substantial Harms**

A.      Emails Containing Plaintiffs' Private Information Were Disseminated on the Internet

42.     On July 22, 2016, WikiLeaks posted thousands of private emails on the Internet. These emails were made available to anybody in the world with access to a web browser.

According to the WikiLeaks website:

> Starting on Friday 22 July 2016 at 10:30am EDT, WikiLeaks released over 2 publications 44,053 emails and 17,761 attachments from the top of the US Democratic National Committee—part one of our new Hillary Leaks series. The leaks come from the accounts of seven key figures in the DNC: Communications Director Luis Miranda (10520 emails), National Finance Director Jordon [sic] Kaplan (3799 emails), Finance Chief of Staff Scott Comer (3095 emails), Finance Director of Data & Strategic Initiatives Daniel Parrish (1742 emails), Finance Director Allen Zachary (1611 emails), Senior Advisor Andrew Wright (938 emails) and Northern California Finance Director Robert (Erik) Stowe (751 emails). The emails cover the period from January last year until 25 May this year.

43.     Emails containing private information belonging to each of the Plaintiffs—and many others—were included in the information published by WikiLeaks beginning on July 22, 2016. These private details revealed personally identifying information, such as social security numbers, dates of birth, home addresses, cell phone numbers, and bank account details; personal health information ranging from doctor's appointments to life-threatening illnesses; information about conflicts with co-workers, collaborators, friends, and family members; sexual orientation

and/or information about romantic relationships; and myriad private details about day-to-day experiences that were never intended for publication to the Internet for the whole world to see.

44.     The emails containing Plaintiffs' private information remain on the Internet to this day.  They are publicly searchable through the WikiLeaks site, allowing anybody to type an individual's name in order to browse emails to, from, or about that person.  Plaintiffs' social security numbers, and those of dozens of other potential identity theft victims, are available to the world.

45.     Plaintiffs are illustrative of dozens of American citizens whose lives were directly affected when this information was hacked and published on the Internet.  Because so many of the published emails came from the DNC's finance team, countless donors and prospective donors to the DNC had their private information, financial information, and communications published.

46.     Before their publication beginning on July 22, 2016, none of the Plaintiffs' private emails had been posted on the Internet or made available to the public.  Before the publication beginning on July 22, 2016, none of the Plaintiffs' social security numbers had been posted on the Internet.

47.     The published emails were not curated or redacted to remove private facts about Plaintiffs or any other victims of the release.

48.     The published emails contained detailed private factual information concerning dozens of DNC donors and employees, including each Plaintiff, such as the following:

49.     Mr. Cockrum's social security number, date of birth, address, and other personally identifying information appeared in the leaked emails.  Mr. Cockrum was required to provide most of this information to the DNC in order to obtain Secret Service clearance to attend

an event with President Obama, which took place in the District of Columbia.  Mr. Cockrum's private information remains on the Internet to this day.

50.     Mr. Schoenberg's and his wife's social security number, dates of birth, address, banking relationships, and other personally identifying information appeared in the leaked emails.  Mr. Schoenberg was required to provide this information to the DNC in order to obtain Secret Service clearance to attend an event with President Obama.  Mr. Schoenberg's private information remains on the Internet to this day.

51.     The publication of DNC emails in general received coverage in Mr. Comer's hometown newspaper, and his family members—including his grandparents—searched for and read emails to, from, and about him, including emails suggesting that Mr. Comer is gay.  Until publication of his emails on WikiLeaks, Mr. Comer was not openly gay with his grandparents and several other friends and members of his close-knit family.  These emails revealed his sexuality to family members with whom he had decided not to share this facet of his life and in a manner he never would have chosen.  Realizing that his grandparents would learn that he was gay caused instantaneous and intense distress, and knowing that they learned in this way continues to cause great sadness.  This revelation and discussion of other private details about his life and work caused immediate and lasting strain on family relations.

52.     Mr. Comer also had private medical information disseminated.  A May 17, 2016 email from Mr. Comer to his boss, with whom he was close, describes his bodily functions during a virus, a topic that Mr. Comer, like most people, would never raise in public communications.

53.     Mr. Comer's emails also included frank and private discussions about other individuals.  Those emails sometimes reflected frustration or conflict—unsurprising in a tight-

knit office under a great deal of stress—or the kind of offhand remarks or gossip that many of us make in private but are never intended for sharing with the entire world.

B.   The Private Information Disseminated About Plaintiffs Was of No Legitimate Concern to the Public

54.   Plaintiffs were private Americans who did not hold and have not sought political office.

55.   Some information dumped by WikiLeaks was the subject of news reporting and some political controversy.  But most of the information published, including sensitive private facts related to the Plaintiffs, was not the subject of news reporting or public interest but was nevertheless made available for the whole world to see.

56.   The published information about Plaintiffs on topics such as sexual orientation, medical conditions, private relationships, social security numbers, and personal financial information was not of any relevance to the political campaign or at all newsworthy.

57.   There is no legitimate public concern in these intimate details about private individuals' personal relationships with family and friends.

58.   There is no legitimate public concern in Plaintiffs' medical information.

59.   There is no legitimate public concern in Plaintiffs' personally identifying information such as banking information, social security numbers, and home addresses.

C.   Plaintiffs Suffered Concrete and Tangible Harms From the Publication of Their Private Information, Including Injuries to Their Person and Property

60.   The publication of the private facts caused the Plaintiffs to suffer greatly, as would any reasonable person who had such private details about their personal life published with fanfare on the Internet.

61.     Shortly after the DNC emails were published on WikiLeaks, Mr. Cockrum learned that his social security number and other personally identifying information were available online for the world to see.

62.     Immediately thereafter, and ever since, Mr. Cockrum has received notices of strangers attempting to obtain credit in his name, some successfully.

63.     After his personal information was published, Mr. Cockrum feared identity theft—and worse—so he directed his personal assistant to take extra precautions when admitting visitors to his office and speaking with strangers on the phone.

64.     He continues to experience anxiety over actual and potential future identity theft, and especially the ability of sophisticated hackers to gain access to his personal or business financial accounts.  He feels that protecting himself, his family, and his philanthropy will require extreme vigilance with no end in sight.

65.     Shortly after emails hacked from the DNC servers were published on WikiLeaks, Mr. Schoenberg learned that his and his wife's social security numbers, dates of birth, home address, phone numbers, banking relationships, and other personally identifying information had been broadcast to the world.

66.     As a result of the mass publication of this private information, Mr. Schoenberg began getting phone calls and letters about fraudulent applications for credit in his and his wife's name.  One such application resulted in issuance of a credit card on a new account shared between his wife and a stranger.

67.     He has been required to spend countless hours speaking with creditors and other financial and reporting institutions to rectify the problems caused by the disclosure of his social security number.

68. He continues to experience anxiety and fear over potential future identity theft, and especially the ability of sophisticated hackers to gain access to his financial accounts using personally identifying information that is now readily available online. Even if his social security number is removed from the WikiLeaks archive available online, he will forever be concerned that it has now been substantially disseminated among criminal enterprises. He fears that these risks to his and his family's financial security will never go away.

69. Mr. Comer's sexual orientation was disclosed to family members—most painfully, his grandparents, for whom he cares deeply, but with whom he was not prepared to discuss this aspect of his life. He had grown up visiting his grandparents often and continued to have a close relationship with them into adulthood; but he feared that being open with them about his homosexuality would threaten whatever years he has left with them. This relationship is now tested by a tension Mr. Comer had worked hard to prevent.

70. Mr. Comer's decision to be open about his sexuality with some friends and colleagues, but not with other family and friends, was both an acutely private decision and one based in understanding of the threat that being openly gay would pose to relationships in his hometown. When Mr. Comer was in ninth grade, the parent of a classmate raised questions about his sexuality with Mr. Comer's mother, and his parents responded by removing him from his college preparatory high school and enrolling him in a fundamentalist Christian institution without explanation. He waited to share his sexuality with his parents until he could support himself outside of their home, as he feared they would subject him to traumatizing "conversion" therapy if he came out while he was dependent on them. Even after he came out to his mother, she asked that he not share this part of his life with his sister. Navigating these close but complicated relationships required careful attention, but the publication of Mr. Comer's sexuality

to the world robbed him of the ability to exercise that care.  The impact of the WikiLeaks release

on his closest relationships caused immediate and continued mental anguish.

71.     The emotional toll caused by publication of his private emails also brought an end

to a long-term romantic relationship that Mr. Comer believes would have remained strong today,

but for the publication of his private information.

