**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROY COCKRUM; SCOTT COMER; and, ERIC SCHOENBERG | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:17-CV-1370-ESH ) ) |
| DONALD J. TRUMP FOR PRESIDENT, INC.; and ROGER STONE, | ) ) ) |
| Defendants. | ) ) ) |

**BRIEF OF *AMICI CURIAE* OF CAMPAIGN LEGAL CENTER AND PROFESSOR THEODORE M. SHAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Paul M. Smith, DC Bar No. 358870
CAMPAIGN LEGAL CENTER
1411 K Street, NW, Suite 1400
Washington, D.C. 20005
Tel.: (202) 736-2200

Ruth M. Greenwood, (*pro hac vice pending*)
CAMPAIGN LEGAL CENTER
73 W Monoroe St, Suite 322
Chicago, IL 60603
Tel.: (312) 561-5508

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ...................................................................................................1

SUMMARY OF ARGUMENT ................................................................................................2

ARGUMENT ...........................................................................................................................5

    I.    Defendants Make Several Erroneous Assertions About § 1985(3) Based on Misreading the Statutory Text and Case Law. ..........................................................5

        A.    The Support or Advocacy Clauses of § 1985(3) Do Not Require State Action or the Identification of an Independent Constitutional Right Being Violated. .......................................................................................................7

        B.    Release of Sensitive Personal Information Can Constitute Intimidation and Injury for the Purposes of § 1985(3). ..............................................................9

        C.    Defendants Can Conspire to Intimidate and Injure Where the Intimidation or Injury Is Merely a Tactic for Achieving a Larger Goal. ...........................15

    II.    Congress's Intent in Passing § 1985(3) Was to Stop Intimidation and Injury Serious Enough to Deter Political Engagement. .......................................................16

        A.    Reconstruction ................................................................................................16

        B.    Congressional Action to Stop Clandestine Bands of Private Conspirators ..17

        C.    Application of the KKK Act to the Defendants' Alleged Conduct .............18

CONCLUSION ......................................................................................................................20

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

\*[1]*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ............................................................9

\**Great American Fed. S. & L. Ass'n v. Novotny*,
    442 U.S. 366 (1979) .......................................................7-8

\**Griffin v. Breckenridge*,
    403 U.S. 88 (1971)...........................................................8

*Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*,
    388 F.3d 327 (7th Cir. 2004) ...........................................12

\**Kush v. Rutledge*,
    460 U.S. 719 (1983) ...................................................3, 6, 9

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)...........................................................10

*Libertad v. Welch*,
    53 F.3d 428 (1st Cir. 1995)............................................15

*MCI Telecomms. Corp. v. AT&T Co.*,
    512 U.S. 218 (1994).......................................................10

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967) ............................................9

*People Helpers, Inc. v. City of Richmond*,
    789 F. Supp. 725 (E.D. Va. 1992) ..................................12

*Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*,
    No. 97 Civ. 0040(RLE), 1999 WL 893398 (S.D.N.Y. Oct. 18, 1999) ............................11

*United Bhd. of Carpenters Local 610 v. Scott*,
    463 U.S. 825 (1983) ........................................................8

*United States v. Beaty*,
    288 F.2d 653 (6th Cir. 1961) ..........................................12

*United States v. Bruce*,
    353 F.2d 474 (5th Cir. 1965) ..........................................12

---

[1] Cases chiefly relied upon denoted with asterisk

*United States v. Deal*,
   6 Race Rel. L. Rep. 474 (W.D. La. 1961)........................................................12

*\*United States v. Nguyen*,
   673 F.3d 1259 (9th Cir. 2012) ......................................................................13

*U.S. ex rel. Katzenbach v. Original Knights of Ku Klux Klan*,
   250 F. Supp. 330 (E.D. La. 1965)..................................................................15

## Constitution:                                                                           Page(s)

U.S. Const. amend. XIII § 1.................................................................................8

U.S. Const. amend. XIII.....................................................................................16

U.S. Const. amend. XIV ....................................................................................16

U.S. Const. amend. XV......................................................................................16

## Federal Statutes, Rules, and Regulations:                                               Page(s)

11 C.F.R. § 104.8 ...............................................................................................9

42 U.S.C. § 1985(2) ..........................................................................................11

42 U.S.C. § 1985(3) ....................................................................................*passim*

42 U.S.C. § 3617................................................................................................12

52 U.S.C. § 10101(b) ........................................................................................12

Fed. R. Civ. P. 12(b)(6).................................................................................2, 4

Fed. R. of App. P. 29(c)(5) ................................................................................1

D.D.C. Local Rule 7(o)(5) .................................................................................1

## Miscellaneous Resources:                                                                Page(s)

Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the
   United States* (Basic Books ed., 2000)..........................................................13

