**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROY COCKRUM, SCOTT COMER, and ERIC SCHOENBERG, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 1:17-cv-1370-ESH |
| DONALD J. TRUMP FOR PRESIDENT, INC., and ROGER STONE, | ) ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFFS' SURREPLY IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

I.      Subsection (a)(1) of the D.C. long-arm statute applies to tort claims................................. 1

II.     The conspiracy between Defendants and their co-conspirators encompassed the stolen
        DNC emails containing Plaintiffs' private information ...................................................... 3

III.    *Bartnicki* has nothing to say about whether Plaintiffs' private information was
        newsworthy or a matter of public concern .......................................................................... 4

IV.     The relevant provisions of 42 U.S.C. § 1985(3) do not require state action ...................... 6

CONCLUSION .................................................................................................................... 8

## INTRODUCTION

For the reasons stated in Plaintiffs' brief in opposition to Defendants' motions to dismiss, this Court has jurisdiction over this matter, and Plaintiffs have alleged facts to show that they were injured as the direct result of a conspiracy between Defendants and their co-conspirators, including Russian agents. *See* Pls.' Mem. in Opp'n to Defs.' Mots. to Dismiss ("Pls.' Mem."), ECF No. 25. Plaintiffs offer this short surreply brief not as a comprehensive response to Defendants' reply briefs, but to respond to arguments raised or emphasized for the first time in Defendants' replies and to aid the Court in its consideration of a few of the most important and complex issues raised by the parties.[1]

## ARGUMENT

### I.    Subsection (a)(1) of the D.C. long-arm statute applies to tort claims

As Plaintiffs explained in their initial brief, one of the bases for this Court's personal jurisdiction over Defendants is that the claims in this case arise from the transaction of business in the District. *See* Pls.' Mem. at 18-21; D.C. Code § 13-423(a)(1). In response, Defendants contend that the relevant provision of the D.C. long-arm statute—subsection (a)(1)—does not apply to tort claims. *See* Reply in Support of Def. Donald J. Trump for President, Inc.'s Mot. to Dismiss ("Campaign Reply") at 4, ECF No. 42.

Defendants are mistaken. In *Shoppers Food Warehouse v. Moreno,* the D.C. Court of Appeals analyzed a tort claim under subsection (a)(1) and concluded that D.C. courts had personal jurisdiction over a non-resident corporation for a tort claim "arising from" that corporation's transaction of business in the District. 746 A.2d 320 (D.C. 2000). That decision settles the meaning of

---

[1] Plaintiffs in no way concede any of the issues not addressed in this brief. Plaintiffs refer the Court to their initial brief for their argument with respect to any such issues.

the D.C. long-arm statute. And local and federal courts in D.C. routinely apply subsection (a)(1) in tort actions. *See, e.g.*, *Xie v. Sklover & Co., LLC*, 260 F. Supp. 30 (D.D.C. 2017); *Stocks v. Cordish Cos., Inc.*, 118 F. Supp. 3d 81 (D.D.C. 2015); *Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088 (D.C. 2008).[2]

Moreover, the cases on which Defendants rely do not stand for the proposition that subsection (a)(1) does not apply to tort claims. The statement in *Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987), that the plaintiff's tort claims "do not fit" under subsection (a)(1) appears to be based on the plaintiff's failure to allege that the claims arose from the transaction of business, not on the fact that they were tort claims. *See id.* at 762. Furthermore, *Crane* predates *Shoppers Food Warehouse*. The court in *Triple Up Limited v. Youku Tudou, Inc.* explicitly declined to address the relevant issue. *See* 235 F. Supp. 3d 15, n.1 (D.D.C. 2017). And the court in *Alkanani v. Aegis Defense Services, LLC*, said that the tort claims do not "arise from" contracts for services when those services result in torts, not that tort claims can never fall under section (a)(1). *See* 976 F. Supp. 2d 13, 27 (D.D.C. 2014).[3] In short, there is no support for Defendants' argument that subsection (a)(1) is inapplicable in the context of tort claims.

---

[2] Defendants' theory is that because subsections (a)(3) and (a)(4) of the long-arm statute provide for personal jurisdiction in certain tort actions, they are the *exclusive* grants of such jurisdiction. But those subsections are not comprehensive. Subsection (a)(3) applies only in cases where "act and injury occur in the District of Columbia," *Capel v. Capel*, --- F. Supp. 3d ---, 2017 WL 4342057, at *4 (quoting *Helmer v. Doletskaya*, 393 F.3d 201, 208 (D.C. Cir. 2004)). Subsection (a)(4) applies only to "tortious injury *in* the District of Columbia by an act or omission *outside* the District of Columbia." D.C. Code § 13-423(a)(4) (emphasis added). Neither subsection applies to acts occurring in the District that result in injury outside the District—the precise scenario in *Stocks* and *Shoppers Food Warehouse*.

