IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROY COCKRUM, SCOTT COMER, and
ERIC SCHOENBERG,

    Plaintiffs,

v.    Civil Action No. 1:17-cv-1370-ESH

DONALD J. TRUMP FOR PRESIDENT,
INC., and ROGER STONE,

    Defendants.

## NOTICE OF FILING

Pursuant to the Court's direction, Plaintiffs submit three unpublished twenty-first century district court opinions corroborating the view that the support-and-advocacy clauses of 42 U.S.C. 1985(3)[1] create causes of action against private parties, as established in *Ex Parte Yarbrough*, 110 U.S. 651 (1884), and *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967). The three cases are:

- *Arizona Democratic Party v. Arizona Republican Party et al,* 2016 WL 8669978, at *5 n.4 ("ARP and the Trump Campaign argue that an action under 42 U.S.C. § 1985(3) requires a showing of racial animus and that the specific provision invoked by Plaintiff— the "support and advocacy clause"—cannot be applied against a non-state actor. (GOP Resp. at 17-19.) Plaintiff disagrees on both counts. (Reply to GOP at 4-8.) Again, the plain language of the statute does not require either of the elements proposed by ARP and the Trump Campaign.")

---

[1] The relevant clauses of 42 U.S.C. 1985(3) were originally found in Section 2 of the Civil Rights Act of 1871 and then codified at Section 5520 of the Revised Statutes (1877).

- *North Carolina Democratic Party v. North Carolina Republican Party et al.*, 1:16-CV-1288 (D.N.C. 2016) at 4 ("[V]oters are entitled to cast their ballots without fear of reprisal or threat of physical harm. *See* 52 U.S.C. § 10307(b) (making it illegal for any person, "whether acting under color of law or otherwise," to "intimidate, threaten, or coerce . . . any person for voting"); 42 U.S.C. § 1985(3).  On Election Day, if it becomes apparent that agents of any defendant or supporters encouraged by any defendant are making an effort to intimidate minority voters or to further incite intimidation of voters, the plaintiff may renew the motion.")

- *Daschle v. Thune*, CIV 04-4177 (D.S.D. November 2, 2004) (granting temporary relief after finding that plaintiffs were likely to succeed on the merits of claims including a voter-intimidation claim against a private party under 42 U.S.C. § 1985(3)).

The two cases in which political parties are named defendants are also brought against other private-party defendants.

Date: May 18, 2018

/s/ *Benjamin L. Berwick*
BENJAMIN L. BERWICK (D.D.C. Bar No. MA0004)
United to Protect Democracy
10 Ware St.
Cambridge, MA 02138
(909) 326-2911
Ben.Berwick@protectdemocracy.org

IAN BASSIN (NY Attorney Registration No. 4683439)
United to Protect Democracy
222 Broadway, 19th Floor
New York, NY 10038
Ian.Bassin@protectdemocracy.org

JUSTIN FLORENCE (D.C. Bar No. 988953)
Justin.Florence@protectdemocracy.org
ANNE TINDALL (D.C. Bar. No. 494607)
Anne.Tindall@protectdemocracy.org
United to Protect Democracy
2020 Pennsylvania Ave. NW, #163
Washington, DC 20006
(202) 856-9191

NANCY GERTNER (MA Bar No. 190140)
Fick & Marx
100 Franklin Street, 7th floor
Boston, MA 02110
(857) 321-8360
ngertner@fickmarx.com

RICHARD PRIMUS (D.C. Bar No. 472223)
The University of Michigan Law School*
625 S. State Street
Ann Arbor, MI 48109
(734) 647-5543
PrimusLaw1859@gmail.com

STEVEN A. HIRSCH (CA Bar No. 171825)
shirsch@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400

* For identification purposes.

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 1 of 11

Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)
2016 WL 8669978

2016 WL 8669978
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. Arizona.

ARIZONA DEMOCRATIC PARTY, Plaintiff,
v.
ARIZONA REPUBLICAN PARTY, et al.,
Defendants.

No. CV-16-03752-PHX-JJT
|
Signed 11/04/2016

**Attorneys and Law Firms**

Dawn L. Smalls, Boies Schiller & Flexner LLP, New York, NY, Marc E. Elias, Perkins Coie LLP, Michael Julian Gottlieb, Boies Schiller & Flexner LLP, Washington, DC, Sarah Rae Gonski, Perkins Coie LLP, Phoenix, AZ, for Plaintiff.

Timothy Andrew LaSota, Timothy A. LaSota PLC, Kory A. Langhofer, Thomas James Basile, Statecraft PLLC, Phoenix, AZ, for Defendants.

**ORDER**

Honorable John J. Tuchi, United States District Judge

**\*1** In response to what it alleges to be a call for the intimidation of voters in next week's presidential election by Donald J. Trump for President, Inc. ("Trump Campaign"), the Arizona Republican Party ("ARP"), Roger J. Stone, Jr., and Stop the Steal, Inc., the Arizona Democratic Party ("ADP") filed this lawsuit a mere eight days before the election. Plaintiff ADP seeks injunctive relief for violations of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), and Section 11(b) of Voting Rights Act of 1965, 52 U.S.C. § 10307(b). (Doc. 1, Compl.) After the Court set an expedited briefing and hearing schedule (Doc. 7), Plaintiff filed a Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 10, Mot.), Defendants ARP and the Trump Campaign filed a Response (Doc. 15, GOP Resp.), and Plaintiff filed a Reply thereto (Doc. 22, Reply to GOP).

Plaintiff was only able to serve Defendant Stop the Steal on November 2, 2016 (Doc. 19), the day its Response to Plaintiff's Motion would have been due, and Plaintiff did not file a certificate of service with regard to Defendant Mr. Stone prior to the Hearing (see Doc. 22-1). On November 3, 2016, the Court held a Hearing on Plaintiff's Motion. (Doc. 24.) Stop the Steal and Mr. Stone appeared through counsel at the Hearing for the purpose of contesting both service and the Court's jurisdiction over them in this matter. The Court denied Stop the Steal's motion to dismiss and reserved judgment on that of Mr. Stone. (Doc. 24.) The Court heard evidence and argument from all parties on Plaintiff's Motion and ordered briefing from Stop the Steal. (Doc. 24.) On November 4, 2016, Stop the Steal and Mr. Stone filed a Response (Doc. 27, STS Resp.), and Plaintiff filed a Reply thereto (Doc. 28, Reply to STS).

Considering all the evidence and arguments of the parties and for the reasons that follow, the Court will deny Mr. Stone's Motion to Dismiss (Doc. 24) and deny Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 10).