72.     Mr. Comer's working environment deteriorated rapidly after his emails' release.

He perceived that his counterparts in the Hillary Clinton campaign viewed him as damaged

goods; they did not want him or others on the finance team to appear on behalf of the campaign

publicly.  He was marginalized and isolated by his colleagues and saw a major event that he

eagerly anticipated leading taken away from him and given to other staff in the wake of the

WikiLeaks posting.

73.     Not only did Mr. Comer see his working relationships and professional reputation

suffer, but he suffered broader reputational harm as well.  Emails taken out of context in which

he made colloquial references about other gay individuals to friends who understood that those

references were made without animus or disrespect generated press reports labeling Mr. Comer

as homophobic and racist.  Mr. Comer's deep commitment to civil rights made these allegations

predictably and particularly painful, and they also risked damage to his reputation in the

advocacy community.

74.     After being marginalized at work as a result of the publication of his hacked

emails, Mr. Comer determined that he was required to leave his job, leading to lost wages.

75.     Mr. Comer received constant harassing phone calls while at home and while at

work in D.C.—as many as 20 per day—for several weeks in the aftermath of the publication of

his emails.  While the quantity of hostile messages tapered over time, they did not stop for

months, and this experience still impacts his comfort in communicating over the phone.  Many of

the callers threatened violence and used vile language, calling him "a faggot," wishing he would

"fucking die," or saying "the world would be better off if [he] were dead."  This barrage of

insults and threats made him feel like a pariah.

76.     Mr. Comer suffered damage to his professional reputation as a result of the

publication of his emails.  Discord created by the public airing of his private communications

continues to impact Mr. Comer's attempt to maintain a career in the political finance industry.

This harm has occurred principally in D.C., where Mr. Comer worked and which is the leading

location for work in Mr. Comer's chosen field of political finance.  During interviews for

positions at several political organizations, including positions based in D.C., potential

employers have questioned Mr. Comer about the release and content of his emails and/or

consequences arising from their release.  A potential employer has asked Mr. Comer to provide

paper copies of the emails posted to WikiLeaks for the potential employer to review.  To date,

Mr. Comer has not been offered a position with any of the above-mentioned potential employers.

77.     Mr. Comer also experienced significant emotional distress, including anxiety and

depression.  He has incurred and continues to incur substantial medical expenses for treatment

for distress caused by the Defendants and their co-conspirators.

78.     The injuries suffered by all three Plaintiffs were the result of their having taken

steps to advocate for and support candidates running for federal office—advocacy that was

centered on, occurred in, and was directed toward D.C.  As a result of the conduct of this

conspiracy, they were punished for their advocacy.

**II.     The Injuries Suffered by Plaintiffs Were Caused by a Conspiracy Involving the Defendants and Others**

79.     On information and belief, the publication of Plaintiffs' private information and the injuries described above resulted from a conspiracy between Defendants, Russian government agents, and other parties to disseminate information hacked from the DNC.

80.     Public reporting from U.S. intelligence and law enforcement officials, and other sources, establishes all of the hallmarks of a conspiracy between Defendants and other co-conspirators, including Russian actors.  Each party had motive to act together, there was ample opportunity to reach agreement, each party took actions that would be illogical absent a conspiracy, each party benefited from these actions, and each party took steps to conceal what had occurred.

81.     U.S. government officials have opened a series of law enforcement and bipartisan congressional investigations into Russian interference in the election and links to the Trump Campaign.  In particular, on March 20, 2017, in public testimony to the House Intelligence Committee, then-FBI Director James Comey stated that the FBI investigation into Russian interference with the election includes the "nature of any links between individuals associated with the Trump Campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."  On May 3, 2017, in testimony before the Senate Judiciary Committee, Mr. Comey again confirmed the existence of an ongoing investigation into possible collusion between the Trump Campaign and Russia to interfere with the 2016 election. According to news reports based on information from U.S. officials, "[t]he FBI has information that indicates associates of President Donald Trump communicated with suspected Russian operatives to possibly coordinate the release of information damaging to Hillary Clinton's campaign."

82.     Plaintiffs seek accountability and redress for the harms they suffered from their

fellow Americans who were participants in this conspiracy.

A.     The Russian Government Engaged in a Campaign to Interfere in the U.S. Election
       and Tilt the Outcome to Mr. Trump

83.     According to an unclassified public report released by the U.S. Intelligence

Community (hereinafter "the U.S. Intelligence Community Report"):

> Russian efforts to influence the 2016 US presidential election represent the
> most recent expression of Moscow's longstanding desire to undermine the US-led
> liberal democratic order, but these activities demonstrated a significant escalation
> in directness, level of activity, and scope of effort compared to previous
> operations.
> We assess Russian President Vladimir Putin ordered an influence
> campaign in 2016 aimed at the US presidential election. Russia's goals were to
> undermine public faith in the US democratic process, denigrate Secretary Clinton,
> and harm her electability and potential presidency. We further assess Putin and
> the Russian Government developed a clear preference for President-elect Trump.
> We have high confidence in these judgments.

84.     According to former Director of National Intelligence James Clapper, the U.S.

intelligence community has "concluded first that President Putin directed an influence campaign

to erode the faith and confidence of the American people in our presidential election process.

Second, that he did so to demean Secretary Clinton, and third, that he sought to advantage Mr.

Trump."

85.     On information and belief, Special Counsel Robert Mueller has empaneled a

grand jury in Washington, D.C. to investigate Russia's interference in the 2016 election and

collusion by the Trump Campaign and its associates.

B.     As Part of That Campaign, Russian Operatives Hacked the Servers of U.S.
       Political Entities, Including the DNC

86.     In order to defeat Hillary Clinton and help elect Mr. Trump, hackers working on

behalf of the Russian government broke into computer networks of U.S. political actors involved

in the 2016 election, including the DNC and the Clinton campaign.  Elements of Russian intelligence gained unauthorized access to DNC networks in July 2015, and maintained that access until at least June 2016.  By March 2016, the Russian General Staff Main Intelligence Directorate ("GRU") gained unauthorized access to DNC networks, Democratic Congressional Campaign Committee ("DCCC") networks, and the personal email accounts of Democratic party officials and political figures.  During the entire period that Russian intelligence had access to DNC accounts—from July 2015 until at least mid-June 2016—those accounts were hosted on servers physically located in the District of Columbia.

87.    By May 2016, the GRU had copied large volumes of data from DNC networks, including email accounts of DNC staffers.

C.    On Information and Belief, Through a Series of Secret Meetings in the Spring and Summer of 2016, Defendants and Their Co-conspirators Agreed to Disseminate Certain Hacked DNC Emails, and Russia Sought to Obtain Policy Concessions

a.    *Defendants engaged in a series of meetings with Russian operatives throughout 2016*

88.    On information and belief, Russian actors and agents of the Trump Campaign who were acting on behalf of the Campaign held multiple secret meetings in D.C., New York, Cleveland, and elsewhere throughout the campaign, including around the time that Russian operatives were stealing material from the DNC servers and in the days and weeks leading up to the publication of Plaintiffs' private information.

89.    The Government Communications Headquarters (GCHQ), a British intelligence agency, first became aware of suspicious interactions between members of the Trump Campaign and Russian intelligence operatives in late 2015.  German, Estonian, and Polish agencies— among others—also detected such interactions between late 2015 and early 2016.

90.     In the summer of 2016, U.S. intelligence officials collected information that senior Russian intelligence operatives and political figures were discussing exerting influence over the Trump Campaign.  They considered this intelligence to be sufficiently credible that they passed it on to the FBI, which opened a counterintelligence investigation that continues to this day into whether the Trump Campaign aided Russian interference in the 2016 election.

91.     On information and belief, federal law enforcement obtained a Foreign Intelligence Surveillance Act warrant to conduct electronic surveillance of Mr. Manafort during the campaign based on intercepted conversations among Russians and between Mr. Manafort and Russian individuals about the campaign.  This was the second such warrant federal law enforcement officials had obtained to surveil Mr. Manafort's interactions with Russia-linked entities since 2014.

92.     On information and belief, Trump Campaign associates exchanged at least 18 undisclosed calls and emails with Russian officials and agents between April and November 2016, including at least six with Russian Ambassador to the United States Sergey Kislyak, whose U.S. office and residence is in Washington, D.C.

93.     Russian Deputy Foreign Minister Ryabkov has acknowledged contacts between Russian officials and Mr. Trump's "immediate entourage" during the campaign.