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter
   Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173 (2015) ..................6, 11, 12

Craig C. Donsanto & Nancy L. Simmons, Public Integrity Section, U.S. Dep't of
Justice, *Federal Prosecution of Election Offenses* (2007)...................................................13

Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863–1877
(Henry Steele Commager & Richard B. Morris eds., 1988)..........................................4, 17

*Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)*,
National Institute of Standards and Technology (2010) .....................................................14

*Hearing on Equifax: Continuing to Monitor Data-Broker Cybersecurity Before the Subcomm.
on Privacy, Tech. & the Law of the S. Judiciary Comm.*,115th Cong. (2017) ..................14

Mark Fockele, *A Construction of Section 1985(c) in Light of Its Original Purpose*,
46 U. Chi. L. Rev. 402 (1979) .....................................................................................17, 18

*Memorandum*, *Preparing for and Responding to a Breach of Personally Identifiable
Information*, Executive Office of the President, Office of Management and Budget
(Jan. 3, 2017)......................................................................................................................14

Noah Webster, *An American Dictionary of the English Language* (1867) ....................................11

*Remarks on Signing the Identity Theft Penalty Enhancement Act*, 2004 (Book II)
Pub. Papers 1221 (July 15, 2004) .....................................................................................14

Statement of Rep. John Coburn (R-Ind.), *Congressional Globe*, 42nd Congress, 1st Session .....18

## STATEMENT OF INTEREST[2]

Amicus curiae, Campaign Legal Center (CLC), is a nonpartisan nonprofit organization that has been working for fifteen years to advance democracy through law. Amicus CLC has litigated many voting rights cases in federal courts, including as arguing counsel for the plaintiffs in the recent United States Supreme Court case, *Gill v. Whitford*, No. 16-1161, as counsel for plaintiffs in *Veasey v. Abbott,* 830 F.3d 216 (5th Cir. 2016) (challenging Texas's photo ID law), and as counsel for plaintiffs in *LULAC v. Reagan,* No. 2:17-cv-04102 (D. Ariz. 2017) (challenging Arizona's dual registration system). CLC has filed amicus curiae briefs in every major voting rights case before the Supreme Court in recent years including *Cooper v. Harris*, 137 S. Ct. 1455 (2017), *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), and *Shelby County v. Holder,* 133 S. Ct. 2612 (2013).

Amicus curiae, Professor Theodore M. Shaw, is the Julius L. Chambers Distinguished Professor of Law at the University of North Carolina School of Law, where he teaches courses on the equal protection clause of the Fourteenth Amendment, and the civil rights statutes from the Reconstruction era. Professor Shaw was the fifth Director-Counsel and President of the NAACP Legal Defense and Educational Fund, Inc. ("LDF"), for which he worked in various capacities over the span of twenty-six years. He has litigated education, employment, voting rights, housing, police misconduct, capital punishment, and other civil rights cases in trial and appellate courts, and before the United States Supreme Court. From 1982 until 1987, he litigated education, housing, and capital punishment cases, and directed LDF's education litigation docket. In 1987,

---

[2] All parties have consented to amici's participation in this case. Pursuant to LCvR 7(o)(5) and Fed. R. of App. P. 29(c)(5), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person or entity, other than amici or their counsel, made a monetary contribution to the preparation or submission of this brief.

under the direction of LDF's third Director-Counsel, Julius Chambers, Mr. Shaw relocated to Los Angeles to establish LDF's Western Regional Office. In 1990, Mr. Shaw left LDF to join the faculty of the University of Michigan Law School. In 1993, Mr. Shaw returned to LDF as Associate Director-Counsel, and in 2004, he became LDF's fifth Director-Counsel. Mr. Shaw's legal career began as a Trial Attorney in the Honors Program of the United States Department of Justice, Civil Rights Division in Washington, D.C., where he worked from 1979 until 1982.

In sum, amici have a demonstrated interest in the protection of civil rights and the health of our representative democracy, and thus the interpretation and application of 42 U.S.C. § 1985(3) to conduct that intimidates people from offering their support or advocacy of candidates for federal office or injures people on account of such support or advocacy.

## SUMMARY OF ARGUMENT

Plaintiffs' Amended Complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) because it states a colorable claim under 42 U.S.C. § 1985(3) (hereinafter "§ 1985(3)"). In their briefing to this Court – The Memorandum of Points and Authorities in Support of Defendant Donald J. Trump for President, Inc.'s Motion to Dismiss the First Amended Complaint (hereinafter "Campaign Br.") and the Memorandum of Points and Authorities in Support of Defendant Roger Stone's Motion to Dismiss Amended Complaint (hereinafter "Stone Br.") – Defendants misread the plain language of § 1985(3) and misinterpret longstanding Supreme Court precedent. As a result, Defendants fail to recognize the statutory rights and protections encapsulated in § 1985(3). This brief will explain the Defendants' misunderstandings and describe how Plaintiffs' interpretation of § 1985(3) is consistent with its text, precedent, and legislative history.