[3] If *Alkanani* were read more broadly, it would be inconsistent with *Shoppers Food Warehouse* and would lead to the anomalous result that D.C. courts would lack jurisdiction over an individual who committed a tortious act in the District that caused injury elsewhere. *See supra* note 2.

## II.     The conspiracy between Defendants and their co-conspirators encompassed the stolen DNC emails containing Plaintiffs' private information

In a footnote in their initial brief, Plaintiffs pointed out that Defendants would be liable under D.C. tort law for the dissemination of the stolen DNC emails even if the agreement between the co-conspirators did not *explicitly* encompass such dissemination, under the well-established rule that a member of a conspiracy is liable for the tortious acts of his co-conspirators. *See* Pls.' Mem. at 27 n.10. Defendants misrepresent this footnote as a concession that the DNC emails were not part of the conspiracy. *See* Campaign Reply at 22. In fact, Plaintiffs have alleged that Defendants conspired with Russian agents and others and that the conspiracy included dissemination of the stolen DNC emails containing Plaintiffs' private information. *See* Pls.' Mem. at 26-28.

In any event, the point made by Plaintiffs in the relevant footnote is correct under hornbook conspiracy law. Defendants claim that a "more general agreement" to cooperate with the agents of a foreign power to interfere in a U.S. presidential election and defeat Mr. Trump's opponent does not subject them to liability as conspirators under D.C. tort law because such an agreement is not illegal. *See* Campaign Reply at 22. But in fact, such an agreement would likely be unlawful in any number of ways, including, as alleged in this case, under federal civil rights law, as well as under campaign-finance laws. *See* Bob Bauer, *The Trump-Russia-WikiLeaks Alliance and Campaign Finance Laws*, Just Security, Nov. 20, 2017, https://www.justsecurity.org/47248/trump-russia-wikileaks-alliance-campaign-finance-laws; Bob Bauer, *The Trump Campaign-Russia Alliance and Campaign Finance: A Response to Skeptics and a Statement of the Case*, Just Security, Jan. 19, 2018, https://www.justsecurity.org/51216/ trump-campaign-russia-alliance-campaign-finance.

III.   ***Bartnicki*** **has nothing to say about whether Plaintiffs' private information was newsworthy or a matter of public concern**

Relying primarily on *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Campaign argues that because some of the stolen emails were of public concern, Defendants were entitled to join a conspiracy to dump all of the emails on the Internet for the entire world to see, regardless of the fact that many of the emails were of no public interest and contained the sensitive personal information of Plaintiffs and others. *See* Campaign Reply at 11-15. But for at least two reasons, *Bartnicki* and the other cases that Defendants cite are easily distinguishable and do not support their conclusion.

***First***, the question here is whether Plaintiffs' private information was newsworthy or a matter of public concern.[4] *Bartnicki* has nothing to say on this question, as there was no dispute that "the subject matter of the conversation" at issue in *Bartnicki* "was a matter of public concern." 532 U.S. at 525. Here, in contrast, the question of newsworthiness is in dispute. Defendants contend that the law permits a publisher of stolen emails to dump all of the emails online as long as some of the emails include some material that is newsworthy or of public concern. Defendants cannot (and do not try to) demonstrate that the private facts at issue here are themselves "matters of public concern." Instead, they argue that a disclosure should be judged "in the aggregate" rather than "line by line" to determine whether it "deals with a matter of public concern." Campaign Reply at 11-13.

But Plaintiffs do not contend that an email deals with a matter of public concern only if its every line is a matter of public concern. Instead, Plaintiffs allege that Defendants participated in a

---

[4] Plaintiffs do not "ignore the First Amendment" as Defendants contend. Campaign Reply at 11. The "newsworthiness" element of the public disclosure tort incorporates First Amendment concerns, as Plaintiffs explained in their initial brief. *See* Pls.' Mem. at 57-58.

conspiracy to dump on the Internet thousands of stolen emails—many of which contained *no* information of any relevance to the public. Nor do the thousands of emails "deal with" any identifiable matter of public concern that can be analyzed "in the aggregate." Instead, dumping the emails of seven employees' inboxes on the Internet produced thousands of disclosures unified only by the destination addresses of those employees. This case is therefore utterly unlike *Bartnicki*, where the disclosure consisted of a single cell-phone conversation between a union local president and his chief negotiator concerning negotiations with a school board. 532 U.S. at 518. That circumscribed disclosure—unlike the tens of thousands of indiscriminate ones made here—"dealt with" a discrete and identifiably newsworthy subject.