**I. LEGAL ANALYSIS**

   **A. Standing**
To bring a judicable lawsuit into Federal Court, Article III of the Constitution requires that one have "the core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy Article III's standing requirements, a plaintiff must show that he suffered a "concrete and particularized" injury that is "fairly traceable to the challenged action of the defendant," and that a favorable decision would likely redress the injury. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). In the complaint, the plaintiff must "alleg[e] specific facts sufficient" to establish standing. *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002). Accordingly, courts should dismiss a plaintiff's complaint if he has failed to provide facts sufficient to establish standing. *See, e.g., Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

**\*2** An organization has standing "to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization also has "associational standing" to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 2 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

In the Complaint, Plaintiff alleges it has standing to bring this action both on behalf of itself and its members "because it is supporting many candidates in the Presidential, Senate, House, and numerous statewide elections" and will suffer immediate and irreparable injury if Defendants' alleged conspiracy to intimidate voters "succeeds in disrupting or changing the results of the election." (Compl. ¶ 14.) This is sufficient to establish Plaintiff's standing, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008), and Defendants do not challenge Plaintiff's standing to bring its claims in this matter.

### B. Mr. Stone's Motion to Dismiss for Lack of Service and Jurisdiction

At the Hearing, Mr. Stone, through counsel, moved to dismiss Plaintiff's claims against him for lack of service and lack of jurisdiction.[1] (Tr. at 43.) Since then, Plaintiff has filed a certificate of service with regard to Mr. Stone (Doc. 26), so the Court will deny as moot his motion with regard to service. The Court addresses his motion with regard to jurisdiction here.

In order for a federal court to adjudicate a matter, it must have jurisdiction over the parties. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). The party bringing the action has the burden of establishing that personal jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). When a defendant moves, prior to trial, to dismiss a complaint for lack of personal jurisdiction, the plaintiff must " 'come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.' " *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

Because there is no statutory method for resolving the question of personal jurisdiction, "the mode of determination is left to the trial court." *Data Disc*, 557 F.2d at 1285 (citing *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939)). Where, as here, a court resolves the question of personal jurisdiction upon motions and supporting documents, the plaintiff "must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss." *Id.* In determining whether the plaintiff has met that burden, the "uncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted).

**\*3** To establish personal jurisdiction over a nonresident defendant, a plaintiff must show that the forum state's long-arm statute confers jurisdiction over the defendant and that the exercise of jurisdiction comports with constitutional principles of due process. *Id.*; *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long-arm statute allows the exercise of personal jurisdiction to the same extent as the United States Constitution. *See* Ariz. R. Civ. Proc. 4.2(a); *Cybersell v. Cybersell*, 130 F.3d 414, 416 (9th Cir. 1997); *A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995) (stating that under Rule 4.2(a), "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution"). Thus, a court in Arizona may exercise personal jurisdiction over a nonresident defendant so long as doing so accords with constitutional principles of due process. *Cybersell*, 130 F.3d at 416.

Due process requires that a nonresident defendant have sufficient minimum contacts with the forum state so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Data Disc*, 557 F.2d at 1287. Courts recognize two bases for personal jurisdiction within the confines of due process: "(1) 'general jurisdiction' which arises when a defendant's contacts with the forum state are so pervasive as to justify the exercise of jurisdiction over the defendant in all matters;[2] and (2) 'specific jurisdiction' which arises out of the defendant's contacts with the forum state giving rise to the subject litigation." *Birder v. Jockey's Guild, Inc.*, 444 F. Supp. 2d 1005, 1008 (C.D. Cal. 2006).

Here, Plaintiff contends that the Court has specific jurisdiction over Mr. Stone through his actions in conjunction with and as a volunteer for Stop the Steal. The issue of whether specific jurisdiction will lie turns on the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006). The Ninth Circuit uses the following approach in making this evaluation: (1) the nonresident defendant must do

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 3 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

some act in or consummate some transaction with the forum, or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable. *Data Disc,* 557 F.2d at 1287. All three requirements must be satisfied for the exercise of jurisdiction to comport with constitutional principles of due process. *Omeluk,* 52 F.3d at 270. The plaintiff bears the burden of establishing the first two prongs of the test. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff does so, the burden shifts to the defendant to set forth a "compelling case" that the exercise of jurisdiction would be unreasonable. *Mavrix Photo, Inc. v. Brand Tech's., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-78 (1985)).

With regard to the first element, the plaintiff must show the defendant "either (1) 'purposefully availed' himself of the privilege of conducting activities in the forum, or (2) 'purposefully directed' his activities toward the forum." *Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Schwarzenegger,* 374 F.3d at 802). The Ninth Circuit has explained that in cases involving tortious conduct, as here, the purposeful direction analysis is most commonly applied. *Mavrix Photo,* 647 F.3d at 1228. Purposeful direction is determined by using the "effects" test that was developed in *Calder v. Jones,* 465 U.S. 783, 789-90 (1984). The effects test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!*, at 1206.

*4 A defendant's intentional act in the forum state does not necessarily have to be wrongful or tortious. "In any personal jurisdiction case we must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo!,* 433 F.3d at 1207. Courts must consider "the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts. A strong showing on one axis will permit a lesser showing on the other." *Id.* at 1210.

Plaintiff alleges and proffers some evidence that Mr. Stone and Stop the Steal have "engaged in the recruitment of individuals to come into the State of Arizona for the purpose of engaging in election monitoring and exit poll activities on Election Day in Arizona," including signing up 107 volunteers as of November 1, 2016, and that Mr. Stone has publicly and repeatedly tied himself to Stop the Steal. (Tr. at 47-50; Reply to STS at 3-6.) Though Mr. Stone's counsel argued that Mr. Stone is distinct from Stop the Steal in terms of these actions (Tr. at 46), Mr. Stone produced no evidence to contradict Plaintiff's evidence. The Court finds that, through the acts of recruiting and organizing exit poll takers to come to Arizona polling places, Mr. Stone has sufficient contacts with Arizona. Furthermore, it is undisputed that Plaintiff's claims arise from those contacts. Because Mr. Stone made no argument that the Court's exercise of jurisdiction would be unreasonable, the Court finds it has jurisdiction over Mr. Stone in this matter. Accordingly, the Court will deny Mr. Stone's oral motion to dismiss on that basis.

**C. Plaintiff's Motion for Injunctive Relief**

The Supreme Court has observed that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (internal quotation and citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (citations omitted); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). The Ninth Circuit Court of Appeals, employing a sliding scale analysis, has also stated that, where there are "serious questions going to the merits" such that a plaintiff has not necessarily demonstrated a "likelihood of success," "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1085 (9th Cir. 2013) (internal quotations and citations omitted).

**1. Likelihood of Success on the Merits**

Plaintiff brings claims under both the Voting Rights Act and Ku Klux Klan Act. Section 11(b) of the Voting Rights Act provides, "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).[3] The statute does not exclude a private right of action for injunctive relief, as Plaintiff has brought here.

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 4 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

*Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *see also* 28 U.S.C. § 1343(a)(4).