94.     On information and belief, on March 24, 2016, George Papadopoulos, a member of Mr. Trump's national security advisory committee, sent an email to several high-ranking Campaign officials and other members of the national security advisory committee, including Mr. Page, offering to set up a meeting with Russian leadership, including Mr. Putin, "to discuss US-Russia ties under President Trump."  Mr. Papadopoulos represented that he was acting as an intermediary of the Russian government and that his "Russian contacts welcomed the

opportunity." Mr. Papadopoulos sent several similar emails over the next several months, proposing that Mr. Trump or a member of his team meet with Russian officials.

95. A week after Mr. Papadopoulos sent his initial email, on March 31, 2016, Mr. Trump met with his national security advisory committee at the not-yet-opened Trump International Hotel in Washington, D.C. That meeting was attended by Mr. Papadopoulos (who had a week earlier revealed himself to be an intermediary for the Kremlin), Mr. Sessions (the chair of the committee), and Mr. Gordon, among others. (Mr. Gordon later stated that, because of the views that Mr. Trump expressed at this meeting, during the Republican National Convention, he pushed for the adoption of language more favorable to Russia in the Republican Party platform.)

96. Less than one month later, on April 27, 2016, at the Mayflower Hotel in D.C., Mr. Trump gave his first major foreign policy speech, which included language that was quite favorable to Russia and Russian interests. Mr. Kislyak attended the speech. On information and belief, Mr. Trump, Mr. Kushner, Mr. Sessions, and Mr. Kislyak held a private conversation during that event.

97. On information and belief, around the time Mr. Manafort took over as Campaign Chairman in May of 2016, he met in New York with Konstantin Kilimnik, a Russian-Ukrainian operative with suspected ties to Russian intelligence who traveled from the Ukraine to the U.S. for that meeting. Mr. Manafort met with Mr. Kilimnik again in Cleveland in August of 2016. Mr. Manafort discussed the hacking of DNC emails with Mr. Kilimnik, and Mr. Kilimnik has claimed that he played a role in preventing adoption of a version of an amendment to the Republican Party platform regarding military aid to Ukraine. While he was Campaign Chairman, Mr. Manafort also sent emails from his Campaign account to Mr. Kilimnik in which

Mr. Manafort emphasized his influence in the Trump Campaign, sought repayment of debts, and discussed potential new business opportunities in Ukraine.

98.     On June 9, 2016, Mr. Trump Jr., Mr. Manafort, and Mr. Kushner attended a meeting at Trump Tower in New York with Natalia Veselnitskaya, a Kremlin-connected Russian lawyer.  The meeting was reportedly arranged at the request of Emin Agalarov, the son of Aras Agalarov, an oligarch connected with Mr. Putin.

99.     On July 7, 2016, while in Washington, D.C., Mr. Manafort sent an email through an intermediary to Oleg Deripaska, a Russian billionaire with close ties to Mr. Putin, offering to brief him about the campaign.  The email stated: "If he needs private briefings we can accommodate."

100.     On information and belief, on or about July 7, 2016, as Mr. Manafort was offering to provide a private briefing to a close Putin ally, Mr. Page visited Moscow and met with Putin confidants Igor Sechin and Igor Diveykin.  On information and belief, despite denials by the Campaign and Mr. Page, who claimed that he took the trip as a "private citizen," the trip was approved by Mr. Lewandowski while he was the campaign manager for the Trump Campaign.

101.     On information and belief, on or about July 18, 2016, during the Republican National Convention and four days before Plaintiffs' private data was dumped to the world, representatives of the Trump Campaign, including Mr. Sessions, Mr. Page, and Mr. Gordon, met with Mr. Kislyak.

> b.     *Long-standing relationships between agents of the Trump Campaign and Russia provided a critical foundation for these meetings, which otherwise would have been anathema to a U.S. presidential campaign*

102.     The Trump Campaign employed a series of top advisors with longstanding and extensive financial and personal ties to Russia.

103.    Mr. Trump and the Trump businesses themselves have deep financial ties to Russia that date back to at least the mid-1990s.  As early as 1987, Mr. Trump traveled to Russia to explore building properties there.

104.    Throughout the 2000s, Mr. Trump tried, ultimately unsuccessfully, to develop real estate ventures in Russia.  In 2007, he declared with respect to his building plans, "we will be in Moscow at some point."

105.    Russian investors have played a key role in financing many of Mr. Trump's real estate projects.  Members of the Russian elite have invested hundreds of millions of dollars in Trump properties in the United States, including nearly $100 million in properties in Florida alone.  When Trump World Tower in Manhattan was completed in 2001, approximately one-third of the most expensive units were purchased by Russian buyers.

106.    In the mid-2000s, Mr. Trump also partnered with two development companies— the Bayrock Group LLC and the Sapir Organization—with deep ties to Russian oligarchs to develop the Trump International Hotel and Tower in SoHo (known as "Trump SoHo"), in lower Manhattan.

107.    In September 2008, at a real estate conference in New York, Mr. Trump Jr., an official and agent of the Trump businesses, stated, "[I]n terms of high-end product influx into the United States, Russians make up a pretty disproportionate cross-section of a lot of our assets; say in Dubai, and certainly with our project in SoHo and anywhere in New York.  We see a lot of money pouring in from Russia."

108.    In 2013, Mr. Trump concluded an agreement to hold the Miss Universe pageant in Russia.  The deal was financed in part by Aras Agalarov.  (Mr. Agalarov subsequently signed a preliminary deal with Mr. Trump to build a tower with Mr. Trump's name on it in Moscow.)

During an interview in Moscow at the time of the pageant, Mr. Trump stated: "I do have a relationship [with Putin] and I can tell you that he's very interested in what we're doing here today. . . .  I do have a relationship with him. . . .  He's done a very brilliant job in terms of what he represents and who he's represented."  While in Moscow, Mr. Trump also met with several other oligarchs with close ties to Mr. Putin.  After that meeting, Mr. Trump stated: "I have a great relationship with many Russians, and almost all of the oligarchs were in the room."

109.    On September 21, 2015, Mr. Trump told the radio host Hugh Hewitt on his program: "The oligarchs are under [Putin's] control, to a large extent.  I mean, he can destroy them, and he has destroyed some of them. . . .  Two years ago, I was in Moscow . . . with the top-level people, both oligarchs and generals, and top-of-the-government people.  I can't go further than that, but I will tell you that I met the top people, and the relationship was extraordinary."

110.    On November 10, 2015, during a Republican primary debate, Mr. Trump stated: "I got to know [Putin] very well because we were both on *60 Minutes*.  We were stablemates, and we did very well that night."

111.    Mr. Trump's business relationships in Russia continued through the 2016 presidential campaign.  The Trump Organization—with Mr. Trump's knowledge and approval—was actively pursuing plans to build a Trump Tower in Moscow in late 2015 and early 2016, during the campaign.  Between April and December of 2016, the Russian patent office granted 10-year extensions to six Trump trademarks that were set to expire in 2016.

112.    Beyond Mr. Trump himself, Mr. Manafort, Mr. Page, Mr. Flynn, and Mr. Kushner all also had long-standing interests in and ties to Russia that, on information and belief, made them similarly receptive to Russian entreaties.

113.    On information and belief, in 2005, Mr. Manafort proposed to Mr. Deripaska a plan for Mr. Manafort to influence politics inside the United States to benefit Mr. Putin's government.  Mr. Manafort eventually signed a $10 million annual contract with Mr. Deripaska beginning in 2006.  Mr. Manafort later advised Ukrainian President Viktor Yanukovych and his pro-Russian political party and helped him win several elections until Mr. Yanukovych was ousted from power in 2014.  After Mr. Yanukovych was forced to flee, a discovered ledger indicated millions in undisclosed cash payments from Mr. Yanukovych and his pro-Russian political party to Mr. Manafort between 2007 and 2012.

114.    In 2008, Mr. Manafort partnered with Mr. Deripaska and a Ukrainian billionaire to explore the possibility of purchasing the Drake Hotel in New York.

115.    In March 2016, Mr. Trump identified Carter Page as one of his campaign's foreign policy advisors.  Mr. Page was an investment banker with Merrill Lynch in Moscow from 2004 to 2007.  In that capacity, he was an adviser to Gazprom, a Russian state-owned energy company.

116.    On information and belief, in the summer of 2016, the FBI obtained a FISA warrant for Mr. Page, on the basis that there was probable cause to believe that he was acting as an agent of a foreign power.  The application for that warrant cited Mr. Page meeting with Russian intelligence operatives as early as 2013 (although the FBI concluded that Mr. Page did not know he was in contact with a spy).  The application also cited reports alleging that an agreement had been made between the Trump Campaign and Russian operatives to trade the dissemination of hacked emails for changes in the Republican platform regarding Ukraine.