Section 1985(3) provides a cause of action for citizens subject to a conspiracy of two or more persons to prevent them by force, intimidation, or threat from supporting or advocating for

certain candidates in a federal election (clause three of § 1985(3)), or to injure them in person or property on account of such support or advocacy (clause four of § 1985(3)). This is exactly the conduct that Defendants are alleged to have engaged in, and as such, the relevant clauses of § 1985(3) correctly apply to the instant case. Amended Complaint (hereinafter "Compl.") ¶¶ 240-251.

Beginning with the text and precedent, § 1985(3) is a very long, run-on sentence containing four semi-colons that divide it into five operative clauses. Each of the first four clauses articulates a separate cause of action. The Supreme Court has explained that the first two clauses should be read discretely from the latter two because the former authorize claims related to violations of "equal protection of the laws." *Kush v. Rutledge*, 460 U.S. 719, 726 (1983). In contrast, clauses three and four of § 1985(3) authorize claims related to "support or advocacy" for candidates for certain federal elections. This brief will refer to the first two clauses as the "equal protection clauses of § 1985(3)" and clauses three and four as the "support or advocacy clauses of § 1985(3)."

Defendants make a series of erroneous assertions about the interpretation of the support or advocacy clauses of § 1985(3). First, Defendants seek to apply a series of doctrinal limitations that – as Supreme Court precedent makes eminently clear – apply only to the equal protection clauses of § 1985(3). Campaign Br. at 42; Stone Br. at 33-34. Second, Defendants understate the magnitude of the intimidation and injury alleged by the Plaintiffs by equating the hacking and publication of Plaintiffs' sensitive personal information with mandated campaign finance disclosures. Stone Br. at 7. And third, Defendants incorrectly argue that they could not have conspired to intimidate or injure the Plaintiffs because their ultimate goal was to "*convinc[e]* voters to choose Mr. Trump over Secretary Clinton by revealing information that would embarrass the Democratic Party," rather than to intimidate or injure the Plaintiffs. Campaign Br. at 43.

Part I of this brief will explain why each of the Defendants' assertions is incorrect and why the conduct alleged by Plaintiffs is sufficient to state a claim according to the requirements of the text of § 1985(3). Part II will analyze the enactment history of § 1985(3) and show how this history supports the plain reading of the text of the support or advocacy clauses of § 1985(3) established in Part I. Briefly, § 1985(3) was enacted as part of the Enforcement Act of 1871, which is often called the *Ku Klux Klan Act* ("KKK Act"). Following the end of the Civil War, the Klan wanted to re-establish white supremacy in the South. The Klan sought to attain this goal by interfering with the political process; it wanted to advance the Democratic Party in the Southern States and stop anyone (black or white) from associating with, supporting, or voting for the Republican Party. Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863–1877, 425-28 (Henry Steele Commager & Richard B. Morris eds., 1988)). The legislative history of § 1985(3) indicates that Congress was primarily concerned with the politically motivated nature of the Klan's conduct – specifically, that the Klan deterred Republicans from political participation through acts of intimidation. Part II also explains that, in the context of the internet age, the conduct alleged in this case falls within the conduct proscribed by the support or advocacy clauses of § 1985(3), because it is serious enough to deter political participation and thereby undermine the proper functioning of the democratic process.

The Plaintiffs have pled sufficient allegations to meet the requirements of the support or advocacy clauses of § 1985(3), as properly interpreted in light of the text and history of the provision. As such, Plaintiffs' Amended Complaint should not be dismissed for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

**ARGUMENT**

I.     **Defendants Make Several Erroneous Assertions About § 1985(3) Based on Misreading the Statutory Text and Case Law.**

To understand § 1985(3), it is useful to break out its five clauses, each of which is separated by a semi-colon:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the *equal protection of the laws*, or of equal privileges and immunities under the laws;

> or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the *equal protection of the laws*;

> or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his *support or advoc*acy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States;

> or to injure any citizen in person or property on account of such *support or advocacy*;

> in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added).

Reviewing § 1985(3)'s five clauses in this way clarifies that the first four clauses set out separate causes of action, and the fifth clause sets out the remedies provided for violations of those causes of action. The first two clauses include a common phrase: "equal protection of the laws" (clause one prohibits conspiring to deprive persons of equal protection of the laws, while clause two prohibits conspiring to prevent or hinder state authorities from securing equal protection of the laws). Similarly, clauses three and four include a common phrase: "support or advocacy"

(clause three prohibits conspiring to prevent by intimidation a citizen from supporting or advocating for certain candidates in federal elections, while clause four prohibits conspiring to injure any citizen on account of their support or advocacy for certain candidates in federal elections). Clause five states that parties injured "in person or property" may recover damages from any of the co-conspirators.