Because the Campaign cannot ascribe any "aggregate" meaning to a mass email dump, it asserts instead that "every single email . . . *inherently* addressed political matters" and was therefore newsworthy because it was found in the accounts of employees of a political party during a presidential campaign. Campaign Reply at 14 (emphasis in original). The Campaign cites no authority for this astonishingly overbroad theory, which, if accepted, would declare open season on the communications systems of every political, public-interest, lobbying, media, and governmental organization.

***Second***, the Court in *Bartnicki* went to great lengths to emphasize that its holding was narrow and based on the particular facts presented, in keeping with its policy of resolving clashes between First Amendment and privacy rights on the narrowest grounds appropriate to the case. *See* 532 U.S. at 529. And the circumstances here are starkly different—both factually and legally—from those in *Bartnicki*. The question in *Bartnicki* was whether the defendants could be held liable under state and federal wiretapping statutes based *solely* on the fact that the published information was obtained unlawfully by an unknown third party and that the publisher knew or had reason to

know how they were obtained. *See* 532 U.S. at 528. That question is simply not implicated here. Plaintiffs do not seek to hold Defendants liable based on the fact that the DNC emails were *obtained* illegally, but because Defendants' *dissemination* of Plaintiffs' private personal information violated Plaintiffs' rights, regardless of how the emails were obtained. Furthermore, unlike the *Bartnicki* defendants, Defendants here are not innocent journalists. They are co-conspirators with a hostile foreign power in an illicit scheme to influence an American election by publishing stolen private and personal information.

## IV.    The relevant provisions of 42 U.S.C. § 1985(3) do not require state action

Defendants assert that it would be unconstitutional to apply the support-and-advocacy clauses of § 1985(3) against private parties. They point to *United States v. Harris*, 106 U.S. 629 (1883), which they describe as holding that the criminal counterpart to § 1985(3) was legislation to enforce the Fourteenth Amendment and therefore applicable only to state actors. Campaign Reply at 28. But the provision at issue in *Harris*—§ 5519 of the Revised Statutes—had no analog to the support-and-advocacy clauses of § 1985(3). Section 5519 was the criminal counterpart only to § 1985(3)'s equal protection clauses. The criminal provision mirroring § 1985(3)'s support-and-advocacy clauses was § 5520, not § 5519—and under § 5520, the Supreme Court *upheld* prosecutions against private parties. *See Ex Parte Yarbrough*, 110 U.S. 651, 667 (1884). As the Court explained, § 5520 had no state-action limitation because it was *not* an exercise of Congress's power to enforce the Fourteenth Amendment. It was an exercise of Congress's separate and undoubted power to protect federal elections. *See id.* at 658, 655-56 (1884). Section 1985(3)'s support-and-advocacy clauses are worded identically to § 5520; both recodify the same language from Section 2 of the Civil Rights Act of 1871. So § 1985(3)'s support-and-advocacy clauses, like § 5520, are

legislation executing Congress's power to protect federal elections, not Congress's power to enforce the Fourteenth Amendment.[5] Not being Fourteenth Amendment legislation, these clauses have no state-action requirement.

Quoting statements in case law, Defendants also insist that the support-and-advocacy clauses create causes of action only for violations of rights created elsewhere. Campaign Reply at 25-26. But as previously explained, the quoted language refers only to § 1985(3)'s equal protection clauses. See Pls.' Mem. at 62-64. To be sure, the cases Defendants cite would have been more precise had they taken care to write "the equal protection clauses of § 1985(3)" instead of using the shorthand "§ 1985(3)." But it is clear that courts often use "§ 1985(3)" in that shorthand way.[6]

Moreover, if a plaintiff harmed on account of his or her political advocacy could state a claim under § 1985(3) only if the harm amounted to the violation of a First Amendment right,

---

[5] Defendants represent that the original statute—the Civil Rights Act of 1871—was "titled 'An Act to enforce the Provisions of the Fourteenth Amendment . . .'" Campaign Reply at 28. The actual title of the statute—obscured by Defendants' ellipsis—was "An Act to enforce the Provisions of the Fourteenth Amendment *and for other purposes*." 17 Stat. 13 (1871) (emphasis added).