***5** The Ku Klux Klan Act provides that an injured party has a right of action for recovery of damages against a person who, with another person, "conspire[s] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States." 42 U.S.C. § 1985(3).[4]

Arizona law also includes an anti-voter intimidation provision, which states it is a class 1 misdemeanor for a person, directly or indirectly, to knowingly "practice intimidation" or "inflict or threaten infliction" of "injury, damage, harm or loss" in order "to induce or compel" a voter "to vote of refrain from voting for a particular person or measure at any election provided by law, or on account of such person having voted or refrained from voting at an election." A.R.S. § 16-1013. In addition, Arizona more stringently controls the area within 75 feet of a polling place as posted by election officials. A.R.S. § 16-515. At any time the polls are open (except for the purpose of voting and for election officials), only "one representative[5] at any one time of each political party represented on the ballot who has been appointed by the county chairman of that political party and the challengers allowed by law" may be present within the 75-foot limit, and "[v]oters having cast their ballots shall promptly move outside" the 75-foot limit. A.R.S. § 16-515(A). Election officials, party representatives and challengers authorized by law to be within the 75-foot limit "shall not wear, carry or display materials that identify or express support for or opposition to a candidate, a political party or organization, a ballot question or any other political issue and shall not electioneer" within the 75-foot limit. A.R.S. § 16-515(F). The statute defines "electioneering" as expressing support for or against a political party, candidate or ballot measure "knowingly, intentionally, by verbal expression and in order to induce or compel another person to vote in a particular manner or refrain from voting." A.R.S. § 16-515(I). The statute also provides that no person shall take photographs or videos while within the 75-foot limit. A.R.S. § 16-515(G). A violation of any of these provisions is a class 2 misdemeanor. A.R.S. § 16-515(H).

For Plaintiff's claim under the Voting Rights Act, Plaintiff must demonstrate that Defendants acted or attempted to intimidate, threaten or coerce a person for voting or attempting to vote; similarly, for Plaintiff's claim under the Ku Klux Klan Act, Plaintiff must demonstrate that Defendants conspired to prevent a person from voting through force, intimidation or threat. Plaintiff claims that Defendants' statements to their constituents urging them to be present and observe the activities of other voters at polling places, to follow other voters and interrogate them as to their votes, to record other voters' license plates, to photograph and video-record other voters, and to call 911 if they suspect someone has engaged in voter fraud constitute at least an attempt to intimidate and/or threaten voters for voting or attempting to vote. (*E.g.*, Compl. ¶¶ 49, 51, 58.) Plaintiff also claims that the plan by Mr. Stone and Stop the Steal to conduct exit polls at carefully selected polling places is merely a pretext for intimidating minority voters. (*E.g.*, Compl. ¶¶ 36-39.)

### a. Statements of the Arizona Republican Party

***6** In conjunction with its claims against ARP, Plaintiff proffers evidence that, in a press release, ARP Chairman Robert Graham stated that the party's credentialed poll watchers "will be the eyes and ears of the GOP to look for those who show up with multiple ballots." (Doc. 11-2 at 6-8, Gonski Decl. Ex. 2.) Acknowledging that state law prohibits talking to voters or taking photographs in polling places, Mr. Graham stated that credentialed poll watchers are "still free to follow voters out into the parking lot, ask them questions, take their pictures and photograph their vehicles and license plate." (Gonski Decl. Ex. 2.) ARP spokesman Tim Sifert added that credentialed poll watchers are "free to go outside that 75-foot limit" and "[t]hat's where they can turn on their phone to take video or pictures or something like that." (Gonski Decl. Ex. 2.) Mr. Graham also stated that, if they believe a felony is in progress, credentialed poll watchers can call 911. (Gonski Decl. Ex. 2.) Plaintiff claims that these statements amount to a call for ARP's credentialed poll watchers to intimidate voters at polling places. Moreover, Plaintiff points to evidence that ARP is flooded with requests from people who would like to become credentialed poll watchers in the upcoming election—some of whom, Plaintiff asserts, the Trump Campaign recruited—to argue that ARP is cooperating with the Trump Campaign to intimidate voters on a wide scale.

Mr. Graham and Mr. Sifert made their statements in the context of a new Arizona law, A.R.S. § 16-1005(H)-(I), which prohibits a practice called "ballot harvesting," or collecting other people's ballots (with some exceptions, including family members and caregivers) and delivering them to polling places.[6] The press release makes the

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 5 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

context of the ARP officials' statements clear; Mr. Graham states that the ARP's credentialed poll watchers are looking "for those who show up with multiple ballots." (Gonski Decl. Ex. 2.) Contrary to Plaintiff's suggestion, nothing in these officials' statements to the press indicates that ARP is training or otherwise instructing its credentialed poll watchers, or anyone else, to follow voters to their cars or take their photographs for reasons other than suspected ballot harvesting. Both officials also state that Arizona law prohibits talking to voters or taking photographs at polling places, that is, within the 75-foot limit. (Gonski Decl. Ex. 2; *see also* Doc. 25, Transcript of Nov. 3, 2016 Hearing ("Tr.") at 71-72.)

At the Hearing, Mr. Graham testified that the Arizona Republican Lawyers Association ("ARLA") trains ARP's credentialed poll watchers and is responsible for the contents of the training manual. (Tr. at 58, 64-65.) He confirmed that ARP has received requests from approximately 1,000 people to be poll watchers for this election, compared to approximately 200 in past elections, but that ARP does not have the resources to train all of those interested before this election and those not trained will not become credentialed poll watchers. (Tr. at 59, 69.) Mr. Graham stated that in his time with ARP, there has never been an issue with credentialed poll watchers acting improperly in past elections. (Tr. at 71.) He also stated that ARP's credentialed poll watching program is provided for by law—the same as in past elections—and that ARP is not coordinating with the Trump Campaign or anyone else to organize any other poll watching activities. (Tr. at 57, 68, 71, 76-77.) Indeed, Mr. Graham testified that he had never heard of Stop the Steal or Mr. Stone before this lawsuit. (Tr. at 73-74.) Mr. Graham confirmed that his statements in the press were specifically aimed at the new ballot harvesting law and that, if the Ninth Circuit strikes down the ballot harvesting prohibition, ARP would instruct credentialed poll watchers not to photograph voters dropping off multiple ballots.[7] (Tr. at 72.) The Court heard no evidence of a broad conspiracy to intimidate voters through poll watching, as claimed by Plaintiff, or a plan by ARP to train or otherwise organize poll watchers with the Trump Campaign, Stop the Steal or Mr. Stone.