117.    Michael Flynn also served as an adviser to the Trump Campaign and was considered as a possible running mate for Mr. Trump.  Following the election, he briefly served

as Mr. Trump's National Security Advisor.  In 2015, Mr. Flynn was paid $11,250 by the U.S.

subsidiary of a Russian cybersecurity firm and the same amount by a U.S. air cargo company

affiliated with the Russian-owned Volga-Dnepr Group.  On December 10, 2015, Mr. Flynn was

paid $45,000 to speak at an RT (formerly *Russia Today*) anniversary gala in Moscow, where he

sat at the same table as Mr. Putin and his chief of staff, Sergei Ivanov.  The U.S. Intelligence

Community Report describes RT as "[t]he Kremlin's principal international propaganda outlet"

and also notes that RT "has actively collaborated with WikiLeaks."

118.    Jared Kushner is Mr. Trump's son-in-law and was one of the most senior advisors

within the Trump Campaign.  On information and belief, Mr. Kushner and his family have

financial and personal ties with Russian investors, including Lev Leviev and Roman

Abramovich, two Russian oligarchs who are close Putin confidants.

> c.    *Defendants and their co-conspirators each had interests in coordinating
> on the dissemination of the hacked DNC emails*

119.    On information and belief, Russia's practice when it engages in cyber-attacks

related to an election in another country is to partner with aligned parties who are on the ground

in that country.  While Russia has extensive experience entering into and extracting information

from computer networks, its modus operandi for interfering in elections like the 2016 U.S.

election is to seek out domestic political operatives who can provide political expertise.

120.    On information and belief, Russia had an interest in coordinating with Defendants

and their agents to disseminate the hacked emails in a way that would maximize their political

impact.

121.    On information and belief, Russia also had an interest in extracting concessions

from and obtaining leverage over Defendants and their agents in exchange for the dissemination

of the information it had hacked from the DNC servers.

122.   As former CIA Director John Brennan has put it, "I know what the Russians try to do.  They try to suborn individuals and try to get individuals, including U.S. individuals, to act on their behalf, wittingly or unwittingly."

123.   On information and belief, Defendants also had an interest in coordinating with their co-conspirators to disseminate the information that Russian operatives had stolen from the DNC.

124.   In the spring of 2016, as it became apparent that Mr. Trump would face Secretary Clinton in the general election, polls showed his campaign trailing by a wide margin.

125.   The Trump Campaign faced difficulty in bringing together Republican supporters. It trailed far behind its opponent in resources.  To have a chance of winning, the Trump Campaign needed to discredit its opponent, depress her support, and create tensions and internal battles within the Democratic Party.

126.   On information and belief, this need provided the Trump Campaign with a powerful motive to work with Russian operatives to cause the dissemination of the hacked materials.

127.   On information and belief, the Chairman of the Campaign, Mr. Manafort, also had an incentive to coordinate with Russia.  According to financial records, Mr. Manafort was in debt to Russian interests by as much as $17 million just months before he joined the Trump Campaign.  Mr. Manafort offered to work for the Trump Campaign for free.

> d.   *Defendants' conduct further demonstrates that they were receptive to coordinating with Russia during the campaign*

128.   Not only did Defendants have a motive to coordinate with their co-conspirators to disseminate the hacked DNC emails, but recently revealed information makes clear that they were aware of Russia's effort to interfere in the election to benefit Mr. Trump and had no

hesitation about coordinating with Russia to benefit the Trump Campaign and harm Mr. Trump's opponent.

129.    As set forth above, on June 9, 2016, Mr. Trump Jr., Mr. Kushner, and Mr. Manafort met with a Kremlin-connected Russian lawyer who was described in emails as a "Russian government attorney who is flying over from Moscow." According to reports, Mr. Trump Jr. agreed to attend this meeting after being promised damaging material about his father's opponent. The Trump Campaign participants in the meeting expected that the lawyer, Natalia Veselnitskaya, would produce such material. Mr. Trump Jr. attended the meeting after receiving an email indicating that the material was part of a Russian government effort to aid the Trump Campaign. That email (released on July 11, 2017 on Mr. Trump Jr.'s Twitter account) stated, "This is obviously very high level and sensitive information but is part of Russia and its government's support for Mr. Trump." Rather than refuse to be part of an effort by Russia to interfere in the election through the release of Russian-obtained information, Mr. Trump Jr. expressed enthusiasm for the idea in a responsive email, in which he stated: "If it's what you say I love it especially later in the summer." According to reports, the formatting of the email chain suggests that it was forwarded to Mr. Manafort and Mr. Kushner before the meeting, meaning that they went to the meeting fully aware that it was part of Russian efforts to interfere with the election. Mr. Trump Jr. acknowledged in a tweet issued on July 10, 2017 that he took the "meeting to hear info about" Mr. Trump's opponent. Rinat Akhmetshin, a Russian-American lobbyist with suspected ties to Russian intelligence and the Kremlin who has previously been accused of involvement with computer hacking schemes, also attended the June 9 meeting. According to his account of the meeting, Ms. Veselnitskaya produced documents that she claimed would show illegal payments to the DNC.

130.     At the time of the June 9 meeting, Russian intelligence had already stolen large volumes of material from the DNC, including material that would soon be published on WikiLeaks.

131.     Hours after a June 7 email exchange setting the time and place for the June 9 meeting, Mr. Trump gave a speech in which he stated: "I am going to give a major speech on probably Monday of next week, and we're going to be discussing all of the things that have taken place with the Clintons."

132.     Just 40 minutes after the June 9 meeting was scheduled to begin, Mr. Trump said on Twitter, in a tweet about Hillary Clinton: "[W]here are your 33,000 emails that you deleted?"

133.     Days after the meeting, Guccifer 2.0, a hacker working as an agent of Russian military intelligence, began posting and offering to reporters documents stolen from the DNC servers.

134.     Although the Trump Campaign officials who attended the meeting were put on notice that the meeting was part of Russian attempts to interfere in the U.S. election, none of them reported the meeting to law enforcement authorities.

135.     This was not the only meeting that Trump Campaign officials are known to have had with Russian-linked officials or agents seeking information that could undermine Mr. Trump's opponent.  Around the time that WikiLeaks published the information hacked from the DNC, a British security consultant named Matt Tait was approached by a Republican political operative named Peter Smith with links to the Trump Campaign about an operation to obtain emails allegedly taken from Clinton's private server.

136.    According to Tait's public representation, he warned Mr. Smith that if such emails existed, they had likely been obtained by Russian agents as part of wider efforts to interfere with the U.S. election.  According to Mr. Tait:

> Smith . . . didn't seem to care.  From his perspective it didn't matter who had taken the emails, or their motives for doing so.  He never expressed to me any discomfort with the possibility that the emails he was seeking were potentially from a Russian front, a likelihood he was happy to acknowledge.  If they were genuine, they would hurt Clinton's chances, and therefore help Trump. . . .  Given the amount of media attention given at the time to the likely involvement of the Russian government in the DNC hack, it seemed mind-boggling for the Trump campaign—or for this offshoot of it—to be actively seeking those emails.

137.    According to Mr. Tait, Mr. Smith appeared to be closely connected to the Trump Campaign and its agents:

> [I]t was immediately apparent that Smith was both well connected within the top echelons of the campaign and he seemed to know both Lt. Gen. Flynn and his son well.  Smith routinely talked about the goings on at the top of the Trump team, offering deep insights into the bizarre world at the top of the Trump campaign.

In September 2016, Mr. Smith sent Mr. Tait a document entitled "A Demonstrative Pedagogical Summary to be Developed and Released Prior to November 8, 2016."  The document "detailed a company Smith and his colleagues had set up as a vehicle to conduct the research: 'KLS Research', set up as a Delaware LLC 'to avoid campaign reporting,' and listing four groups who were involved in one way or another.  The first group, entitled 'Trump Campaign (in coordination to the extent permitted as an independent expenditure)' listed a number of senior campaign officials: Steve Bannon, Kellyanne Conway, Sam Clovis, Lt. Gen. Flynn and Lisa Nelson."  According to Tait, "this document was about establishing a company to conduct opposition research on behalf of the campaign, but operating at a distance so as to avoid campaign reporting. Indeed, the document says as much in black and white."  On information

and belief, this entity was established and Mr. Smith's activities were conducted in coordination with the Trump Campaign.  On information and belief, the willingness Mr. Smith showed to coordinate with potential Russian agents to obtain and disclose hacked data reflects Defendants' general approach to such coordination.