The Supreme Court has recognized that the equal protection clauses of § 1985(3) are distinct from its support or advocacy clauses, and as such, they should be interpreted differently. *See Kush v. Rutledge*, 460 U.S. at 726 ("Although *Griffin* itself arose under the first clause of § 1985(3), petitioners argue that its reasoning should be applied to the remaining portions of § 1985 as well. We cannot accept that argument . . . ."); s*ee also* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 203-04 (2015).

Defendants make three main arguments as to why the Plaintiffs' pleadings are insufficient to state a claim under the text of § 1985(3). First, Defendants argue that the support or advocacy clauses of § 1985(3) require proof of state action and the identification of a separate constitutional right that was violated by Defendants. Campaign Br. at 42; Stone Br. at 33-34. Second, Defendants suggest that the release of sensitive personal information cannot be intimidation or injury under § 1985(3) because similar information is required by FEC disclosures. Stone Br. at 7. Finally, Defendants argue that even though the effect of the conspiracy may have been to intimidate and injure Plaintiffs, it was not the purpose of the conduct and so it does not violate § 1985(3). Campaign Br. at 38. Each of these arguments is erroneous.

**A.** **The Support or Advocacy Clauses of § 1985(3) Do Not Require State Action or the Identification of an Independent Constitutional Right Being Violated.**

Defendants, mistakenly, assert that Plaintiffs allege a conspiracy to violate their First Amendment rights. Campaign Br. at 42 ("Plaintiffs' claims rest on the right to give 'support or advocacy'—a First Amendment right."); Stone Br. at 33 ("Plaintiffs complain they were not free to associate and advocate for the candidate of their choice . . . ; [i]n other words they were denied the protections of the First Amendment."). This misunderstanding is the reason that both Defendants explain at some length that "[i]f Plaintiffs' complaint is based upon First Amendment protections, then state action is required." Stone Br. at 33.

In reality, Plaintiffs never allege, with respect to Count III, that they have had a *constitutional* right infringed. Rather, the pleadings allege a violation of Plaintiffs' *statutory* rights under clauses three and four of § 1985(3). Compl. ¶¶ 240-251. Plaintiffs' pleadings include allegations that "Defendants conspired to prevent by intimidation Plaintiffs and other eligible voters like them from giving their support or advocacy in a legal manner for a candidate for President of the United States," *id.* ¶ 247 (a violation of clause three of § 1985(3)), and that "Defendants conspired to injure Plaintiffs and others like them in their persons and property on account of their support or advocacy in a legal manner for a candidate for President of the United States," *id.* ¶ 248 (a violation of clause four of § 1985(3)). There are no allegations made under the equal protection clauses of § 1985(3) and as such, the doctrinal requirements of those clauses do not apply.

In order to grasp why the support or advocacy clauses do not require state action or the identification of an independent constitutional right being violated, it is useful to understand why these requirements *can apply* to the equal protection clauses of § 1985(3). The equal protection clauses of § 1985(3) "provide[] no substantive rights [them]sel[ves]," *Great American Fed. S. &*

*L. Ass'n v. Novotny,* 442 U.S. 366, 372 (1979) ("*Novotny*"); they merely refer to the deprivation of either "equal protection of the laws" or "equal privileges and immunities." This means that "[t]he rights, privileges, and immunities that [the equal protection clauses of] § 1985(3) vindicate[] must be found elsewhere." *United Bhd. of Carpenters Local 610 v. Scott*, 463 U.S. 825, 833 (1983) ("*Carpenters*"). Thus, plaintiffs asserting § 1985(3) equal protection claims must identify a separate constitutional right being violated – either a denial of equal protection of the laws or a denial of some other right covered by the reference to "equal privileges and immunities."

That means that the equal protection clauses typically require a showing of state action, because nearly all of the relevant constitutional rights require state action. For example, if plaintiffs claim an infringement of First Amendment rights, it will be "necessary for respondents to prove that the State was somehow involved in or affected by the conspiracy." *Carpenters*, 463 U.S. at 833. Some exceptions exist, such as a claim of conspiracy to deprive individuals of their rights under the Thirteenth Amendment, which does not require a showing of state action. The Thirteenth Amendment, after all, applies to private conduct. U.S. Const. amend. XIII § 1 ("Neither slavery nor involuntary servitude . . . shall exist within the United States . . . ."); *Griffin v. Breckenridge*, 403 U.S. 88, 104-05 (1971).