[6] For example: plaintiffs proceeding under the equal-protection clauses of all three subsections of § 1985 must show class-based animus. *Kush v. Rutledge*, 460 U.S. 719, 726 (1983). Plaintiffs proceeding under the support-and-advocacy clauses need not make that showing. *Id.* Nonetheless, courts deciding cases under § 1985(3)'s equal-protection clauses often describe "§ 1985(3)" as requiring a showing of class-based animus. *See, e.g.*, *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 830 (1983) (speaking of "the kind of class-based animus contemplated by § 1985(3)"); *Great Am. Fed. Sav. & Loan v. Novotny*, 442 U.S. 366, 392 (1979) (White, J., dissenting) ("[O]nly those deprivations imbued with 'invidiously discriminatory motivation' amounting to 'class-based . . . animus,' are encompassed by § 1985(3)") (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)); *Bryant v. Military Dep't of Miss.*, 597 U.S. 678, 687 (5th Cir. 2010) (speaking of "the class-based animus requirement of § 1985(3)"); *Farber v. City of Paterson*, 440 F.3d 131, 136 (3d Cir. 2006) (stating that it is among "the requirements of a § 1985(3) claim . . . that the conspirators be motivated by class-based invidiously discriminatory animus . . . ."); *Hoai v. Vo*, 935 F.2d 308, 309 (D.C. Cir. 1991) (affirming dismissal of a claim because appellants failed to allege "a conspiracy motivated by a class-based, invidiously discriminatory animus, as required by Section 1985(3)."). These opinions do not purport to contradict the settled proposition that plaintiffs proceeding under the support-and-advocacy clauses of § 1985(3) need not show class-based animus. They are simply not bothering to note that point; they use "§ 1985(3)" as a shorthand to mean "the portion of § 1985(3) now at issue."

§ 1985(3) would have been of no use to citizens (white or black) who, in 1872, were injured by Klansmen for advocating the re-election of President Grant. Those plaintiffs would have had no First Amendment claim, because the First Amendment does not run against private parties—or even, in 1872, against state governments. An interpretation of § 1985(3) that does not reach Klan violence against 1870s Republican-Party activists cannot possibly be right. *See* Br. of *Amici Curiae* Campaign Legal Ctr. & Prof. Ted Shaw at 4, 16-18, ECF No. 38 (explaining that the Civil Rights Act of 1871, also called the Ku Klux Klan Act, was centrally intended as a response to the Klan's politically motivated attacks on citizens in Southern states).

Finally, Defendants warn that Plaintiffs' interpretation of § 1985(3) would make federal courts into intrusive monitors of campaign tactics, required to adjudicate lawsuits every time someone heckled a political speaker or started "a bar fight with a customer wearing political apparel." Campaign Reply at 27. That's wrong. Mere heckling causes no cognizable injury, and a man who picks a fight while drinking is probably not engaged in a deliberate conspiracy. But if an eligible voter is harmed in person or property on account of giving support or advocacy to a candidate for federal office, and if the harm occurs as the result of a conspiracy, then a § 1985(3) action will lie. That's what the statute says, and that's what happened in this case.

## CONCLUSION

For the reasons stated above and in Plaintiffs' initial brief, the Court should deny Defendants' motions to dismiss.

Date: January 19, 2018                    /s/ *Benjamin L. Berwick*
                                          BENJAMIN L. BERWICK (D.D.C. Bar No. MA0004)
                                          United to Protect Democracy
                                          10 Ware St.
                                          Cambridge, MA 02138
                                          (909) 326-2911
                                          Ben.Berwick@protectdemocracy.org

                                          IAN BASSIN (NY Attorney Reg. No. 4683439)
                                          United to Protect Democracy
                                          222 Broadway
                                          New York, NY 10038
                                          (202) 856-9191
                                          Ian.Bassin@protectdemocracy.org

                                          JUSTIN FLORENCE (D.C. Bar No. 988953)
                                          Justin.Florence@protectdemocracy.org
                                          ANNE TINDALL (D.C. Bar. No. 494607)
                                          Anne.Tindall@protectdemocracy.org
                                          United to Protect Democracy
                                          2020 Pennsylvania Ave. NW, #163
                                          Washington, DC 20006
                                          (202) 856-9191

                                          NANCY GERTNER (MA Bar No. 190140)
                                          Fick & Marx
                                          100 Franklin Street, 7th floor
                                          Boston, MA 02110
                                          (857) 321-8360
                                          ngertner@fickmarx.com

                                          RICHARD PRIMUS (D.C. Bar No. 472223)
                                          The University of Michigan Law School*
                                          625 S. State Street
                                          Ann Arbor, MI 48109
                                          (734) 647-5543
                                          PrimusLaw1859@gmail.com

                                          STEVEN A. HIRSCH (CA Bar No. 171825)
                                          Keker, Van Nest & Peters LLP
                                          633 Battery Street
                                          San Francisco, CA 94111-1809
                                          (415) 391-5400
                                          shirsch@keker.com

                                          * For identification purposes.

                                          *Counsel for Plaintiffs*

9