**\*7** Walter Opaska testified on behalf of ARLA, which has taken on the responsibility of training credentialed poll watchers for the Republican Party in Arizona. (Tr. at 81.) Mr. Opaska stated that ARLA trains credentialed poll watchers never to talk to or confront voters and not to lodge a "challenge" as provided for by law against any voter. (Tr. at 87-88.) Mr. Opaska stated that credentialed poll watchers do not have the authority to enforce the now stricken ballot harvesting law, or any other law, and if they suspect a voter is breaking the law, they are to report it to the elections inspector. (Tr. at 88-90.) He tells credentialed poll watchers that they may discreetly take photos or videos of a person suspected of breaking the law outside the 75-foot limit but never to interact with a voter. (Tr. at 87, 90-91.) While the training manual for credentialed poll watchers states that a voter could be suspected of ballot harvesting if he or she brings in three or more ballots, Mr. Opaska stated that he instructed credentialed poll watchers only to be suspicious of voters who come to the polling place with "10, 20, a box load of ballots"—an instruction that is no longer meaningful in the absence of a ballot harvesting prohibition. (Tr. at 86, 90.) He stated that, in the years he has been involved in the program, there has never been a report that a credentialed poll watcher for the Arizona GOP challenged a voter. (Tr. at 94.) The Court heard no evidence that ARP is affiliated with training poll watchers to engage in any activities that would on their face constitute intimidation, threat, coercion or force against any voter for voting or attempting to vote.

In its brief filed after the Hearing, Plaintiff provides a screen-shot of a page from ARP's website that states, "If you observe anything improper or illegal at the polls on Election Day please use this form to report it to the Arizona Republican Party. Submit any photos, videos, or other materials as evidence. Thank you for your service to ensure the integrity of elections in Arizona!" (Reply to STS at 3; Ex. 3.) Plaintiff argues that this statement contemplates activity beyond that which ARP claims it proscribes, both by encouraging members of the public to be uncredentialed observers at polling places by taking photos or videos of perceived illegal activity and by failing to advise uncredentialed observers that no photos or videos can be taken within the 75-foot limit. (Reply to STS at 3.) On its face, there is nothing untoward about telling members of the public to say something if they witness the law being broken, and ARP's website does not exhort action for any specific perceived crime or against any specific type of person or group. The Court thus sees no obvious tie between the statement on the website and intimidation, threat, coercion or force against any voter for voting or attempting to vote. Moreover, Arizona law already provides that no photographs or videos can be taken within the 75-foot limit—a rule that everyone is obligated to follow—and ARP's website is not telling uncredentialed observers to break the law.[8]

Plaintiff likens ARP's statements regarding following and photographing a narrow group of voters suspected of ballot harvesting or breaking the law to actions that the District of South Dakota enjoined in the context of a prior

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 6 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

election in *Daschle v. Thune*, No. 04-CV-4177 (D.S.D. Nov. 2, 2004). There, the court received evidence that individuals acting on behalf of the defendants in that case followed Native American voters from the polling places and copied or otherwise recorded their license plate numbers, and that the conduct resulted in intimidation of Native American voters, particularly through the resulting word of mouth among the Native American population. *Id*. The two cases are not similar, however. There, the defendants had already taken actions against a group of voters that the group already perceived as intimidation, and the court had evidence that defendants' actions were likely to suppress the vote. Here, Plaintiff produced no evidence that ARP's actions will result in voter intimidation. Indeed, although ARP publicly condoned the idea that its credentialed poll watchers could follow and photograph a voter outside the 75-foot limit in the narrow instance in which the voter was suspected of violating Arizona's new ballot harvesting law, that law is no longer valid. Credentialed poll watchers are trained not to talk to, confront, or interact in any way with the voter. ARP's public statements with regard to following and photographing voters outside the 75-foot limit were made only in the context of helping law enforcement enforce the now-invalid ballot harvesting law and could not reasonably have been read to address voters generally, much less intimidate them. Moreover, credentialed poll watchers for both political parties are established and regulated by Arizona law, and there is no evidence of even a single incident between a credentialed poll watcher and voter since at least 2006—the period of time Mr. Opaska has been involved with the ARLA credentialed poll watcher training.

**\*8** With regard to the statement on ARP's website, it is tailored to recording somebody suspected of breaking the law and it is not on its face tied to voter intimidation. The Court also heard no evidence of coordination between ARP and the other Defendants such that statements of the other Defendants could be tied to ARP. As a result, the Court cannot find that Plaintiff is likely to succeed in showing ARP's statements constitute intimidation, threat, coercion or force against voters for voting or attempting to vote in violation of the Voting Rights Act and/or the Ku Klux Klan Act.

### b. Statements of the Trump Campaign

In its pleadings, moving papers and presentation to the Court, Plaintiff identified various statements made by the candidate, his surrogates and campaign officials that, it argues, show both an intent on the part of the Trump Campaign to intimidate voters and intimidation in fact. Plaintiff pointed to an unnamed Trump Campaign official recently telling reporters that "[w]e have three major voter suppression operations under way," which Plaintiff summarized as targeting "Latinos, African Americans, and other groups of voters." (Compl. at 1.) It introduced news articles relating Mr. Trump's own statements at campaign rallies and before the media that the election is "rigged" and that widespread voter fraud will favor his opponent. Plaintiff relates additional statements by Mr. Trump to his supporters that, "[a]s opposed to somebody coming up and voting 15 times for Hillary[,] I will not tell you to vote 15 times. I will not tell you to do that. You won't vote 15 times, but people will. They'll vote many times, and how that could have happened is unbelievable." (Gonski Decl. Ex. 18.)

During a speech given in Pennsylvania, Mr. Trump told attendees, "I hope you people can sort of not just vote on the eighth [but] go around and look and watch other polling places and make sure that it's 100 percent fine.... Go down to certain areas and watch and study, make sure other people don't come in and vote five times." (Gonski Decl. Ex. 11.) The following week, while exhorting followers to "go out and watch" for voter fraud, Mr. Trump told attendees, "[a]nd when I say 'watch,' you know what I'm talking about, right?" (Gonski Decl. Ex. 19.) In Michigan, the candidate told those present to "[g]o to your place and vote, then go pick some other place, and go sit there with friends and make sure it's on the up and up." (Gonski Decl. Ex. 20.)

Plaintiff introduced as evidence additional media reports that campaign spokespersons were to emphasize talking points stating, among other things, "We have [ ]seen very significant recent voting irregularities across the country from Pennsylvania to Colorado and an increase in unlawful voting by illegal immigrants"; "Non-citizen votes may have been responsible for Barack Obama's narrow margin of victory in North Carolina in 2008"; and, "More than 14 percent of non-citizens surveyed in 2008 and 2010 [ ] said they were registered to vote." (Gonski Decl. Ex. 10.)