      *e.*      *On information and belief, Defendants and their co-conspirators reached an agreement to disseminate the hacked DNC emails*

138.    As described above, Defendants and their co-conspirators had a long history of financial and personal entanglements, extensive contact during the time period relevant to the dissemination of the hacked DNC emails, ample motive to coordinate regarding such dissemination, and a demonstrated inclination to coordinate to benefit Mr. Trump's campaign and undermine support for his opponent.

139.    On information and belief, during contacts between Russian officials and agents for Defendants, the parties did in fact reach an agreement regarding the publication of hacked DNC material—in particular, emails involving the DNC finance staff and operations (which included Plaintiffs' private information).  On information and belief, this agreement included policy concessions to Russian interests by Defendants.  On information and belief, meetings that led to this agreement—and other conduct in furtherance of the agreement—occurred in the District of Columbia.  U.S. intelligence officials deemed reports describing the contours of the agreement between Defendants and Russian officials to be important enough to brief both the outgoing and incoming Presidents about it.

D.    <u>The Trump Campaign Provided a Series of Beneficial Concessions to Russia</u>

140.    In the midst of the extensive contacts between Russian officials and Defendants during the relevant time period, not only was Plaintiffs' hacked information disclosed, but the

Republican Party, now under the control of the Trump Campaign, at the Campaign's direction reversed its long-standing position vis-à-vis Russia to adopt a more pro-Russia approach.

141.    For many years, the Republican party has taken strong positions opposed to Russia and the government of Mr. Putin.

142.    During the 2008 presidential campaign, for example, the Republican nominee John McCain made opposition to Russian aggression a centerpiece of his platform.  In particular, the Republican Party firmly opposed Russian actions against neighboring states.

143.    In his speech at the 2008 Republican National Convention, Mr. McCain criticized Russian aggression: "Russia's leaders, rich with oil wealth and corrupt with power, have rejected democratic ideals and the obligations of a responsible power.  They invaded a small, democratic neighbor to gain more control over the world's oil supply, intimidate other neighbors, and further their ambitions of re-assembling the Russian empire."  Mr. McCain added: "[W]e can't turn a blind eye to aggression and international lawlessness that threatens the peace and stability of the world and the security of the American people."

144.    During the 2012 presidential campaign, Republican nominee Mitt Romney called Russia "our number one geopolitical foe."  During a presidential debate, Mr. Romney stated: "I have clear eyes on this. I'm not going to wear rose-colored glasses when it comes to Russia, or Mr. Putin."

145.    During his acceptance speech at the 2012 Republican National Convention, Mr. Romney again challenged Mr. Putin.  Mr. Romney promised: "Under my administration, our friends will see more loyalty, and Mr. Putin will see a little less flexibility and more backbone."

146.    The Trump Campaign took a dramatically different approach to Russia, marking a stark departure from its party's traditional platform.

147.    On information and belief, on or about July 18, 2016—four days before DNC emails containing Plaintiffs' private information were dumped publicly, and the same day that Mr. Sessions, Mr. Page, and Mr. Gordon met with Mr. Kislyak near the site of the Republican National Convention—the Trump Campaign worked to remove strong language about Russia's action in Ukraine from the Republican platform.

148.    Specifically, at a Republican platform meeting, one member proposed an amendment stating: "Today, the post-Cold War ideal of a 'Europe whole and free' is being severely tested by Russia's ongoing military aggression in Ukraine."  The proposed amendment continued: "The Ukrainian people deserve our admiration and support in their struggle." Accordingly, the amendment called for maintaining or increasing sanctions against Russia, increasing aid for Ukraine, and "providing lethal defensive weapons" to Ukraine.  But, according to reporting, Trump Campaign staffers in the room "intervened" and "were able to get the issue tabled while they devised a method to roll back the language."  The Campaign staffers wrote an alternate amendment "with softer language," which was ultimately adopted.

149.    Mr. Gordon initially denied any involvement in shaping this part of the platform. He later would admit that he was personally involved in softening the language on Ukraine in order to align it with Mr. Trump's views as expressed in the March 31, 2016 meeting of the Campaign's national security advisory committee in D.C.  According to reports, Mr. Gordon stated that "this was the language Donald Trump himself wanted and advocated for back in March."

150.    Despite Russia's recent aggression in Ukraine, and in contrast to the convention speeches of Senator McCain and Governor Romney in 2008 and 2012, Mr. Trump did not mention Russia at all during his convention speech.

151.    The Trump Campaign took other steps to benefit Russia.  The Trump Campaign advanced a significant Russian foreign policy interest by casting doubt on the U.S.'s commitment to its NATO allies.  Mr. Trump repeatedly declined to support NATO's historical commitment to defend members who are under attack, refused to offer support to Baltic countries if they were attacked by Russia, and instead criticized NATO members.  In response to Mr. Trump's comments regarding NATO, Republican Senator Lindsey Graham stated: "The Republican nominee for President is essentially telling the Russians and other bad actors that the United States is not fully committed to supporting the NATO alliance."

152.    Mr. Trump and his associates also have undertaken efforts to lift sanctions imposed on Russia in response to its interference with the 2016 election.  On December 29, 2016, the Obama administration imposed economic sanctions on Russian actors in response to such interference.  The United States also expelled certain Russian diplomats and seized Russian-owned facilities in New York and Maryland.

153.    On information and belief, on that same day, in a phone conversation with Russian ambassador Kislyak, Mr. Flynn urged Russia not to respond to the recent U.S.-imposed sanctions.  Mr. Flynn subsequently lied about the substance of the conversation.

154.    Mr. Flynn's December 29 conversation with Mr. Kislyak was one of several contacts between the two in late December 2016.  On information and belief, those conversations took place while Mr. Flynn, Mr. Kislyak, or both were in Washington, D.C.

155.    Immediately upon taking office, the Trump administration undertook efforts to lift economic sanctions imposed on Russia.  And Mr. Trump opposed a bill sanctioning Russia that was eventually passed in Congress with more than enough bipartisan support to override any veto, thus forcing Mr. Trump to sign the bill to avoid having his first ever veto overridden.

156.    Another of Russia's foreign policy goals has been to improve Russia's and Mr. Putin's image within the United States.  Mr. Trump made a series of comments supportive of Mr. Putin, all consistent with this Russian policy desire.  For example, in December 2015, Mr. Trump said of Mr. Putin: "It is always a great honor to be so nicely complimented by a man so highly respected within his own country and beyond."  Mr. Trump elsewhere during the campaign described Mr. Putin as "very much of a leader" with "very strong control over his country," adding that "he's been a leader, far more than our president has been a leader."

157.    This public relations campaign was effective.  According to a February 2017 Gallup poll, "Americans see Russian President Vladimir Putin in a better light than two years ago."  That image has declined only in more recent months, as national news has focused on Russia's attempts to interfere in our election.

158.    Mr. Trump also sought to minimize Mr. Putin's negative human rights record.  In response to questions about Mr. Putin arranging the deaths of opponents, Mr. Trump responded, "I haven't seen any evidence that he killed anybody."

159.    These actions and other statements from the Trump Campaign helped to further Russia's foreign policy objectives.

E.      Pursuant to the Conspiracy, Certain Hacked DNC Emails, Containing Plaintiffs' Private Information, Were Published to the World on WikiLeaks

160.    On July 22, 2016, four days after the change to the Republican Party platform and in furtherance of the conspiracy, actors in control of the stolen materials obtained by Russia caused WikiLeaks to post thousands of private emails hacked from the DNC on the Internet.  As set forth above, the emails published on WikiLeaks included private information about each of the Plaintiffs—and about dozens of other private Americans.  The information about Plaintiffs was not newsworthy and its release caused them substantial injuries.

161.    On information and belief, Defendants conspired with their co-conspirators to select the materials to be released and time the release of the hacked DNC emails to obtain maximum political benefit for the Trump Campaign.  The conspirators focused on DNC finance staff emails for their potential to deter eligible voters (including Plaintiffs) from donating to, attending events in support of, and otherwise supporting their candidate for the White House. Although Russian agents had possessed large volumes of DNC data for some time, the DNC emails were not published on WikiLeaks until the timing was politically optimal to benefit the Trump Campaign.  As Mr. Trump Jr. indicated in an email (later published on his Twitter account), the release of information would be helpful to the Trump Campaign "especially later in the summer."