And so, in summary, to allege a violation of the equal protection clauses of § 1985(3), one must allege: (1) a "racial, or perhaps otherwise class-based" animus, *Griffin v. Breckenridge*, 403 U.S. at 102; *see also Carpenters*, 463 U.S. at 834-5;[3] (2) a violation of an independent constitutional right; and, if the independent constitutional right applies only to official actions, then one must also allege (3) state action.

---

[3] Defendants do not raise the issue of whether discriminatory animus is required under the equal protection clauses of § 1985(3), but given the jurisprudence, it is listed here for the sake of completeness.

By contrast, the support or advocacy clauses of § 1985(3) establish their own statutory protections (against conspiracies to prevent by force, intimidation, or threat citizens from supporting or advocating for certain candidates in federal elections or to injure citizens in person or property on account of such support or advocacy). No separate right need be identified. *See, e.g.*, *Paynes v. Lee*, 377 F.2d 61, 63-64 (5th Cir. 1967). Further, given that no separate constitutional right need be implicated, the support or advocacy clauses of § 1985(3) do not require state action; instead, they apply, as the language of the provision suggests, to "citizens" that meet the requirements of the provision.[4]

### B.    Release of Sensitive Personal Information Can Constitute Intimidation and Injury for the Purposes of § 1985(3).

Defendants seek to elide the stark distinction between the entirely reasonable federal campaign finance disclosure requirements, 11 C.F.R. § 104.8 (name, address, occupation, employer, date and amount of donation), and the release of sensitive personal information (including social security numbers, bank account details, and private personal and health information). Stone Br. at 7 ("[T]he security breach of the DNC's servers drew attention to information about [Plaintiffs] that the DNC was required to disclose under federal campaign law.").

There is a wide chasm between a regular FEC donor disclosure and the publication and promotion of hacked emails containing sensitive personal information. An FEC donor disclosure is far more limited; it is prescribed by law and carried out through an administrative process; and

---

[4] Note also, that the support or advocacy clauses of § 1985(3) do not require the proof of racial or class-based animus because they do not include the language of "equal protection." *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993) (stating that the two-part *Griffin* test applies to "the first clause of § 1985(3)"); *Kush v. Rutledge*, 460 U.S. at 726 (declining to extend the limitations discussed in *Griffin* to the other § 1985 claims because they are not similarly limited by the equal protection clause).

the nature of the disclosures is well-known, in advance, to persons engaging in the political process. By contrast, in the instant case, it is alleged that Defendants specifically targeted finance operatives at a political party's headquarters, hacked their emails, and released their entire mailboxes without a single redaction. Compl. ¶¶ 1-21. According to Plaintiffs' allegations, these actions caused them significant injuries, including violations of their privacy rights under D.C. law, psychological distress, damage to reputations, and exposure to all the injuries that come with attempted and actual identity theft. Compl. ¶¶ 22-25, 60-78.

The Defendants' alleged conduct is not similar to regular campaign finance disclosures; instead, it is the type of serious intimidation and injury that § 1985(3) proscribes. In order to understand that the alleged conduct constitutes intimidation, we must understand what the statute means when it prohibits "intimidation." In statutory interpretation, words are given their ordinary or natural meaning. *Leocal v. Ashcroft*, 543 U.S. 1, 8-9 (2004) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). Dictionaries can also be useful to courts in discerning the ordinary meaning of a term. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225-28 (1994).

With respect to the natural and ordinary interpretation of "intimidation" in § 1985(3), the Court can draw guidance from (at least) four sources: the most basic is of course to look to dictionary definitions of the term in question; second, the Court can look to the interpretation of the word "intimidation" in the context of other *federal* civil rights cases; third, it can conduct the same inquiry with respect to *state* civil rights cases; finally, this Court can look to the interpretation of the term "intimidation" by the Department of Justice, a federal agency. Each of these sources suggests that the alleged conduct constitutes intimidation for the purposes of § 1985(3). While the precise historical conduct that § 1985(3) targeted was intimidation by disguised Klansmen, the modern form of anonymous conspiracies seeking to intimidate and injure individuals and scare the

10

public from offering their support or advocacy for a candidate for President is perfectly encapsulated in the hacking and release of sensitive personal information.

Starting with the most basic understanding of the term "intimidate," Noah Webster's dictionary from 1867 defines intimidate as "[t]o make fearful; to inspire with fear.—S[yn]. [t]o dishearten; dispirit; abash; deter; frighten; terrify." Noah Webster, *An American Dictionary of the English Language* 555 (1867), https://archive.org/stream/americandictio00 we#page/554/mode/2up; *see also* Cady & Glazer, *supra*, at 196 (summarizing the definition of intimidation using multiple regular and legal dictionaries). This definition does not mention methods (whether physical or psychological violence, or otherwise); it merely notes the state of mind that the perpetrator implants in the victim(s).