Finally, Plaintiff provided pages from the Trump Campaign website where those interested could "Volunteer to be a Trump Election Observer" to "Help [Trump] Stop Crooked Hillary From Rigging This Election," which had fillable fields asking for an entrant's name, contact information and date of birth. (Gonski Decl. Ex. 3.) From the above statements, talking points and webpage, Plaintiff urges the conclusion that the Trump Campaign has intimidated, threatened or coerced persons for voting, or attempts to so intimidate, threaten

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 7 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

or coerce such persons in violation of the Voting Rights Act. Plaintiff also urges the conclusion that the Trump Campaign and its co-Defendants have conspired to prevent voters from voting by intimidation or threat, or to injure them for voting, in violation of the Ku Klux Klan Act.

***9** Plaintiff's evidence regarding the Trump Campaign is insufficient to demonstrate a likelihood of success on the merits of either its Voting Rights Act claim or its Ku Klux Klan Act claim. First, at least some of the Trump Campaign's statements on which Plaintiff relies are taken out of context because they were abbreviated, and when considered in full, do not persuade at all that they evince an intent to intimidate voters, or to coordinate or conspire with others to deny the vote to anyone; nor when read in full would the statements have the effect of intimidating a voter. The quote that the campaign had "three major voter suppression operations underway," which Plaintiff summarizes as against Latinos, African Americans, and others, without more, leads a reader to conclude that the "suppression" referred to is to be achieved by denying the vote to certain groups, and that the only groups being "suppressed" are minority voters. A reading of the full text of the article provides a different meaning:

> "We have three major voter suppression operations under way," says a senior official. They're aimed at three groups Clinton needs to win overwhelmingly: idealistic white liberals, young women, and African Americans. Trump's invocation at the debate of Clinton's WikiLeaks e-mails and support for the Trans-Pacific Partnership was designed to turn off Sanders supporters. The parade of women who say they were sexually assaulted by Bill Clinton and harassed or threatened by Hillary is meant to undermine her appeal to young women. And her 1996 suggestion that some African American males are "super predators" is the basis of a below-the-radar effort to discourage infrequent black voters from showing up at the polls—particularly in Florida.

*Inside the Trump Bunker, With Days to Go*, Joshua Green and Sasha Issenberg, Bloomberg Business, October 27, 2016. The full text makes clear the speaker uses the word "suppression" to describe efforts to persuade voters not to vote for Hillary Clinton by pointing out issues on which the Trump Campaign believes her positions do not appeal to those voter demographic groups—not any effort to deny the vote by intimidation or otherwise. The quote also makes clear that the Trump Campaign is targeting its arguments against voting for Ms. Clinton to groups beyond minorities. The quotation from the unnamed campaign official is not persuasive of any element of proof required here.

Second, whether true or false, and whether appealing or repugnant to the listener, Mr. Trump's and his agents' statements that the election is rigged, that voter fraud is being perpetrated *en masse* by "illegal aliens," and that his supporters should go to polls and watch to ensure a fair election, without more, simply do not prove actual or likely intimidation. One can seriously question the wisdom of stirring up supporters about a controversial issue, encouraging them to go to a precinct that is not their own, and telling them to look for "voter fraud" without defining what it is, leaving individuals to their own devices to figure out how to go about that task.[9] If the objective of observing is to detect persons voting more than once, the fact that the observer is in a precinct not their own, whether in the next town or the next state, only adds to the difficulty of recognizing a voter coming through the line more than once. And if the objective of observing, as strongly suggested by the candidate's statements, is to detect persons attempting to vote who are ineligible because they are not citizens, it is beyond question that no one can tell a person's citizenship based on what that person looks like or sounds like. But whatever the shortcomings of the Trump Campaign's statements on this issue might be, simply arguing there is voter fraud and urging people to watch out for it is not, without more, sufficient to justify the extraordinary relief that an injunction constitutes.

***10** Plaintiff bears the burden of providing the evidence to take its claims from a nebulous concern over Defendants' statements, to a likelihood that the named Defendants and those acting in concert with them will intimidate, threaten, coerce, or attempt to intimidate, threaten or coerce, voters. Plaintiff has produced no evidence that anyone who signed up on the Trump Campaign website was ever contacted to follow up or connect them with a polling place. It produced no evidence that the Trump Campaign organized, trained or otherwise facilitated any volunteer's actual attendance at a polling place as an observer, in Arizona or elsewhere. It produced no evidence of any specific actions that observers would take, things they would say, or other facts that would allow the Court to evaluate whether such actions or statements could or would constitute intimidation, instead inviting the Court to conclude that the Trump Campaign's general exhortations to watch polling places is enough, and largely to speculate about what will come of them.

Plaintiff produced no evidence that the Trump Campaign had engaged in voter intimidation in Arizona in the past. And despite that early in-person voting has been ongoing in Arizona for over three weeks, it produced no evidence

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 8 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

of any attempts at voter intimidation, or any voter reporting they felt intimidated, during this cycle. This places the instant case in vastly different territory than *Daschle v. Thune*, where, as discussed above, the court had before it concrete examples of voter intimidation by the defendants' supporters that had actually occurred during early voting, thus removing any air of speculation about likelihood of harm to voters or the plaintiff.[10]

Without any of these several types of evidence, the Court is unable to evaluate in any meaningful way the likelihood of the harm Plaintiff urges will occur in terms of actual or attempted voter intimidation as a result of the Trump Campaign's statements. For that reason, Plaintiff is unlikely to succeed on the merits of its Voting Rights Act claim. Nor is Plaintiff likely to succeed on the merits of its claim under the Ku Klux Klan Act, as it has not presented sufficient evidence of a conspiracy between the Trump Campaign and any co-Defendant to suppress votes in Arizona. As discussed above, the uncontroverted evidence at the hearing was that ARP did not communicate with the Trump Campaign on this topic and that the poll watching manual made available to all credentialed Republican poll watchers advises them not to contact voters directly and states that as a general matter, credentialed poll watchers do not challenge voters.

As for Defendants Stop the Steal and Mr. Stone, whatever communications may occur between them and the Trump Campaign, Plaintiff has not produced evidence sufficient to persuade the Court that they have conspired to intimidate voters, based on the same analysis as above. The Court agrees with Plaintiff's counsel that it may make inferences from what evidence exists. But at some point the inferences become so attenuated as to be speculative. In the Court's judgment, based on the evidence before it, the inferences necessary to reach a conclusion that there is a conspiracy to intimidate voters have reached the point of speculation.

### c. Statements of Stop the Steal and Mr. Stone

Plaintiff has proffered evidence that Stop the Steal's planned exit polling is illegitimately designed to target Democratic-leaning and majority-minority districts, rather than legitimate exit polling, which requires broad geographical distribution to produce unbiased, reliable results. (Doc. 12, Mellman Report and Decl. at 1.) This may be true. However, as Stop the Steal's counsel iterated, there is no requirement that exit polls be scientific. (Tr. at 158-59 ("Stop the Steal isn't required to be scientific. It's not even required to succeed. It may fail.").) Nor is Stop the Steal or Mr. Stone required to operate a polling firm in order to conduct exit polling. There is no law or regulation requiring any exit polling to be standardized, reliable, or to serve any purpose, much less a legitimate one—only that it not serve an expressly illegitimate one. Therefore, it is not for the Court to decide whether or not resultant information may be of use. Instead, the Court must determine whether or not such activity, be it called "exit polling" or anything else, violates voters' rights.