162.    Shortly after the DNC emails were published, Mr. Stone, who was still in close contact with Mr. Trump and Mr. Manafort, admitted in an interview that he had communicated with WikiLeaks founder Julian Assange but that he was "not at liberty" to discuss aspects of those communications.  On October 12, 2016, Mr. Stone admitted that he had "backchannel communications" with Mr. Assange "through an intermediary—somebody who is a mutual friend." He added that "[t]hat friend travels back and forth from the United States to London and we talk."

163.    At around the time the DNC emails were published, Mr. Stone engaged in public and private Twitter conversations with the hacker Guccifer 2.0, who several weeks earlier had claimed credit for the DNC hack.

164.    According to the U.S. Intelligence Community Report, Guccifer 2.0 was working as an agent of Russian military intelligence.  The report states that GRU (Russian intelligence) "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data

obtained in cyber operations publicly and in exclusives to media outlets."  The "GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks.  Moscow most likely chose WikiLeaks because of its self-proclaimed reputation for authenticity."

165.    The strategic timing and content of the publication of DNC emails right before the Democratic National Convention aggravated tensions and internal disagreements within the Democratic Party, as intended.  Headlines from around the time of the Convention demonstrated the effect of the publication.  *The New York Times* reported that "the publication of 20,000 Democratic National Committee emails by WikiLeaks this weekend provided a disastrous prelude to the convention."  A *National Review* article entitled "WikiLeaks blows up the party's hopes for a smooth convention week" explained: "This week, the Democrats begin their convention with the resignation of their national committee chairwoman, Debbie Wasserman Schultz, after nearly 20,000 of the committee's e-mails were published by WikiLeaks."

F.    Throughout the Remainder of the Campaign, Defendants Amplified and Drew
       Attention to Hacked Emails that Had Been Published

166.    The Trump Campaign sought to maximize its advantage from the release of the hacked emails by further publicizing and amplifying the released information.  In the last months of the campaign, Mr. Trump mentioned WikiLeaks over 160 times during his campaign appearances, drawing increased attention to the released Russian-hacked emails.

167.    For example, on July 23, the day after the release of the DNC emails, Mr. Trump sought to amplify and gain further political benefit from the timing of the release of the emails. "The Wikileaks e-mail release today was so bad to Sanders that it will make it impossible for him to support [Hillary Clinton], unless he is a fraud," Mr. Trump tweeted to his followers.

168.    On October 27, 2016, during an appearance on Good Morning America from the Trump International Hotel in Washington, D.C., Mr. Trump said that the media should be

"talking about . . . WikiLeaks and the horrible things that have come out about Hillary Clinton, the horrible things."

169.    Defendants also continued to communicate with Russia and others regarding the hacking and release of emails that could harm Secretary Clinton.  On July 27, 2016, during the Democratic National Convention, Mr. Trump held a press conference in Florida.  During his remarks, Mr. Trump called on Russia to continue its cyberattacks, stating, "Russia, if you're listening, I hope you're able to find the 30,000 [Hillary Clinton] emails that are missing." Although the Trump Campaign—and later, then-White House press secretary Sean Spicer— claimed that Mr. Trump was "joking," when Mr. Trump was asked at the time to clarify his remark and whether he was serious, Mr. Trump stated: "If Russia or China or any other country has those emails, I mean, to be honest with you, I'd love to see them."

170.    Following that statement, Defendant Stone engaged in a series of exchanges with one of the Russian hackers culminating in the release of a second tranche of emails, this time from the DCCC and Clinton Campaign Chairman John Podesta's account.

171.    In August and September 2016, Defendant Stone and Guccifer 2.0 engaged in an exchange of direct messages over Twitter.

172.    On August 12, 2016, Guccifer 2.0 released documents obtained from the DCCC and tweeted: "@RogerJStoneJr thanks that u believe in the real #Guccifer2."  Guccifer 2.0 subsequently tweeted "paying u back," in reply to a tweet from Defendant Stone.

173.    On August 18, 2016, Defendant Stone stated in a C-SPAN interview that he was in touch with Assange "through an intermediary."

174.    On August 21, 2016, Defendant Stone tweeted: "Trust me, it will soon the [sic] Podesta's time in the barrel.  #CrookedHillary."

175.     In mid-September, Stone said on a radio interview that he expected "Julian Assange and the Wikileaks people to drop a payload of new documents on a weekly basis fairly soon."

176.     On October 1, 2016, Defendant Stone tweeted: "Wednesday @HillaryClinton is done."

177.     Two days later, on October 3, 2016, Defendant Stone tweeted: "I have total confidence that @wikileaks and my hero Julian Assange will educate the American people soon #LockHerUp."

178.     Then, on October 4, 2016, Defendant Stone tweeted: "Payload coming. #Lockthemup."

179.     Just two days later, on October 7, 2016, WikiLeaks published the first batch of emails hacked from Clinton campaign chairman John Podesta, one hour after an Access Hollywood video surfaced on which Mr. Trump made lewd remarks about sexually assaulting women.

180.     Later, Mr. Trump himself previewed disclosures that would be coming, in order to elevate attention to them.  For example, on November 2, he declared: "So today, I guess WikiLeaks, it sounds like, is going to be dropping some more."

181.     As set forth above, the release of Plaintiffs' private information, as well as the subsequent amplification by Defendants, caused them real and substantial harm as a result of their participation in the political process and their support and advocacy for a particular presidential candidate.  This harm to Plaintiffs was a direct and foreseeable consequence of the dissemination of the hacked emails.  The publication of the emails also served to intimidate eligible voters who were potential donors and supporters of Mr. Trump's opponent, including

Plaintiffs, as it put them on notice that their support and advocacy could expose them to the release of their private information.

G.   Defendants Then Sought to Deny and Conceal Any Evidence of Their Interactions

182.   Defendants and their associates have repeatedly tried to deny or conceal all aspects of this conspiracy.  First, they have denied or attempted to conceal their contacts during the campaign with Russian actors.  Second, they have failed to disclose contacts with Russian actors even when such failure violates or circumvents the law.  Third, they have sought to conceal the nature of their personal and business relationships with Russia.  Fourth, they have sought to dismiss the unanimous conclusions of the U.S. government that Russia interfered with the 2016 election, doing nothing to hold Russia accountable for this attack on the election and the privacy of Plaintiffs and others like them.  Fifth, they have concealed their involvement in softening the Republican Party platform change to Russia's benefit.  And sixth, since the election Mr. Trump has taken actions to block the law enforcement investigation into any involvement by his Campaign and associates in Russian attempts to interfere with the 2016 election.

*a.*     *Defendants attempted to conceal contacts with Russian actors*

183.   Defendants and other Trump associates have repeatedly denied or attempted to conceal contacts during the campaign with Russian actors.

184.   For example, Defendants concealed the June 9, 2016 meeting between Mr. Trump Jr., Mr. Manafort, Mr. Kushner, and a Russian lawyer.  On July 24, 2016, during a CNN interview, Mr. Trump Jr. said that reports that Russia was trying to help the Trump Campaign by damaging his opponent were "disgusting" and "so phony" despite having attended a meeting with Russian agents for precisely that purpose.  When news of the meeting came to light, Mr. Trump Jr. offered differing and incomplete explanations of the origins and purpose of the

meeting. In his initial account of the meeting, Mr. Trump Jr. stated that he "was asked to attend the meeting by an acquaintance, but was not told the name of the person I would be meeting with beforehand," and that "[w]e primarily discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at the time and there was no follow up." On information and belief, that initial statement was personally dictated by Mr. Trump. Only later did Mr. Trump Jr. acknowledge that the purpose of the meeting was to discuss information about Mr. Trump's opponent to benefit his campaign.

185.   The initial denial of the June 9 meeting is just one example of repeated denials by Defendants and their associates of contacts between the Trump Campaign and Russian agents that have later proven false.

186.   For example, on July 24, 2016—the same day that Mr. Trump Jr. issued his denial—Mr. Manafort stated that allegations of links between the Trump Campaign and Russia were "absurd" and that "there's no basis to it."

187.   On September 25, 2016, in response to a question about Mr. Page's contacts with Russian agents, Kellyanne Conway, a senior advisor to Mr. Trump, stated: "If he's doing that, he's certainly not doing it with the permission or knowledge of the campaign . . . . He is certainly not authorized to do that."

188.   On November 10, 2016, in Washington, D.C., Campaign spokeswoman Hope Hicks stated that contacts between the Campaign and Russian actors "never happened." She added: "There was no communication between the Campaign and any foreign entity during the campaign."