Moving to federal civil rights cases, the term "intimidation" is used in statutes other than § 1985(3) and the definition of that term in cases dealing with those statutes is instructive. The most similar use of the term is in 42 U.S.C. § 1985(2) – which prohibits conspiracies to intimidate parties or witnesses in connection with legal proceedings. In interpreting that section, a district court held that emotional stress, not merely physical injury, could give rise to a claim for witness intimidation under that provision. *Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*, No. 97 Civ. 0040(RLE), 1999 WL 893398, at *4 (S.D.N.Y. Oct. 18, 1999). In that case, the Southern District of New York explained that though the *Civil Rights Act of 1871* was "adopted to address physical intimidation . . . which often resulted from Klan violence," this "was not the only goal of the statute." *Id.* The Court found that the statute was "also designed to address improper interference with the judicial process," and therefore the plaintiff could bring a claim alleging that there was interference "with the witness' ability to give 'free, full and truthful testimony' in federal court." *Id.*

Similarly, 42 U.S.C. § 3617 makes it unlawful to "intimidate, threaten, or interfere with" a person for enjoying or exercising fair housing rights. In cases involving this statute, courts have held that plaintiffs stated claims for intimidation even where the defendant's conduct did not include physical violence. *See, e.g.*, *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (scrawling of a racial slur on plaintiffs' property); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733 (E.D. Va. 1992) (excessive investigations by the city of a rental property).

Section 131(b) of the Civil Rights Act (52 U.S.C. § 10101(b)) also includes a prohibition on the use of intimidation, in this case with respect to interfering with the right to vote in federal elections. In interpreting the term "intimidate," courts have found that economic coercion (not merely physical violence) is included in the definition of that term. *See United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (white landowners evicted and refused to deal in good faith with black tenant farmers for the purpose of interfering with their voting rights, which gave rise to a voter intimidation claim); *United States v. Deal*, 6 Race Rel. L. Rep. 474 (W.D. La. 1961) (white business owners refused to engage in business transactions with black farmers who attempted to register to vote); *United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) (white landowners ordered black defendant, an insurance collector active in encouraging voter registrations, to stay off their property, preventing him from reaching business clients). *See also* Cady & Glazer, *supra*, at 193-202 (summarizing dozens of other cases where courts interpreted the term "intimidate" or "intimidation" with respect to civil rights).

Perhaps the most useful case for defining modern intimidation in an electoral context is a recent one with a fact pattern similar to this case. In *United States v. Nguyen,* the defendant was alleged to have been involved with a campaign to mail 14,000 letters to newly registered voters

with Hispanic surnames. The letters warned that if the recipients voted in the election, their personal information would be collected by the government and made available to organizations that were "against immigration." 673 F.3d 1259, 1261 (9th Cir. 2012). The court found that intimidation (in this case under California's state criminal voter intimidation statute) is not "limited to displays or applications of force, but can be achieved through manipulation and suggestion," that is, intimidation may be "subtle, rather than forcefully coercive." *Id.* at 1265. In *Nguyen*, the intimidating conduct was the threat of release of personal information.

This Court may also look to the Department of Justice's definition of voter intimidation for guidance as to the plain meaning of "intimidation." According to the Department of Justice, intimidation is conduct designed to "deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety." Craig C. Donsanto & Nancy L. Simmons, Public Integrity Section, U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* 54 (2007), https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-0507.pdf.

The descriptions and examples of intimidation outlined in this section demonstrate that there are a variety of ways to intimidate individuals with respect to their civil rights. In the 1870s, marauding hordes of violent conspirators were a common (but not the sole) method of intimidation. Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 105-107 (Basic Books eds., 2000). More recently, conspirators have become subtler in their intimidation techniques, but no less ruthless. Threatening to destroy an individual's economic livelihood, subjecting her to relentless investigations, or exposing her sensitive personal information may all constitute conduct designed to intimidate.

With respect to the release of sensitive personal information and its ability to form part of

conduct that intimidates or injures, we can gain additional insight into the effect of the release of such information from various national sources. The release of personally identifiable information is considered to put individuals at harm of "identity theft, embarrassment, or blackmail," according to the *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)*, National Institute of Standards and Technology ES-1 (2010), http://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-122.pdf.

Similarly, the Office of Management and Budget has noted that certain data are "particularly sensitive and may alone present an increased risk of harm to the individual. These data elements include, but are not limited to, SSNs, passport numbers, driver's license numbers, state identification numbers, bank account numbers, passwords, and biometric identifiers." *Memorandum, Preparing for and Responding to a Breach of Personally Identifiable Information*, Executive Office of the President, Office of Management and Budget (Jan. 3, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/m-17-12_0.pdf.