**\*11** At base, Stop the Steal is not prohibited from conducting exit polling, so long as it does so in accordance with all applicable laws and regulations. *See Daily Herald Co. v. Munro*, 838 F.2d 380, 390 n.8 (9th Cir. 1988) (upholding District Court's finding that exit polling did not interfere with citizens' right to vote without showing that polling was disruptive, intended to interfere with any voter's rights, or that someone did not vote or voted differently due to polling). Unscientific, targeted, unreliable, and even useless exit polling, by itself, does not violate any voters' rights. Without a demonstration that Stop the Steal's planned exit polling is likely to intimidate, the Court may not enjoin it from conducting its polling. Plaintiff has failed to proffer any evidence that any voter is likely to be intimidated, threatened, or coerced due to the polling. Instead, Plaintiff offers conclusory statements based only on the purported motivation of Stop the Steal and its members. If Stop the Steal does intend to conduct its polling only at Democratic-leaning or majority-minority districts, its actions are facially suspicious. And neither Stop the Steal nor Mr. Stone have offered legitimate reasons for conducting polling in those targeted locations. But Plaintiff does not offer the vital evidentiary components that would allow the Court to infer likely or intended intimidation: precisely what Stop the Steal plans to do, where it plans to do it, how such conduct will intimidate voters, or even if the exit polling will ultimately occur. (Mellman Report and Decl. at 1.) The factually unsubstantiated, though informed, opinion of Plaintiff's expert does not obviate the need for further evidence of either Stop the Steal's alleged stratagem to intimidate non-white voters, or indeed any evidence of what Stop the Steal will do at the polls. Without such evidence, the Court cannot evaluate whether Stop the Steal's activities might constitute intimidation or not.

Plaintiff has also produced evidence that Stop the Steal and Mr. Stone recruited and mobilized groups of volunteers known as "vote protectors," who are encouraged to identify themselves as reporting for vote protectors, approach voters at the polls, and inquire about election fraud. (Gonski Decl. at Ex. 23;

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 9 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

http://stopthesteal.org.) Plaintiff also alleges that Mr. Stone is using social media to urge potential uncredentialed observers to wear red shirts on Election Day. (Compl. ¶ 35.) However, there is no prohibition regarding the clothing of uncredentialed observers at polling locations, nor has Plaintiff provided any legal precedent holding that such activity is unconstitutional, likely to intimidate voters, or will otherwise hinder voter participation. Neither the encouragement of the activities alleged, nor the activities themselves are *per se* prohibited. It is Plaintiff's burden to illustrate that these activities are likely to intimidate, threaten, or coerce voters. The evidence educed has failed to do so.

### 2. Likelihood of Irreparable Harm

While a large portion of ARP and the Trump Campaign's brief focuses on what is purportedly the second part of the four-factor test (GOP Resp. at 4-7), they instead articulate that there is no evidence that the alleged harms have occurred or are likely to occur. This argument is properly placed in the first part of the four-factor test—likelihood of success on the merits. In analyzing the irreparable harm factor, the Court does not assess the likelihood that such harm will occur, but, if such harm does occur, whether it will be irreparable.

In doing so, it is clear that abridgement of the right to vote constitutes irreparable injury. *Reynolds v. Sims*, 377 U.S. 533, 562 (the right to vote is "a fundamental political right, because [it] is preservative of all rights"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' ") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote ... constitutes irreparable injury.") (internal citation omitted). Consequently, if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff would be irreparably harmed. Further, if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact. This factor weighs in favor of a preliminary injunction.

### 3. Balance of Equities and the Public Interest

**\*12** Because Plaintiff brings this action not only on behalf of the Arizona Democratic Party, but also unidentified potential voters (*see, e.g.*, Mot. at 15-16), and ARP and the Trump Campaign purport to oppose the injunction due to its effect on unknown third-parties (GOP Resp. at 7-10), the Court will collapse the final two factors into a single category. *See Arizona Dream Act Coal. v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2016) (analyzing both public interest and equities factors simultaneously); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011) ("we consider together the final two elements of the preliminary injunction framework—the public interest and the balance of the equities"); *Merced v. Spano*, No. 16CV3054 (SJ) (SMG), 2016 WL 3906646, at \*2 (E.D.N.Y. July 14, 2016) ("The remaining elements (irreparable harm, balance of the equities and public interest) will be discussed together because in this instance, they are intertwined."). Analyzing factors three and four in unison, the Court must balance both Plaintiff's and the public's interest in protecting voters from undue influence, intimidation, or coercion, against Defendants' poll observing rights and right to free speech under the First Amendment.

As stated, the right to vote is a fundamental one, *Reynolds*, 377 at 562, the preservation of which is compelling. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191 (1992). Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) ("There is no doubt that the right to vote is fundamental ..."). The Supreme Court has consistently held that the states, too, have a compelling interest in maintaining the integrity of the voting place and preventing voter intimidation and confusion. *Burson v. Freeman*, 504 U.S. 191, 198 (1992); *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). Accordingly, both Plaintiff and the public have a strong interest in allowing every registered voter to do so freely.

On the other hand, the Court acknowledges that Plaintiff's injunction, as requested, raises First Amendment concerns. Just as the right to vote is a fundamental one, so too is the right to political speech and the right to associate. *See, e.g.*, *Mills v. Alabama*, 384 U.S. 214,

Case 1:17-cv-01370-ESH   Document 57-1   Filed 05/18/18   Page 10 of 11

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

218-19 (1966) ("there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs ... [including] discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes"); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 146 (2d Cir. 2000) ("The right to political association also is at the core of the First Amendment, and even practices that only potentially threaten political association are highly suspect.") (internal quotation and citation omitted). While the Court may only enjoin Defendants and their co-conspirators, if any, the injunction may nonetheless have a chilling effect on protected First Amendment speech by others. Indeed, Plaintiff has not provided the Court with a narrowly tailored injunction that would not unintentionally sweep within its ambit other activities that constitute exercise of freedom of speech. *See, e.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013) ("An overbroad injunction is an abuse of discretion."); *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) ("one basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits") (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444 (1974)); *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("an injunction should not impose unnecessary burdens on lawful activity").