189.    On December 18, 2016, Ms. Conway was asked whether "anyone involved in the Trump Campaign [had] any contact with Russians trying to meddle with the election."  She replied: "Absolutely not.  And I discussed that with the president-elect just last night.  Those conversations never happened."

190.    On January 11, 2017, Mr. Trump denied that anyone in his campaign or any of his associates had contact with Russia leading up to or during the campaign.

191.    On January 15, 2017, Mike Pence denied any contacts between the Trump Campaign or its associates and Russian operatives.

192.    On February 20, 2017, in Washington, D.C., deputy press secretary Sarah Huckabee Sanders said that allegations about contacts between Trump associates and Russia are "a non-story because to the best of our knowledge, no contacts took place, so it's hard to make a comment on something that never happened."

193.    In March 2017, Mr. Trump Jr. stated: "Did I meet with people that were Russian? I'm sure, I'm sure I did.  But none that were set up.  None that I can think of at the moment.  And certainly none that I was representing the campaign in any way, shape, or form."

        *b.*      *Defendants and their associates failed to disclose contacts with Russian actors even when such failure violated or circumvented the law*

194.    Not only have Defendants and their associates sought to conceal their contact with Russian individuals, but they have done so even where their failure to disclose such contacts violated or circumvented the law.

195.    Mr. Kushner failed to disclose his meetings with Russian agents, and others with foreign government officials, in security clearance forms, as required by law.  On information and belief, in December 2016, Jared Kushner and Michael Flynn discussed with Russian Ambassador Kislyak the establishment of a communication back channel with Russia, which

would use Russian diplomatic facilities in an apparent attempt to avoid detection by American intelligence agencies.  Also in December 2016, on information and belief, Mr. Kushner met in New York with Sergey Gorkov, the chairman of Vnesheconombank, a Russian state-owned bank that is subject to U.S. sanctions.  These meetings were not disclosed.

196.    Trump Campaign advisor and now-Attorney General Jeff Sessions also failed to disclose during his Senate confirmation hearing and in security clearance forms at least two meetings during the campaign with Mr. Kislyak—at least one that took place in D.C.  On information and belief, those meetings included discussions of campaign-related matters, including Mr. Trump's position on issues important to Russia, which Mr. Sessions has previously denied.

197.    Mr. Flynn failed to disclose payments from foreign sources, including Russian sources, as required by law.

198.    Mr. Manafort failed to register with the Department of Justice as a foreign agent while working for Mr. Yanukovych.  In June 2017, Mr. Manafort retroactively filed foreign agent registration forms showing that his firm had been paid over $17 million from Yanukovych's pro-Russian Ukrainian political party over a two-year period.

> c.    *Defendants and their associates concealed aspects of their personal and business relationships with Russian actors*

199.    Defendants and their associates have also concealed the nature of their personal and business relationships with Russian actors.  For example, during the campaign, Mr. Trump walked back his repeated boasts about his Russia connections.  On July 27, 2016, the same day that he called on Russia to hack Hillary Clinton's emails, Mr. Trump insisted that "I never met Putin. I've never spoken to him."  In a television interview, he reiterated: "But I have nothing to do with Russia, nothing to do, I never met Putin, I have nothing to do with Russia whatsoever."

48

He further stated: "I have nothing to do with Russia.  I don't have any jobs in Russia.  I'm all over the world but we're not involved in Russia."

200.  On October 24, 2016, at a campaign rally in Florida, Mr. Trump stated: "I have nothing to do with Russia, folks, I'll give you a written statement."

201.  On October 26, 2016, at a rally in Kinston, North Carolina, Mr. Trump declared, "First of all, I . . . have no business whatsoever with Russia, have nothing to do with Russia."

202.  On January 11, 2017, Mr. Trump tweeted: "Russia has never tried to use leverage over me. I HAVE NOTHING TO DO WITH RUSSIA—NO DEALS, NO LOANS, NO NOTHING!"

203.  On February 7, 2017, Mr. Trump posted a tweet from D.C. that claimed, in part, "I don't know Putin, have no deals in Russia, and the haters are going crazy."

204.  On February 16, 2017, during a press conference in the White House, Mr. Trump claimed, when asked about contacts with Russia: "I had nothing to do with it.  I have nothing to do with Russia.  I told you, I have no deals there.  I have no anything."  He went on to state that he was "okay with" the publication of stolen emails by WikiLeaks.

205.  To date, despite questions about his business relationships and financial ties to Russia, Mr. Trump—in a stark break from precedent and in the face of extreme political pressure—has refused to disclose the past ten years of his tax returns.  He has done this notwithstanding the obvious opportunity to put to rest some of the damaging speculation about Russian dealings that may or may not be indicated on these returns.  On information and belief, these tax returns could reveal the nature and extent of his business entanglements with Russian interests.

d.     *Defendants and their associates have sought to deny any Russian interference with the 2016 election*

206.     Mr. Trump and his associates have repeatedly questioned or denied Russia's involvement in the hacking of the DNC emails and interference with the 2016 election, despite the overwhelming consensus of the U.S. Intelligence Community and others that Russia was responsible.

207.     For example, on June 15, 2016, shortly after the hacking of the DNC became public, Mr. Trump suggested that the DNC hacked itself to get attention.

208.     On July 26, 2016, Mr. Trump tweeted that Democrats were blaming Russia to "deflect the horror and stupidity of the WikiLeaks disaster."

209.     On September 8, 2016, in an interview on the Russian-controlled media outlet RT, Mr. Trump stated that it is "probably unlikely" that Russia interfered with the election.  He further stated: "I think maybe the Democrats are putting that out.  Who knows?  But I think that it's pretty unlikely."

210.     On September 26, 2016, during the first presidential debate, Mr. Trump dismissed accusations that Russia was behind the DNC hacks and stated: "It also could be somebody sitting on their bed that weighs 400 pounds, okay?"

211.     On October 9, 2016, during the second presidential debate, Mr. Trump claimed that "[Clinton] doesn't know if it's the Russians doing the hacking.  Maybe there is no hacking."

212.     On November 28, 2016, in an interview with *Time* magazine after the election, Mr. Trump stated: "I don't believe [Russia] interfered.  That became a laughing point, not a talking point, a laughing point."

213.     On July 6, 2017, in remarks to reporters while traveling in Poland, Mr. Trump stated, "I think it very well could be Russia but I think it could very well have been other

countries," continuing, "no one really knows for sure." In fact, U.S. intelligence agencies are unanimous in the view that it was indeed Russia.

214. On July 7, 2017, Mr. Trump met personally with Mr. Putin and reportedly accepted Mr. Putin's denial of involvement in trying to disrupt the U.S. election. Secretary of State Rex Tillerson indicated that the two agreed that continued focus on this issue would be a hindrance and thus agreed to move on.

215. Mr. Trump's unsupported denials continue to this day. On September 22, 2017, he tweeted: "The Russia hoax continues, now it's ads on Facebook. What about the totally biased and dishonest Media coverage in favor of Crooked Hillary?"

216. Mr. Stone has also denied Russian involvement in the hacking of the DNC servers. For example, on July 11, 2017, during a speech in Washington, D.C., Mr. Stone stated, incorrectly, that there is no evidence of Russian interference in the 2016 election. He also dismissed allegations of collusion with Russia as a "fairy tale," argued that it was a false narrative invented to distract from the fact that Secretary Clinton was the presidential candidate "in bed" with the Russians, and dismissed the significance of the June 9 meeting at Trump Tower.

        e.     *Defendants have concealed their involvement in the platform change to benefit Russia*

217. On information and belief, Defendants and their co-conspirators have also attempted to conceal their involvement in the change in the Republican Party's platform language about Ukraine. Mr. Trump and Mr. Manafort initially denied any campaign involvement in the platform language. In January 2017, Mr. Gordon, the Trump Campaign's national security policy representative at the Republican National Convention, also denied

involvement.  But in March 2017, Mr. Gordon admitted that he was personally involved in softening the language on Ukraine.

      f.      *Mr. Trump took actions to block the law enforcement investigation into involvement by his Campaign and associates in Russian attempts to interfere with the 2016 election*

218.    After assuming the Presidency, Mr. Trump made repeated efforts to ingratiate himself with FBI Director Comey, who was overseeing an investigation into Russian interference in the 2016 election and possible Trump Campaign involvement.  On information and belief, at a dinner in Washington, D.C., Mr. Trump asked for Mr. Comey's personal loyalty. In a later meeting in the White House, Mr. Trump requested that Mr. Comey let go of his investigation into wrongdoing by Mr. Flynn.  Mr. Trump and his staff also made several efforts to have members of the U.S. law enforcement and intelligence communities publicly rebut claims of such coordination.