Additionally, notable public officials have discussed the serious harm that the release of personal financial information can cause. *See Remarks on Signing the Identity Theft Penalty Enhancement Act*, 2004 (Book II) Pub. Papers 1221, 1346 (July 15, 2004), https://www.gpo.gov/fdsys/pkg/PPP-2004-book2/pdf/PPP-2004-book2-doc-pg1346-2.pdf ("[I]dentity theft leaves the victim poor and feeling terribly violated."); *Hearing on Equifax: Continuing to Monitor Data-Broker Cybersecurity Before the Subcomm. on Privacy, Tech. & the Law of the S. Judiciary Comm.*,115th Cong. (2017) (Statement of Sen. Chuck Grassley, Chairman, Senate Judiciary Committee), https://www.judiciary.senate.gov/imo/media/doc/10-04-17%20Grassley%20Statement.pdf (in response to the recent breach of Equifax's security, Senator Grassley explained that "[t]he information hackers obtained or gained access to in the Equifax

breach is the most sensitive personal information used by thieves to commit identity theft. Let that sink in. A credit card number or bank account information can be changed with a phone call. But you can't change your social security number and date of birth.").

Plaintiffs have plead colorable claims of intimidation and injury by the wide dissemination of their sensitive personal information, and those claims should be put to a fact-finder to decide if the conduct alleged rises to the level of intimidation or injury for the purposes of § 1985(3).

### C.   Defendants Can Conspire to Intimidate and Injure Where the Intimidation or Injury Is Merely a Tactic for Achieving a Larger Goal.

Defendants incorrectly assert that they cannot be guilty of a conspiracy to intimidate or injure supporters of a candidate for President because their goal was to "*convinc[e]* voters to choose Mr. Trump over Secretary Clinton by revealing information that would embarrass the Democratic Party." Campaign Br. at 43. Section 1985(3) reaches all conspiracies that include intimidation and injury of voters and supporters as a tactic, even where the conspiracy also has other aims. Just as a bank robber may ultimately want to get money, this does not negate her intent to engage in the conduct of bank robbery to achieve the larger goal of obtaining money. *See Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995); *see also* Pls. Br. at 65-67.

Here, Plaintiffs allege that Defendants intimidated and injured the Plaintiffs by hacking and releasing their sensitive personal information on account of giving their support or advocacy to a Presidential candidate. Compl. ¶ 247. Regardless of whether the Court finds that the release of sensitive personal information is illegal, Defendants' conduct may still be found to have intimidated and injured Plaintiffs in violation of § 1985(3). *U.S. ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 348 (E.D. La. 1965) ("[A]cts otherwise lawful may become unlawful and be enjoined under [section 131 of the Civil Rights Act], if the purpose and effect of the acts is to interfere with the right to vote.").

In summary, pursuant to the text and precedent of § 1985(3), the following are the elements of liability under the third clause of § 1985(3): one must show (1) that two or more persons (2) conspired (3) to intimidate (4) an eligible voter (5) from giving support or advocacy to a Presidential candidate. Similarly, in order to prove a violation of the fourth clause of § 1985(3), one must show (1) that two or more persons (2) conspired (3) to injure (4) a citizen (5) on account of her support or advocacy of a Presidential candidate. No other proof (*e.g.*, state action, violence, a sole purpose to intimidate) is required.

## II.   Congress's Intent in Passing § 1985(3) Was to Stop Intimidation and Injury Serious Enough to Deter Political Engagement.

At the height of Reconstruction, Congress was alarmed that members of the Klan, and similar groups, were engaged in a campaign to intimidate and injure individuals for the purpose of subverting the political process and producing electoral outcomes favorable to one political party. And so, in 1871, Congress passed § 1985(3) to combat the Klan's tactics of political suppression. The legislative history and historical backdrop make it clear that the purpose of § 1985(3) was to protect individuals from fear or harm caused by conspirators when giving their political support or advocacy. Properly understood in light of this original purpose, § 1985(3) prohibits the type of organized, politically motivated harassment that the Complaint alleges.

### A.   Reconstruction

Immediately following the Civil War, the federal government undertook a broad-based effort to bring African American voters into the political process. By 1870, Congress had passed the Thirteenth, Fourteenth, and Fifteenth Amendments. U.S. Const. amends. XIII, XIV, XV ("Reconstruction Amendments"). These ended slavery, promised the equal protection of the laws, and outlawed the denial or abridgement of the right to vote based on race, color, or previous condition of servitude.

The Reconstruction Amendments, along with local organizing efforts by groups like the Union League, and, most powerfully, the Republican Party itself, led to a period of widespread electoral success for African American voters and the Republican Party. Foner, *supra*, at 291-307. A coalition of newly enfranchised black voters and a sympathetic minority of white voters brought nearly all of the Southern governorships and legislatures under Republican control and elected numerous African American representatives to Congress. Foner, *supra*, at 353.