**\*13** The Court also acknowledges that Plaintiff's requested injunction may further impinge on state-created rights or freedoms regarding poll observation. However, the injunction issued, if any, would only instruct both credentialed poll watchers and uncredentialed observers alike to follow the law as prescribed, and for any training given to credentialed poll watchers to similarly guide its trainees. Further, poll watching is not a fundamental right that enjoys distinct First Amendment protection and it does not carry the same implications as the preceding rights. *See, e.g.*, *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching is not incidental to this right and has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1161–62 (N.D. Ill. 1983) (holding that the act of poll watching is not protected by the First Amendment). Ultimately, each side implicates vital rights central to our system of government. Because the right to vote is sacrosanct and preservative of all other rights, the hardship balance and public interest factors weigh slightly in favor of granting Plaintiff's Motion.

**II. CONCLUSION**

The Court finds that Defendant Mr. Stone has sufficient contacts with Arizona and that Plaintiff's claims arise from those contacts, such that the Court has jurisdiction over Mr. Stone in this matter. The Court also finds that Plaintiff has not demonstrated it is likely to succeed in showing the statements and actions of Defendants to-date constitute intimidation, threat, coercion or force against voters for voting or attempting to vote in violation of the Voting Rights Act and/or the Ku Klux Klan Act. Moreover, Plaintiff has not shown the likelihood of a conspiracy as required for its Ku Klux Klan Act claim. Plaintiff is thus not likely to succeed on the merits for either of its claims against Defendants. Although Plaintiff has demonstrated (1) a likelihood of irreparable injury if Defendants violate the Voting Rights Act and/or the Ku Klux Klan Act prior to or on Election Day; (2) that the balance of equities tips slightly in its favor; and (3) that, in such an instance, an injunction would be in the public interest, the Court must deny Plaintiff's request for injunctive relief before Election Day based on the record before the Court. The parties may continue to raise issues to this Court through Election Day if they receive additional, material evidence.

**IT IS THEREFORE ORDERED** denying Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 10).

**IT IS FURTHER ORDERED** denying as moot Defendant Roger J. Stone, Jr.'s oral motion to dismiss for lack of service and denying his oral motion to dismiss for lack of jurisdiction (*see* Doc. 24; Doc. 25, Tr. at 43).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8669978

---

Footnotes

1   The Court denied a similar motion brought by Defendant Stop the Steal at the Hearing. (Tr. at 52.)

2   Plaintiff does not attempt to provide facts to support a finding of general jurisdiction over Mr. Stone.

**Arizona Democratic Party v. Arizona Republican Party, Not Reported in Fed. Supp. (2016)**
2016 WL 8669978

| | |
|---|---|
| 3 | ARP and the Trump Campaign argue that an action under Section 11(b) of the Voting Rights Act requires a showing that a defendant intended to intimidate, threaten or coerce or attempt to intimidate, threaten or coerce a person for voting or attempting to vote. (GOP Resp. at 22 (citing *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985)).) Plaintiff argues that an action under Section 11(b) only requires that a defendant intended to act, with the result that the actions intimidate, threaten or coerce or attempt to intimidate, threaten or coerce a person for voting or attempting to vote. (Reply to GOP at 4 (citing Section 11(b) of the Voting Rights Act); Reply to STS at 7-9.) While the Court agrees with Plaintiff that the plain language of the statute does not require a particular *mens rea*, the Court need not decide this question to resolve Plaintiff's Motion. |
| 4 | ARP and the Trump Campaign argue that an action under 42 U.S.C. § 1985(3) requires a showing of racial animus and that the specific provision invoked by Plaintiff—the "support and advocacy clause"—cannot be applied against a non-state actor. (GOP Resp. at 17-19.) Plaintiff disagrees on both counts. (Reply to GOP at 4-8.) Again, the plain language of the statute does not require either of the elements proposed by ARP and the Trump Campaign. For the purpose of resolving Plaintiff's Motion, the Court presumes application of the "support and advocacy clause," like the other clauses in 42 U.S.C. § 1985(3), to ARP and the Trump Campaign as non-state actors. The Court need not read into the statute a racial animus requirement to resolve Plaintiff's Motion. |
| 5 | For the purposes of this Order, the Court refers to these representatives provided for by statute and duly appointed as "credentialed poll watchers." The Court refers to those persons present to observe activities at a polling place who are not appointed under the statute as "uncredentialed observers." |
| 6 | The day after the Hearing, an *en banc* panel of the Ninth Circuit Court of Appeals ruled that the statute is constitutionally infirm and struck it down in Ninth Circuit Case No. 16-16698, Order dated Nov. 4, 2016. (*See* Reply to STS at 2.) |
| 7 | After the Ninth Circuit did strike the ballot harvesting law, ARP filed a Notice (Doc. 30-2) that it was informing its credentialed poll watchers via its website not to follow or photograph voters suspected of ballot harvesting or, indeed, any voter. |
| 8 | After the Ninth Circuit struck the ballot harvesting law, ARP filed a Notice declaring that it removed the subject page from its website. (Doc. 30-2.) |
| 9 | Indeed, among other evidence, Plaintiff produces a Tweet from a Trump supporter in Florida stating he planned to be "wear'n red at polls," "watch'n fer shenanigans," and "haul ya away," accompanied by a photo of a pickup truck and a person-sized cage built in the bed, surrounded by American flags. (Gonski Decl. Ex. 7.) An Ohio supporter stated, "it's called racial profiling. Mexicans. Syrians. People who can't speak American. I'm going to go right up behind them. I'll do everything legally. I want to see if they are accountable. I'm not going to do anything illegal. I'm going to make them a little bit nervous." (Gonski Decl. Ex. 6.) While these statements are deeply troubling, they do not illustrate an organized effort to intimidate voters in this jurisdiction, but rather appear to be outlier statements from other jurisdictions. Enjoining Defendants in this action is not likely to address those statements. |
| 10 | The Court notes, as have other district courts considering similar matters, that should evidence arise on or before November 8, 2016, demonstrating harm or likelihood of harm as a result of Defendants' actions, it would entertain renewal of Plaintiff's Motion. |

End of Document                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16-CV-1288 |
| NORTH CAROLINA REPUBLICAN PARTY, DONALD J. TRUMP FOR PRESIDENT, INC., ROGER J. STONE, JR., and STOP THE STEAL INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER**

This matter is before the Court on a motion for temporary restraining order and/or preliminary injunction filed by the plaintiff North Carolina Democratic Party. (Doc. 4). The plaintiff contends that the defendants are acting in concert to disrupt the upcoming election by intimidating voters in violation of the Voting Rights Act and the Ku Klux Klan Act of 1871. The plaintiff seeks injunctive relief prohibiting the defendants from encouraging individuals to serve as unofficial poll watchers, from monitoring polling places, from gathering or loitering within 50 feet of a polling place, and from photographing or otherwise intimidating voters.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail in the preliminary injunction motion, the plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it will likely

suffer irreparable harm absent an injunction; (3) the balance of equities weighs in its favor; and (4) the injunction is in the public interest.  *Id.* at 20.