219.    On May 9, 2017, Mr. Trump fired Director Comey.  On information and belief, the next day, at a meeting in the Oval Office, he told Russian Foreign Minister Sergey Lavrov and Ambassador Kislyak that he "faced great pressure because of Russia," and that as a result of firing Mr. Comey, "That's taken off."

                    *    *    *    *    *

220.    In sum, as set forth above, Russia adopted at its highest levels of government a strategy to interfere with the 2016 U.S. election and successfully executed that strategy by, among other things, stealing and conspiring with others to disseminate DNC emails.  On November 8, 2016, Mr. Trump won the election to become President of the United States. Russia achieved a major foreign policy goal with the election of Mr. Trump and defeat of Secretary Clinton.

221.    In the process, Plaintiffs paid a personal price merely for seeking to participate in the democratic process.  And the threat that actors like the Defendants and their co-conspirators might seek to disseminate hacked employee and supporter information again in the future hangs over our democratic process, imposing a chilling effect on the rights of Americans to support and advocate for candidates for office.

222.    Defendants and their co-conspirators have engaged in extensive efforts to deny Russia's involvement in the hacked information, to undermine efforts to hold Russia accountable for its cyberattack on the DNC and release of Plaintiffs' personal information, and to conceal their contacts with Russian actors in order to conceal their own involvement in the conspiracy.

### COUNT I
**Public Disclosure of Private Facts in Violation of D.C. Law (Co-Conspirator and Aiding and Abetting Liability)**

223.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

224.    Defendants agreed with each other and with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

225.    Defendants also aided and abetted the above-described public disclosure.

226.    Defendants and their co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

227.    Defendants and their co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts, in which the public has no legitimate concern, about Plaintiffs and other individuals similarly

situated, and that publication of such information would cause suffering, shame, or humiliation to a person of ordinary sensibilities.

228.   In furtherance of the conspiracy, one or more conspirators published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding sexual orientation, personal health matters, social security numbers, credit cards, personal and professional relationships, banking relationships, home addresses, and telephone numbers.

229.   As a direct and proximate result of the conduct of Defendants and their co-conspirators, Plaintiffs have sustained significant harm, entitling them to damages in an amount to be proven at trial.

230.   The outrageous, malicious, and willful misconduct of the Defendants—conspiring with a hostile foreign government to publish Plaintiffs' stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles the Plaintiffs to punitive damages so that the Defendants themselves and others in their position are deterred from repeating their outrageous actions in the future.

## COUNT II
### Intentional Infliction of Emotional Distress in Violation of D.C. Law (Co-Conspirator and Aiding and Abetting Liability)

231.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

232.   Defendants agreed with each other and with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

233.    Defendants also aided and abetted the above-described public disclosure.

234.    Defendants and their co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

235.    Defendants and their co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts about Plaintiffs and other individuals similarly situated, and that publication of the emails would cause Plaintiffs and others severe or extreme emotional distress.

236.    In furtherance of the conspiracy, one or more conspirators published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding sexual orientation, personal health matters, social security numbers, credit cards, personal and professional relationships, banking relationships, home addresses, and telephone numbers.

237.    The conduct of Defendants and their co-conspirators was extreme, outrageous, and beyond the bounds of decency.

238.    As a direct and proximate result of the conduct of Defendants and their co-conspirators, Plaintiffs have suffered severe or extreme emotional distress, entitling them to damages in an amount to be proven at trial.

239.    The outrageous, malicious, and willful misconduct of the Defendants—conspiring with a hostile foreign government to publish Plaintiffs' stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles the Plaintiffs to receive punitive damages so that the Defendants themselves and others in their position are deterred from repeating their outrageous actions in the future.

## COUNT III

**(Conspiracy to Intimidate Lawful Voters from Giving Support or Advocacy to Electors for President and to Injure Citizens in Person or Property on Account of Such Support or Advocacy in Violation of 42 U.S.C. 1985(3))**

240.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

241.    Plaintiffs are U.S. citizens who are lawfully entitled to vote.

242.    Plaintiffs communicated with each other and with others at the DNC, and made and solicited contributions to the DNC, for the purpose of giving support and advocacy in a legal manner in favor of the election of candidates for federal office in D.C., including for President of the United States.

243.    Defendants agreed with each other and with other parties, including Russian government officials and WikiLeaks, to publicly disclose on the Internet private email communications that were stolen, or hacked, from the DNC for the purpose of influencing the 2016 presidential election.

244.    Defendants and their co-conspirators knew that the hacked DNC emails were private and intended to publicly disclose the private emails.

245.    Defendants and their co-conspirators knew, were plainly indifferent to the fact, or consciously disregarded the foreseeable risk that the hacked DNC emails contained private facts about Plaintiffs and other individuals similarly situated.

246.    In furtherance of the scheme, one or more conspirators published on the Internet hacked DNC emails containing private facts about Plaintiffs and others, including information regarding sexual orientation, personal health matters, social security numbers, credit cards, personal relationships, banking relationships, home addresses, and telephone numbers, as well as information about eligible voters', including Plaintiffs', lawful support and advocacy for a

candidate for President.  Defendants further conspired with other parties to draw attention to the disseminated DNC emails containing eligible voters', including Plaintiffs', private information.

247.    In so doing, and by exposing Plaintiffs to significant harm as a result of their prior activities in support of a candidate for President, Defendants conspired to prevent by intimidation Plaintiffs and other eligible voters like them from giving their support or advocacy in a legal manner for a candidate for President of the United States.

248.    In so doing, Defendants conspired to injure Plaintiffs and others like them in their persons and property on account of their support or advocacy in a legal manner for a candidate for President of the United States.

249.    As a natural and foreseeable result of the conspiracy, Plaintiffs, among other eligible voters, were injured in their persons and property.

250.    As a direct and proximate result of the conduct of Defendants and their co-conspirators, Plaintiffs have sustained significant harm, entitling them to damages in an amount to be proven at trial.

251.    The outrageous, malicious, and willful misconduct of the Defendants—conspiring with a hostile foreign government to publish Plaintiffs' stolen and private information to the world as part of a conspiracy to influence a presidential election—also entitles the Plaintiffs to receive punitive damages so that the Defendants themselves and others in their position are deterred from repeating their outrageous actions in the future.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully pray that this Court:

   a)  Issue judgment in favor of Plaintiffs.

b) Award compensatory and consequential damages as proven at trial, and in an amount over $75,000, to compensate Plaintiffs for the injuries they suffered.

c) Award punitive damages as just and proper in light of Defendants' outrageous and malicious conduct and to deter such egregious conduct from being committed in the future.

d) Require Defendants to disgorge any profits they obtained through their involvement in the conspiracy, including gains from their financial relationships with Russian actors and financial benefits accruing to them from Russia's intervention in the election.

e) Award Plaintiffs costs and reasonable attorneys' fees.

f) Provide such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial of all issues so triable.

Date: September 26, 2017

*/s/ Benjamin L. Berwick*
BENJAMIN L. BERWICK (D.D.C. Bar No. MA0004)
United to Protect Democracy
10 Ware St.
Cambridge, MA 02138
(909) 326-2911
Ben.Berwick@protectdemocracy.org

IAN BASSIN (NY Attorney Registration No. 4683439)
United to Protect Democracy
147 Prince St.
Brooklyn, NY 11201
(202) 856-9191
Ian.Bassin@protectdemocracy.org

JUSTIN FLORENCE (D.C. Bar No. 988953)
Justin.Florence@protectdemocracy.org
ANNE TINDALL (D.C. Bar. No. 494607)

Anne.Tindall@protectdemocracy.org
United to Protect Democracy
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
(202) 856-9191

NANCY GERTNER (MA Bar No. 190140)
Fick & Marx
100 Franklin Street, 7th floor
Boston, MA 02110
(857) 321-8360
ngertner@fickmarx.com

RICHARD PRIMUS (D.C. Bar No. 472223)
The University of Michigan Law School*
625 S. State Street
Ann Arbor, MI 48109
(734) 647-5543
PrimusLaw1859@gmail.com

STEVEN A. HIRSCH (CA Bar No. 171825)
shirsch@keker.com
STEVEN P. RAGLAND (CA Bar No. 221076)
sragland@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400

* For identification purposes.


*Counsel for Plaintiffs*