In communities across the South, the Klan and similar organizations[5] responded to these sweeping changes with a sustained campaign of violence, threats, and intimidation. Much of the Klan's violence was political in nature. It was directed primarily at black Republicans and, to a lesser degree, their white Republican allies, and it was designed to deter them from engaging in the political process. The Klan was, in effect, "a military force serving the interests of the Democratic party, the planter class, and all those who desired the restoration of white supremacy." *Id.* at 425.

### B.      Congressional Action to Stop Clandestine Bands of Private Conspirators

The escalation of violence and intimidation against black Americans and supporters of the Republican Party drew the attention of Congress. As the legislative history of the bill establishing § 1985(3) reflects, a primary concern of Congress was that the Klan's conduct was politically motivated – specifically, that the Klan sought to undermine the democratic process by deterring Republicans from political engagement through intimidation. *See, e.g.*, Mark Fockele, *A Construction of Section 1985(c) in Light of Its Original Purpose*, 46 U. Chi. L. Rev. 402, 407-11 (1979). The record is unambiguous on this point:

Such is the conclusion stated in the majority report of the Senate Select Committee to

---

[5] Foner recounts organizations like the "Knights of the White Camelia" and the "White Brotherhood." Foner, *supra*, at 425.

Investigate Alleged Outrages in the Southern States:  "[I]t is clearly established . . . [t]hat the Ku-Klux organization does exist, has a political purpose, is composed of members of the democratic or conservative party, [and] has sought to carry out its purpose by murders, whippings, intimidations, and violence." This theme was sounded again and again during the debates in Congress, the Republicans steadily insisting on it and the Democrats steadfastly denying it. The immediate goal of the Klan, as seen by the Republican majority, was to wrest control of the state governments from the Republican party and to reestablish Democratic hegemony in the South.

*Id.* at 408 (quoting H.R. Rep. No. 1, 42d Cong., 1st Sess. xxx-xxxi) (footnotes omitted).

The Congressional Record makes clear that members wanted to curb politically motivated conduct that interfered with the proper functioning of the democratic process. *See, e.g.*, Statement of Rep. John Coburn (R-Ind.), *Congressional Globe*, 42nd Congress, 1st Session, 460, https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=099/llcg099.db&recNum=575 ("The Democrats do get and use the entire benefit of the Ku Klux Klans. It is exactly, as they say, political. They get up a reign of terror, they encourage crimes of the most frightful nature to carry elections. We would suppress them, would punish them; we would restore order, fair-dealing, equality, and peace, to secure free elections.").

## C.      Application of the KKK Act to the Defendants' Alleged Conduct

The drafters of § 1985(3)'s support or advocacy clauses could not have foreseen the development of the internet. They could not have imagined the existence of a worldwide information repository and communications system, and that nearly all of a person's sensitive information and private communications could be stolen and published for the world to see. However, old crimes can occur in modern contexts. If a thief steals from a victim's electronic bank account, it is still theft even if no paper currency has changed hands. And in the context of the internet age, that politically targeted intimidation or injury occurred online is no reason that Defendants should escape liability under the support or advocacy clauses of § 1985(3).

18

Plaintiffs allege, *inter alia*, that on account of giving their support for a Presidential candidate, Defendants conspired to hack the extremely sensitive financial and personal information owned by Plaintiffs and publish that information online for the world to see. Compl. at ¶¶ 246-250. No more is required for liability under the support or advocacy clauses of § 1985(3). Defendants' conduct sends a clear message to Plaintiffs – and to all Americans who are considering working in politics or donating to a political party – that the price of that political engagement may be the theft of their identities and the publication of their most private personal information. This is a message that could undeniably deter political participation and thereby undermine the proper functioning of the democratic process. This Court should hold that the activities alleged in the Complaint fall within the conduct proscribed by § 1985(3)'s support or advocacy clauses.

## CONCLUSION

For the foregoing reasons, this Court should deny the Defendants' motions to dismiss the Amended Complaint.

Dated this 8th day of December 2017.

Respectfully submitted,

/s/ Paul M. Smith
Paul M. Smith, DC Bar No. 358870
CAMPAIGN LEGAL CENTER
1411 K Street, NW, Suite 1400
Washington, D.C. 20005
Tel.: (202) 736-2200

Ruth M. Greenwood, (*pro hac vice pending*)
CAMPAIGN LEGAL CENTER
73 W Monroe St, Suite 322
Chicago, IL 60603
Tel.: (312) 561-5508

*Counsel for Amici Curiae*

20

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it contains 25 pages or fewer, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/ Paul M. Smith
Paul M. Smith
CAMPAIGN LEGAL CENTER
1411 K Street, NW, Suite 1400
Washington, D.C. 20005
Tel.: (202) 736-2200

Dated: December 8, 2017