Tomorrow, November 8, 2016, is Election Day, when voting will take place in North Carolina for the president, a United States senator, the governor, and numerous other public officials.  The plaintiff has presented evidence that the defendants are each organizing or encouraging volunteers to go to polling locations in North Carolina for the ostensible purposes of identifying and stopping voting fraud and conducting exit polling.  The plaintiff has presented evidence from which it asks the Court to infer that the real purpose and effect of these volunteer activities will be to intimidate minority voters.

While the statements of the defendant Roger Stone, the defendants' presidential nominee, and the nominee's surrogates, taken in context, may be susceptible to the interpretation that Mr. Stone and the Trump campaign are encouraging their supporters to intimidate voters, there is little evidence that supporters are acting on these indirect suggestions.  There have been only a handful of hearsay reports that purported supporters of the defendants' presidential nominee may have threatened or intimidated voters in North Carolina during several weeks of early voting.  The only evidence that the plaintiff has presented as to North Carolina are statements to news media by Mr. Stone that volunteers will conduct exit polling in Charlotte and Fayetteville, (Doc. 6-5 at 1); a report on a social media website that two supporters of the defendants' presidential nominee were seen near the Board of Elections office in Lee County with a baseball bat emblazoned with the nominee's name, (Doc. 6-30); and a handful of hearsay reports from a few counties that individuals purporting to be supporters of the defendants' presidential

nominee have harassed voters at early voting polling places.  (Doc. 8 at ¶¶ 3-9).  The Lee County incident has been explained under oath and does not appear to have been intimidating conduct.  (Doc. 11-1).  The only evidence that any of this conduct has intimidated a voter or suppressed the vote is a hearsay report that one voter in Wake County left a polling place without voting in order to avoid persons telling voters waiting in line to vote for the defendants' nominee "or else." (Doc. 8 at ¶ 4).  While there are additional reports nationwide, the evidence of such troubling "outlier statements" in other states is not particularly indicative that intimidation will occur in North Carolina.  *See Ariz. Democratic Party v. Ariz. Republican Party*, No. 2:16-CV-3752, slip op. at 17 n.9 (D. Ariz. Nov. 4, 2016) (order denying preliminary injunction).

      Even if all this evidence is credited, it is insufficient to establish a likelihood of success on the merits of the plaintiff's claims of a conspiracy by the defendants to train and encourage volunteers to intimidate voters in North Carolina.  Nor is it sufficient to establish the degree of irreparable harm required to obtain the broad injunctive relief the plaintiff seeks.

      Moreover, these statements by the nominee and others are also susceptible to the interpretation that these defendants are encouraging their supporters to report potential voter fraud.  There is nothing inherently intimidating about persons observing spaces outside polling places and reporting possible fraud to appropriate officials or to a hotline in a peaceful, non-threatening, and non-disruptive manner.  Supporters of particular candidates have long been allowed to encourage persons coming to the polls to vote a particular way, subject to reasonable space restrictions applicable to all.  Trust and

confidence in election results is important, and restricting persons supporting one candidate or party from access to spaces near polling sites when there is not substantial evidence that the persons will act to or have been trained or encouraged to intimidate voters is not conducive to such trust and confidence and raises significant First Amendment concerns. Intimidation of voters, intentional or otherwise, is already against the law, and persons violating those laws are already subject to criminal prosecution and civil damages.

That said, voters are entitled to cast their ballots without fear of reprisal or threat of physical harm. *See* 52 U.S.C. § 10307(b) (making it illegal for any person, "whether acting under color of law or otherwise," to "intimidate, threaten, or coerce . . . any person for voting"); 42 U.S.C. § 1985(3). On Election Day, if it becomes apparent that agents of any defendant or supporters encouraged by any defendant are making an effort to intimidate minority voters or to further incite intimidation of voters, the plaintiff may renew the motion.

It is **ORDERED** that the plaintiff's motion for a temporary restraining order and/or preliminary injunction, (Doc. 4), is **DENIED**, without prejudice should circumstances change.

This the 7th day of November, 2016.

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

FILED
NOV 0 2 2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| THOMAS A. DASCHLE, | \* | CIV 04-4177 |
| Plaintiff, | \* | |
| vs. | \* | TEMPORARY RESTRAINING ORDER |
| JOHN THUNE; SOUTH DAKOTA REPUBLICAN PARTY; and JOHN DOES 1-200, | \* | |
| Defendants. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Under the principles of *Bush v. Gore*, 531 U.S. 98 (2000), the Court finds that the Plaintiff Thomas A. Daschle has standing to bring the present action. The action shows that Plaintiff Daschle is suing on his behalf as well as on behalf of persons who are unable to protect their own rights, that being Native Americans, to vote in this South Dakota General Election. See also *Oti Kaga, Inc. v. South Dakota Housing Authority*, 342 F.3d 871, 881-82 (8th Cir. 2003), and cases cited therein.

Oral testimony, photographs, and arguments were presented by the Plaintiff and the Defendants concerning today's events in a hearing from 8:00 P.M. until 11:30 P.M. this evening. Due to the fact that the General Election voting commences at 7:00 A.M. tomorrow morning, the Court cannot prepare a more detailed opinion.

After receiving evidence on behalf of Plaintiff and Defendants in the form of oral testimony as well as photographs, the Court applies the four factor tests from *Dataphase Systems, Inc. v. CL Systems, Inc.*, 540 F.2d 109 (8th Cir. 1981), and concludes that there clearly is the threat of irreparable harm to the Movant in that if Native Americans are improperly dissuaded from voting, those voters normally simply disappear and there is no identifying most of them and even if

identified, they can't vote later. The harm that will be inflicted upon the Movant is far greater than any injury granting the temporary restraining order will cause Defendants. The Movant and the Native American voters whose rights are asserted by the Movant will suffer the irreparable harm described above while Defendants are only being required to follow the law. The Court does find that the Movant is more likely to succeed on the merits of the equal protection claim and the claims under 42 U.S.C. § 1973i(b) and 42 U.S.C. § 1985(3), as the Court finds that there was intimidation particularly targeted at Native American voters in Charles Mix County by persons who were acting on behalf of John Thune. The Eighth Circuit has ruled that injunctive relief is available under § 1985(3). *See Brewer v. Hoxie School District*, 238 F.2d 91 (8th Cir. 1956). Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters in Charles Mix County. This is a small Native American population within which word travels quickly. Finally, the public interest is served by having no minority denied an opportunity to vote. Accordingly,

IT IS ORDERED that a Temporary Restraining Order is entered against Joel C. Mandelman and all other Defendant John Does acting on behalf of John Thune in Charles Mix County prohibiting them from following Native Americans from the polling places and directing that they not copy the license plates of Native Americans driving to the polling places, or being driven to the polling places, and further directing that the license plates of Native Americans driving away from the polling places also not be recorded.

Dated this 2nd day of November, 2004.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
DEPUTY